Norton Rose Fulbright  US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Telefax: (212) 318-3400
Frank Taylor, Esq.
Francisco Vazquez, Esq.
Julie H. Firestone, Esq.
frank.taylor@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
julie.firestone@nortonrosefulbright.com
Attorneys for Fidelity  & Guaranty Life
Insurance Company

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| In re: | Chapter 7 |
| LEON LOWENTHAL, | Case No. 19-24115  (RDD) |
| Debtor | |

_____

_____

| | |
|---|---|
| FIDELITY AND GUARANTY LIFE INSURANCE COMPANY, | |
| Plaintiff, | |
| against | Adversary Case No. _____ |
| LEON LOWENTHAL, PROSPERITY LM, INC., PW INSURANCE AGENCY CORP., AND DOES 1-25, | |
| Defendants. | |

_____

**ADVERSARY COMPLAINT DETERMINING
THAT DEBTS ARE NOT DISCHARGEABLE
PURSUANT TO 11 U.S.C. §§ 523(A)(2)(A),
523(A)(4) AND 523(A)(6)**

## TABLE OF CONTENTS

                                                                        **Page**

NATURE OF THE ACTION.................................................................................. 3

JURISDICTION AND VENUE............................................................................. 6

FACTS COMMON TO ALL COUNTS ................................................................ 7

COUNT I  (11 U.S.C. § 523(a)(2)(A)).................................................................22

COUNT II  (11 U.S.C. § 523(a)(4)).....................................................................25

COUNT III  (11 U.S.C. § 523(a)(6)) ...................................................................27

**ADVERSARY COMPLAINT DETERMINING
THAT DEBTS ARE NOT DISCHARGEABLE
PURSUANT TO 11 U.S.C. §§ 523(A)(2)(A),
523(A)(4) AND 523(A)(6)**

Plaintiff Fidelity & Guaranty Life Insurance Company ("FGLIC"), for its Adversary

Complaint against Debtor/Defendant Leon Lowenthal, Defendants PW Insurance Agency Corp.

and Prosperity LM, Inc.,[1] and DOES 1-25, and pursuant to Sections 523(a)(2)(A), 523(a)(4), and

523(a)(6) of Title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq. (the

"Bankruptcy Code"), states and alleges as follows:

## NATURE OF THE ACTION

1.       Lowenthal engaged in a massive fraudulent rebating scheme that victimized, among

others, FGLIC, an insurance company, out of no less than $4,485,100.70 in commissions

fraudulently obtained by Lowenthal from FGLIC.[2]

2.       In addition, Lowenthal and others fraudulently induced FGLIC to pay all of them

no less than $40,321,386.78 in commissions and bonuses through the submission of false and

fraudulent life insurance applications submitted to FGLIC upon which FGLIC relied in issuing

insurance policies and paying bonuses and commissions to Lowenthal.

3.       Upon information and belief, Lowenthal funneled the commissions and bonuses

fraudulently obtained from FGLIC to purchase at least three separate properties: the $84.7

---

[1]      The term "Lowenthal" as used in this Adversary Complaint refers collectively to Debtor
Leon Lowenthal and his d/b/a's Defendants PW Insurance Agency Corp. and Prosperity LM,
Inc. The term "L. Lowenthal" refers to Debtor Leon Lowenthal individually.

[2]      Lowenthal has been sued in at least two other matters prior to the filing of his Petition
here: (i) *Visión en Análisis y Estrategia, S.A. de C.V. v. Andersen*, 2015 U.S. Dist. LEXIS
96900, 2015 WL 4510772, *aff'd*, 662 Fed. Appx. 29, 2016 U.S. App. LEXIS 18059; and (ii)
*Benjamin Landa v. Leon Lowenthal, Menachem Meisner, and Philip Herzog*, Case Nos.
603918/2019; 603932/2019; and 604694/2019).

million American Metro Center in Hamilton, New Jersey; 309 Maple Avenue, Linden, New Jersey; and 370 Jackson Avenue, Scotch Plains, New Jersey (collectively, the "Real Property").

4.    To obtain his ill-gotten gains, Lowenthal perpetrated a wide-ranging, complex, illegal and fraudulent premium financing scheme ("*Lowenthal Scheme*") on FGLIC:

(i)    Lowenthal caused various persons, the so-called "Funders,"[3] to loan money to be used to fund premiums for the purchase of life insurance policies to be issued by FGLIC;

(ii)    Lowenthal then caused sham trusts to be created

(a)    into which the loaned funds were placed;

(b)    from which the loaned funds were used to pay the premiums for the life insurance policies to be issued by FGLIC; and

(c)    into which the policies issued by FGLIC were to be placed (the "Sham Trusts");

(iii)    Menachem Meisner acted as the trustee for many of these Sham Trusts;

(iv)    After the Sham Trusts were created, Lowenthal submitted to FGLIC:

(a)    false and fraudulent life insurance applications; and

(b)    premium payments that were improperly and illegally borrowed from the Funders for the sole purpose of obtaining commissions and bonuses from FGLIC by fraudulent means;

(v)    FGLIC reasonably relied upon the false and fraudulent applications and the premium payments, and FGLIC:

(a)    issued an insurance policy into the Sham Trusts for each such insured; and

(b)    paid, either directly or indirectly, at least 135% of the premiums to Lowenthal as commissions and bonuses; and

---

[3]    These Funders include, but are not limited to, various Claimants who have filed Proofs of Claim and Adversary Complaints against L. Lowenthal in his bankruptcy case: (i) Dr. Aharon Gutterman and Batsheva Markowitz (ECF Claim 8-1); (ii) Nachum Feintuch a/k/a Michael Feintuch (ECF Claim 9-1); (iii) Darren Singer (ECF Claim 10-1); (iv) Alan Rubenstein (ECF Claim 11-1); and (v) Rockford Holdings Group LLC, Steve Makowsky, and Joe "Yossi" Davidson (ECF Claim 12-1).  The Funders have detailed their participation in the *Lowenthal Scheme* in their papers filed with this Court, which are incorporated herein by this reference.

(vi)    Lowenthal, Meisner and others, including possibly the Funders, used the ill-gotten commissions and bonuses to either:

(a)    purchase the Real Property for themselves; or

(b)    use a portion of the ill-gotten commissions and bonuses to pay premiums on other policies, thereby continuing the *Lowenthal Scheme*.

5.    The *Lowenthal Scheme* is graphically displayed in Exhibit A, which is attached to the Firestone Declaration, which is filed contemporaneously with this pleading and is incorporated herein by this reference.

6.    The relationship of the various parties to the *Lowenthal Scheme* is further detailed in the spreadsheet that is attached hereto as Exhibit B to the Firestone Declaration and incorporated herein by this reference.

7.    DOES 1-25 are Lowenthal's co-conspirators, who participated in the *Lowenthal Scheme*, in funding the scheme, in acting as trustees, and/or in facilitating and perpetuating the fraud. As such, DOES 1-25 are jointly and severally liable to FGLIC for the harm described herein. FGLIC will amend this Adversary Complaint as the identities of the DOE Defendants may be revealed.

8.    The debt Lowenthal owes to FGLIC is based on money Lowenthal and his co-conspirators obtained as a result of the fraud and breaches of fiduciary duty.

9.    Specifically, Lowenthal owes FGLIC $40,321,386.78.

10.    This is the amount of the fraudulently obtained commissions and bonuses FGLIC paid Debtor L. Lowenthal and his co-conspirators pursuant to sales of FGLIC insurance policies that Lowenthal and his co-conspirators induced by submitting to FGLIC false and fraudulent applications for life insurance upon which FGLIC reasonably relied.

11.     Lowenthal is jointly and severally liable for this debt, along with his co-conspirators.

12.     The debt should be excepted from discharge, and the entire discharge should be denied.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

14.     Venue is proper pursuant to 28 U.S.C. § 1409(a).

15.     This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (I).

16.     If for any reason this Court determines that all or any portion of this proceeding is non-core, FGLIC consents to the entry of a final order by this Court that the proceeding is non-core.

17.     The deadline for FGLIC to file Objections to L. Lowenthal's dischargeability of certain debts has not expired.[4]

18.     As set forth more specifically below and in each Count, L. Lowenthal, PW Insurance Agency Corp., and Prosperity LM, Inc. (collectively, "Lowenthal") are liable to FGLIC in an amount no less than $40,321,386.78, and Debtor L. Lowenthal acted and conspired with others such that his obligation to pay FGLIC an amount no less than $40,321,386.78 is not subject to discharge under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.

---

[4]     The deadline for filing objections to L. Lowenthal's discharge is October 5, 2020. *See Notice of Chapter 7 Bankruptcy Case* [Docket No. 86].

## FACTS COMMON TO ALL COUNTS

**I.    DEBTOR LEON LOWENTHAL IS THE ALTER EGO OF DEFENDANTS PROSPERITY LM, INC. AND PW INSURANCE AGENCY CORP.**

19.    According to the Schedules and Statement of Financial Affairs he filed in his bankruptcy case, Debtor L. Lowenthal was a principal, officer and/or member of Defendants Prosperity LM, Inc. and PW Insurance Agency Corp.

20.    Upon information and belief, L. Lowenthal was acting as the alter ego of Defendants Prosperity LM, Inc. and PW Insurance Agency Corp. and abusing the corporate form to perpetrate an intentional fraud on FGLIC. Adherence to the fiction of the existence of Prosperity LM, Inc. and PW Insurance Agency Corp. as entities separate from L. Lowenthal would permit an abuse of the corporate privilege, would sanction fraud, and would promote injustice, if this fiction were allowed to shield L. Lowenthal from the consequences of his wrongful conduct.

21.    Upon information and belief, L. Lowenthal failed to observe corporate formalities and used and transferred funds by and between the companies as he pleased.

**II.    DEBTOR LEON LOWENTHAL OWED FGLIC FIDUCIARY DUTIES.**

22.    Until his license was revoked in 2018, L. Lowenthal was a licensed, independent insurance broker specializing in life, accident and health insurance policies.

23.    FGLIC is and, at all times material hereto, was in the business of, *inter alia*, selling life insurance policies.

24.    L. Lowenthal was an independent agent appointed by FGLIC to sell life insurance policies from February 2, 2015 until November 21, 2017.

25.    On or about February 2, 2015, L. Lowenthal entered into an "Insurance Producer Agreement" with FGLIC, a true and correct copy of which is attached as Exhibit C to the

Firestone Declaration, whereby L. Lowenthal was appointed as, and agreed to act as, an agent for the purpose of selling insurance policies issued by FGLIC.

26.    FGLIC relied on L. Lowenthal to act with honesty and integrity.

27.    L. Lowenthal owed FGLIC fiduciary duties of, *inter alia*, good faith, fair dealing, honesty and compliance with the law.

28.    Pursuant to the Insurance Producer Agreement, L. Lowenthal agreed to and represented that he would comply with all applicable laws and regulations and with FGLIC's internal policies and procedures in procuring prospective insureds, completing and submitting applications, and making accurate representations. Firestone Decl., Ex. C at p. 1.

29.    L. Lowenthal also agreed to and represented that he would comply with FGLIC's Market Conduct Guide and Code of Ethical Conduct. Firestone Decl., Ex. C at p. 1.

30.    A true and correct copy of the Code of Ethical Conduct is attached to the Firestone Declaration as Exhibit D; and a true and correct copy of the Market Conduct Guide is attached to the Firestone Declaration as Exhibit E.

31.    The Insurance Producer Agreement, Code of Ethical Conduct, and the Market Conduct Guide set forth certain duties that Lowenthal owed to FGLIC, including duties with respect to the submission of truthful and accurate applications. *See* Firestone Decl., Ex. C at p. 1; Firestone Decl., Ex. D at p. 2; Firestone Decl., Ex. E. at pp. 22-23.

32.    In selling insurance policies, L. Lowenthal was obligated to, *inter alia*, (i) disclose to FGLIC honestly and completely the financial, medical and other pertinent facts upon which FGLIC would rely in considering, pricing and issuing policies, including whether the premiums were borrowed; and (ii) disclose honestly and completely the terms of FGLIC's insurance policies to prospective insureds. *See e.g.* Firestone Decl., Ex. E at pp. 22-23.

33.    FGLIC reasonably relied on L. Lowenthal to honestly and accurately disclose all pertinent information to FGLIC regarding each insured through each life insurance application, so that FGLIC, *inter alia,* could fairly assess whether to issue life insurance policies worth millions of dollars.

## III.    LOWENTHAL CONSPIRED TO VIOLATE THE LAW AND HARM FGLIC BY DEFRAUDING FGLIC OF COMMISSIONS AND BONUSES.

34.    Lowenthal was the linchpin of the *Lowenthal Scheme,* which was a wide-ranging conspiracy to defraud FGLIC of commissions and bonuses through illegal premium financing and rebating.

35.    The *Lowenthal Scheme* involved the sale of life insurance policies by using sham loans from the Funders to pay the first-year premiums.  *See,* ftnt. 3, *supra.*

36.    By using sham loans from the Funders to pay the first-year premiums, the insureds obtained "free insurance" since they paid nothing for their policies.

37.    Through the issuance of fraudulently procured life insurance policies, L. Lowenthal fraudulently obtained commissions and bonuses from FGLIC and other insurance companies.

38.    In issuing these policies, FGLIC reasonably believed that the insureds would continue to hold the policies for more than one year, paying additional premiums each year.

39.    Holding the policies for more than one year was critical, since FGLIC paid more in commissions and bonuses to L. Lowenthal in the first year than it received in premiums.

40.    As is consistent in the industry, in the ordinary course, FGLIC paid commissions and bonuses for the sale of "large" policies to its agents in amounts that ranged between 120% and 155% of the first year premium paid for each insurance policy.

41.    FGLIC, and other insurers, pay these commissions and bonuses with the expectation that the insureds will keep the policies in force and continue to pay the premiums for many years.

42.    Had FGLIC known that the funds were borrowed, then FGLIC: (i) never would have issued the policies; and (ii) never would have paid the commissions and bonuses.

43.    Because the fraudulently policies lapsed after a single year, FGLIC and the other insurers were left holding the bag and additional costs were placed upon insureds to the detriment of the public good.

44.    When Lowenthal used the commissions and bonuses to repay the Funders for the premiums, either directly or indirectly, Lowenthal engaged in a fraudulent and illegal practice known as "rebating."

45.    Rebating is prohibited by the insurance laws of the State of New Jersey, where Lowenthal sold the FGLIC life insurance policies.  *See* N.J.S.A. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

46.    Further, by misrepresenting and intentionally omitting material information on the life insurance applications that, *inter alia*, the funds used to pay the premiums were NOT borrowed, Lowenthal submitted false and fraudulent applications to FGLIC.

47.    Making false statements on an insurance application is a violation of applicable insurance laws, regulations, and rules.  *See, e.g.*, N.J.S.A. § 2C:21-4.6(a).

48.    Upon information and belief, the funds Lowenthal swindled from FGLIC were used to purchase the Real Property.

### A.    Lowenthal Conspired to Obtain a Series of Sham "Loans" from Funders.

49.    Lowenthal conspired with numerous Funders to create sham "loans" to fund premiums for the purchase of FGLIC life insurance policies.[5]

50.    Lowenthal was to repay the Funders out of the commissions and bonuses paid by FGLIC, together with some interest, and then pocket the difference.

51.    L. Lowenthal used the commissions and bonuses he fraudulently obtained from FGLIC, to repay, in part, the sham loans, and pocketed the rest of the commissions and bonuses himself.

52.    Presumably because the funding sources dried up, the *Lowenthal Scheme* collapsed.

53.    After the *Lowenthal Scheme* collapsed, many of the Funders filed actions against Lowenthal for the unpaid portions of the sham loans, including Adversary Complaints in this matter.[6]

54.    One of the alleged Funders is L. Lowenthal's father-in-law Philip Herzog ("Herzog") who, upon information and belief, is a co-proprietors of Herzog Wine Cellars, a successful wine company that owns popular wine brands Kedem, Manischewitz, Baron Herzog, Jeunesse, and Weinstock.

55.    Funders Dr. Aharon Gutterman ("Dr. Gutterman"), Batsheva Markowitz (the wife of Dr. Aharon Gutterman) ("Mrs. Gutterman"), Northeast Anesthesia, P.C. (a professional corporation owned by Dr. Gutterman) and Aharon Gutterman MD PLLC (a limited liability

---

[5]    *See* Footnote 3.

[6]    *See* Footnote 1.

11

company owned by Dr. Gutterman)[7] sued Herzog and Herzog's daughter Ricky (who is Lowenthal's wife Ricky) in the Supreme Court of the State of New York State, Kings County ("Kings County Action").

56.     Herzog and Ricky Lowenthal removed the Kings County Action to the United States District Court, Eastern District of New York, where the case is docketed at 1:20-cv-01082-AMD-LB ("*Gutterman*").

57.     The *Gutterman* Plaintiffs allege that Lowenthal approached them, as investors, to provide loans, which were to be used to finance premiums for life insurance policies to be issued on the lives of Lowenthal clients. *Gutterman* ECF No. 1-1, ¶¶ 2, 33-40, 54.

58.     From May 2014 through May 2018, the *Gutterman* Plaintiffs loaned approximately $3.3 million to Lowenthal for the purchase of life insurance policies. *Id.* 46, 54, 61.

59.     This timeframe includes the period during which Lowenthal fraudulently induced FGLIC into issuing life insurance policies to Lowenthal's clients.

60.     Lowenthal allegedly promised that he would repay the loans from commissions paid to him for the placement of the insurance policies. *Id.*, ¶¶ 4, 33-40.

61.     According to the *Gutterman* court filings, Lowenthal repaid only $1,512,162 to Gutterman of the $3.3 million Gutterman loaned to Lowenthal for the purchase of life insurance policies.

62.     According to Gutterman, Lowenthal kept $1,787,838 for himself.

63.     According to the Complaint in *Gutterman*, Gutterman advanced $2,871,000 through bank transfers and $448,000 in cash. *Id.* at ¶ 65.

---

[7]     Dr. Gutterman, Mrs. Gutterman, Northeast Anesthesia, P.C. and Aharon Gutterman MD PLLC shall be collectively referred to herein as "Gutterman."

64.     According to the *Gutterman* Complaint, Herzog supplied signed checks drawn on Herzog's personal bank accounts as collateral and guarantees for the sham loans to fund insurance premiums.[8] Ex. F at ¶ 9.

65.     The *Gutterman* Complaint further alleges that Herzog provided Gutterman with the following signed checks.

a.      In or about May 2014, Herzog provided Gutterman a signed check in the amount of $50,000;

b.      In or about June 2014, Herzog provided a signed check in the amount of $85,000;

c.      In or about November 2016, Herzog provided a signed check in the amount of $850,000;

d.      In or about March 2017, Herzog provided a signed check in the amount of $100,000;

e.      In or about January 2018, Herzog provided a signed check with the amount left blank.

*Id.* at ¶ 66.

66.     According to Singer, "[Lowenthal] engaged in a fraudulent scheme to obtain loans from [Singer] as an investor to fund the initial premiums for High End Life Policies."[9] ECF No. 41, ¶ 31, p. 4.

67.     Singer alleges that the "*investor funds* were to be "repaid" out commissions paid to [Lowenthal] by the Life Companies [like FGLIC]". *Id.*, ¶ 32, p. 5 (emphasis added).

68.     From January 1, 2017 through January 3, 2019, "Lowenthal and [Darren Singer, a Claimant/Plaintiff here] entered into Agreements whereby [Plaintiff Singer] loaned

---

[8]     Dr. Gutterman further alleges, that when the *Lowenthal Scheme* collapsed, Dr. Gutterman attempted to deposit the collateral checks provided by Herzog, but the checks were dishonored by the applicable banks. (*Id.* at ¶¶ 17-18.)

[9]     The term "High End Life Policies" refers to life insurance policies with an annual premium greater than $25,000.  The FGLIC policies sold by Lowenthal have very high premiums.

$1,500,500.00 to . . . Lowenthal ("Plaintiff's Loans") [for the purchase of High End Life Policies]." *Id.,* ¶ 29, p. 5.

69.     According to the Complaint filed against L. Lowenthal with this Court by Plaintiffs Rockford Holdings Group LLC, Steve Makowsky and Joe "Yossi" Davidson ("Rockford Plaintiffs"), the Rockford Plaintiffs loaned Lowenthal $1,880,000.00 to perpetuate the *Lowenthal Scheme*. ECF. No. 42, ¶¶ 39-44, pp. 5-6.

70.     In similar fashion, Plaintiff Alan Rubenstein ("Rubenstein") alleges that from January 1, 2017 through January 3, 2019, he loaned Lowenthal "at least $818,500.00 . . . ." ECF. No. 46, ¶ 37, p. 5.

71.     A demonstrative chart of the various sham loans provided by the known Funders together with the dates of premiums paid to and policies issued by FGLIC is attached to the Firestone Declaration as Exhibit B.[10]

**B.     Lowenthal Sold R.G.[11] a FGLIC Policy as Part of the Scheme**

72.     Lowenthal sold to R.G., a New Jersey resident, a FGLIC life insurance policy valued at $4.75 million, which was procured by fraud and breaches of fiduciary duty.[12]

73.     In July 2016, Lowenthal completed a FGLIC life insurance application for R.G. (the "R.G. Application"), which redacted R.G. Application is attached to the Firestone Declaration as Exhibit G and incorporated herein by this reference.

---

[10]     As discovery is continuing, the chart is by necessity incomplete. Upon information and belief, there are additional Funders and sham loans that remain unknown.

[11]     Names of insureds and trustees that are not already in the public record through previous filings in this case are being redacted to initials only, for privacy purposes.

[12]     FGLIC has reason to believe that R.G. is Claimant Dr. Aharon Gutterman's mother. Interestingly, this policy was purchased at the time Gutterman was loaning money as an investor to Lowenthal. It would appear that Gutterman cash (Gutterman paid only in cash or wire transfer) was used to improperly obtain "free insurance" for Dr. Aharon Gutterman's mother and to secure the payment of illegal and fraudulent commissions and bonuses to Lowenthal.

74.     In the R.G. Application, Lowenthal identified the trustee of the policy as E.B. *Id*.

75.     The FGLIC life insurance policy application contains a "Statement of Intent," which provides: "It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or *participation of investors* in life insurance death benefits." *See, e.g.*, Firestone Decl., Ex. G at p. 2 (emphasis added).

76.     Question 2 of the Statement of Intent in the R.G. Application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"

77.     Lowenthal falsely answered this question "NO" in the Application.

78.     On or about July 28, 2016, L. Lowenthal executed the R.G. Application, certifying falsely that R.G. was not using funds from a third party in order to pay the insurance premium.

79.     Upon information and belief, Lowenthal knew this representation was false when made because he knew R.G. was paying the premium with funds from a co-conspirator.

80.     Lowenthal concealed from FGLIC the fact that R.G. was paying the premiums with funds from a co-conspirator to induce FGLIC to issue the policy to R.G.

81.     Upon information and belief, Lowenthal also fraudulently concealed from FGLIC the fact that the R.G. Application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the R.G. policy's first-year premium.

15

82.     Lowenthal's false statements in connection with the R.G. Application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

83.     Using the mail and wire, Lowenthal delivered the fraudulent application to FGLIC on or about July 28, 2016.

84.     In reliance on Lowenthal's misrepresentations, FGLIC issued a life insurance policy to R.G. with a value of $4.75 million, and an effective date of September 1, 2016.

85.     The R.G. Family Trust instruments disclose that E.B. was the Trustee. A true and correct copy of the Trust is attached hereto as Exhibit H to the Firestone Declaration and is incorporated herein by this reference.

86.     In reality, Menachem Meisner acted as Trustee and wired the funds to pay the premium from the Trust. Firestone Decl., Ex. I.

87.     On or about September 14 and 29, 2016, Menachem Meisner, acting as purported trustee for the R.G. Family Trust, wired two payments to FGLIC totaling $917,700 for the first-year premium for R.G.'s policy.  Firestone Decl., Ex. I.

88.     Menachem Meisner, therefore, was acting as trustee for the policy, rather than E.B., as Lowenthal represented in the policy application.[13]

89.     Upon information and belief, the Funders funneled money, through a sham transaction, to R.G. or The R.G. 2016 Family Trust to fund the premium payments.

---

[13]     Funder Michael Feintuch alleges in his Objection to Approval of Disclosure Statement filed in this action "that many of the Debtor's creditors allege that the Debtor's insurance business was nothing more than a Ponzi scheme. In this regard, three (3) actions were commenced in the Supreme Court of the State of New York, Nassau County: *Landa v. Lowenthal, et al.*, Index Nos. 603918/2019; 603932/2019; and 604694/2019), which shed light on the fact the Debtor was not working alone. Rather, Menachem Meisner was a co-borrower on the insurance loans made to the Debtor. In addition, Philip Herzog, the Debtor's father in law and proposed plan funder, served as the guarantor on these loans." If these allegations are correct, then Herzog, Meisner and Lowenthal were, in fact, engaged in a conspiracy to defraud FGLIC. ECF No. 27, ¶ 7, p. 4.

90.    In reliance on Lowenthal's fraud, FGLIC paid L. Lowenthal, directly or indirectly, commissions and bonuses of approximately $1.15 million for the fraudulent sale of the R.G. policy.

91.    If the allegations of Gutterman are correct, Lowenthal paid a portion of the commission and bonus payments to the Funders to repay the sham loans that had funded the premiums and the remainder to Menachem Meisner to purchase the Real Property, while at the same time the mother of Funder Dr. Gutterman received free insurance.

92.    Specifically, upon information and belief, on September 21, 2016, September 22, 2016, and October 3, 2016, Lowenthal made three payments totaling $1,061,000 to Funder Menachem Meisner and/or his company Kindred Enterprises, LLC.

93.    By paying his commission and bonus payments back to the Funders, Lowenthal violated applicable law: (i) by unlawfully splitting commissions with an unlicensed person, in violation of N.J. Stat. Ann. § 17:22A-41d; and (ii) by unlawfully rebating premium payments, in violation of N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

94.    R.G. failed to make the second year's scheduled premium payment.

95.    FGLIC sent a "Lapse Letter" on or about October 19, 2017, advising R.G. of the policy's impending lapse.

96.    In the Lapse Letter, FGLIC asked R.G. to contact a FGLIC representative to discuss the policy.

97.    A representative of FGLIC contacted R.G. on or about November 1, 2017, to inquire as to the reasons that R.G. would allow the policy to lapse with no value after paying over $900,000 in premiums during the first year.

98.    R.G. said that she did not want the policy to lapse, and advised that she would contact Lowenthal.

99.    L. Lowenthal called FGLIC's representative on November 9, 2017, and claimed that he would call again on November 27, 2017, to renew the policy.

100.    R.G.'s policy was not renewed, nor did FGLIC receive further payment on the policy.

101.    FGLIC sent R.G. a Rescission Letter on or about November 29, 2017.

102.    Lowenthal's profit of the conspiracy was approximately $230,000 (the difference between the commission and the first year premium).

C.    **Lowenthal Sold E.F. a FGLIC Policy as Part of the Scheme Using Funds from Dr. Aharon Gutterman**

103.    Lowenthal sold E.F. a FGLIC life insurance policy valued at $5 million, which was procured by fraud and breaches of fiduciary duty.

104.    In July 2016, Lowenthal completed a FGLIC life insurance application (the "E.F. Application") for E.F., which redacted Application is attached as Exhibit J  to the Firestone Declaration and is incorporated herein by this reference.

105.    The owner of the policy was to be the E.F. Trust 2016, which Lowenthal represented as being a New Jersey entity.

106.    The E.F. Application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"

107.    Lowenthal falsely answered this question "NO" in the Application.

108.    On or about July 22, 2016, L. Lowenthal executed the E.F. Application, certifying falsely that E.F. was not using funds from a third party in order to pay the insurance premium.

18

109.    Upon information and belief, Lowenthal knew this representation was false when made because he knew E.F. was paying the premium with funds from a Funder.

110.    Lowenthal concealed from FGLIC the fact that E.F. was paying the premiums with funds from a Funder to induce FGLIC to issue the policy to E.F.

111.    Upon information and belief, Lowenthal also fraudulently concealed from FGLIC the fact that the E.F. Application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the E.F. policy's first-year premium.

112.    Lowenthal's false statements in connection with the E.F. Application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

113.    Using the mail and wire, Lowenthal delivered the fraudulent application to FGLIC on or about July 22, 2016.

114.    Unbeknownst to FGLIC, in late October or early November 2016, Dr. Aharon Gutterman loaned Lowenthal $862,000 for the purpose of purchasing life insurance policies as part of the *Lowenthal Scheme*.

115.    Dr. Aharon Gutterman filed a Proof of Claim against Lowenthal in this bankruptcy case, in which he attached the $862,000 promissory note. (ECF Claim 8-1 at p. 12 of 16.). The note is undated, but states that L. Lowenthal will repay Dr. Gutterman on November 7, 2016.

116.    In reliance on Lowenthal's misrepresentations, FGLIC issued a life insurance policy to R.G. with a value of $5 million, and an effective date of November 28, 2016.

117.    On January 2, 2017 and January 9, 2017, Lowenthal caused two premium payments totaling $800,550 to be wired to FGLIC to fund the first-year premium for the E.F. policy.

118.    In reliance on Lowenthal's fraud, FGLIC paid L. Lowenthal, directly or indirectly, commissions and bonuses of approximately $950,000 for the fraudulent sale of the E.F. policy.

119.    Upon information and belief, Lowenthal paid most of the commission and bonus payments back to the Funders to repay the sham loans that had funded the premiums.

120.    By paying his commission and bonus payments back to the Funders, Lowenthal violated applicable law: (i) by unlawfully splitting commissions with an unlicensed person, in violation of N.J. Stat. Ann. § 17:22A-41d; and (ii) by unlawfully rebating premium payments, in violation of N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

121.    E.F. failed to make the second year's scheduled premium payment on the policy.

122.    FGLIC sent E.F. a "Lapse Letter" on or about January 4, 2018, advising of the policy's impending lapse.

123.    In the Lapse Letter, FGLIC asked E.F. to contact a FGLIC representative to discuss the policy, including the reason that E.F. would allow the policy to lapse with no value after paying over $800,000 in premiums during the first year.

124.    On or about January 18 and 19, 2018, a representative of FGLIC attempted to contact E.F. by telephone to discuss the policy, but received no response.

125.    E.F.'s policy was not renewed, nor did FGLIC receive further payment on the policy.

126.    FGLIC sent E.F. a Rescission Letter on or about February 26, 2018.

127.   Lowenthal's profit of the conspiracy was approximately $150,000 (the difference between the commission and the first-year premium).

128.   Lowenthal sold at least four other FGLIC policies with remarkably similar fact patterns.

129.   Upon information and belief, these four policies were also part of the same conspiracy to defraud FGLIC.

130.   Information for these four other policies is set forth in Exhibit B, which is incorporated herein by this reference.

131.   Each of the four additional FGLIC life insurance policy application completed by Lowenthal and submitted to FGLIC contained the same "Statement of Intent," which provides: "It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s).   The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits."

132.   Each of the four additional policies completed by Lowenthal and submitted to FGLIC contains the same Question 2 of the Statement of Intent, which asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *See, e.g.*, *id.*

133.   Each policy application submitted to FGLIC through Lowenthal answered "NO" in response to this Question 2.  *See, e.g.*:

    a.   R.G. Application, Firestone Decl., Ex. G at p. 2;

    b.   E.F. Application, Firestone Decl., Ex. J at p. 2;

    c.      S.M. Application, Firestone Decl., Ex. K at p. 2;

    d.      P.U. Application, Firestone Decl., Ex. L at p. 2;

    e.      C.B. Application, Firestone Decl., Ex. M at p. 2;

    f.      A.B. Application, Firestone Decl., Ex. N at p. 3.

134. ***However, <u>for each insurance application Debtors submitted to FGLIC,</u> the representation that the premiums were not financed through a loan was false.***

135. By misrepresenting and intentionally omitting material information on the life insurance applications, Lowenthal submitted false and fraudulent life insurance applications to FGLIC, in violation of applicable insurance laws, regulations, and rules. *See, e.g.*, N.J.S.A. § 2C:21-4.6(a).

## COUNT I

### (11 U.S.C. § 523(A)(2)(A))
### (AGAINST L. LOWENTHAL)

136. FGLIC incorporates by reference herein the allegations contained in the paragraphs above.

137. A debtor may not discharge a debt "for money, property, or services … to the extent obtained, by … false pretenses, a false representation, or actual fraud …." 11 U.S.C. § 523(a)(2).

138. To establish a false representation claim, the law requires that FGLIC show:

    (1)    L. Lowenthal made a false representation or omission of fact,

    (2)    Which L. Lowenthal;

        (a)    Either knew was false or made with reckless disregard for its truth; and

        (b)    Made with an intent to deceive;

    (3)    Upon which FGLIC justifiably relied.

139.    To establish an Actual Fraud claim, FGLIC must show:

(1)    L. Lowenthal made a representation to FGLIC;

(2)    L. Lowenthal knew the representation was false when it was made;

(3)    L. Lowenthal made the representation with the intent and purpose to deceive;

(4)    FGLIC actually and justifiably relied on the representation;

(5)    FGLIC sustained a loss as a proximate result of its reliance on the representation.

140.    In identifying debts not subject to discharge, "11 U.S.C. § 523(a)(2)(A) includes 'debts which arise from the wrongful acts of conspirators and their co-conspirators.'" *In re Dangerfield*, 2009 WL 2192648 at * 5 (N.D. Ill. 2009) (citing *Aetna Casualty and Surety Company v. Markarian*, 228 B.R. 34, 39 (1st Cir. 1988)).

141.    "A false representation can be shown through either an express statement or through an omission where the circumstances are such that disclosure is necessary to correct what would otherwise be a false impression." *In re Paredes*, No. 16-10320 (MG), 2017 WL 2603687, at *5 (Bankr. S.D.N.Y. June 15, 2017).

142.    L. Lowenthal knowingly made material misrepresentations to FGLIC and omitted and concealed material facts with the intent to induce FGLIC to pay commissions to Lowenthal.

143.    In willful disregard of his duties, L. Lowenthal engaged in a massive, fraudulent premium financing scheme to swindle FGLIC:

(i)    L. Lowenthal fraudulently misrepresented to FGLIC that he was submitting legitimate and proper applications for the sale of life insurance policies, when, in fact, he was not;

(ii)    L. Lowenthal intentionally submitted false and fraudulent life insurance applications to FGLIC through the mail and wire, upon which fraudulent applications FGLIC relied in issuing the policies;

(iii)     The applications were false and fraudulent in several respects, including, but not limited to: (a) misrepresenting the identity of the person who would act as trustee of the policy; and (b) misrepresenting that the premiums used to purchase each policy were not borrowed from others, which representation turned out to be false when made.  Indeed the very papers submitted by Claimants in their Proofs of Claim filed at ECF Claim 8-1 through Claim 12-1 establish the fraud; and

(iv)     As established by the papers and dealings filed by Claimants Dr. Aharon Gutterman and Batsheva Markowitz; Nachum Feintuch a/k/a Michael Feintuch; Darren Singer; Alan Rubenstein; and Rockford Holdings Group LLC, Steve Makowsky, and Joe "Yossi" Davidson, the premiums used to purchase the life insurance policies issued by FGLIC were, in fact, funded by persons other than the insureds (*i.e.*, the Funders), meaning that the insureds did not pay for the policies issued by FGLIC, in violation of, among other things, Lowenthal's fiduciary duties owed to FGLIC and applicable nonbankruptcy law, including New Jersey's anti-rebating statute, N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

144.   L. Lowenthal made these misrepresentations and material omissions knowing that each was false, and intending that FGLIC would rely on the misrepresentations and material omissions and then pay Lowenthal the commissions based upon the false and fraudulent applications.

145.   L. Lowenthal knew that if he disclosed the true nature of these policy applications, FGLIC would not have approved them.

146.   FGLIC's reliance upon the fraudulent misrepresentations and material omissions was reasonable and was expected and foreseeable by L. Lowenthal.

147.   L. Lowenthal caused FGLIC to pay $4,485,110.70  in commissions and bonuses to Lowenthal, because of FGLIC's reliance upon L. Lowenthal's fraudulent misrepresentations and material omissions.

148.   In taking these actions, L. Lowenthal perpetrated his part in a conspiracy to obtain life insurance policies and commissions from FGLIC under false pretenses.

149.    The conspiracy caused FGLIC to pay $40,321,386.78 in commissions and bonuses to L. Lowenthal and his co-conspirators.

150.    Lowenthal is jointly and severally liable for this amount, along with his co-conspirators.

151.    L. Lowenthal made the false statements and omissions described in this Adversary Complaint in furtherance of the conspiracy to defraud FGLIC.

152.    L. Lowenthal is therefore liable not only for debts caused by his own acts, but also for debts caused by the acts of others in furtherance of the conspiracy.

153.    As a result of L. Lowenthal's fraudulent misrepresentations and material omissions and FGLIC's justifiable and reasonable reliance thereon, L. Lowenthal has benefited both directly and indirectly from, and is indebted to FGLIC for, the total amount of the commissions and bonuses FGLIC paid pursuant to L. Lowenthal's and his co-conspirators' sales of FGLIC policies.

154.    This amount equals $40,321,386.78.

## COUNT II

### (11 U.S.C. § 523(A)(4))
### (AGAINST L. LOWENTHAL)

155.    FGLIC incorporates by reference herein the allegations contained in the paragraphs above.

156.    11 U.S.C. § 523(a)(4) states that a debtor cannot be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

157.    FGLIC must prove the elements of a 11 U.S.C. § 523(a)(4) claim, which are that L. Lowenthal committed:

(1)   Fraud or defalcation (mere deficit from misconduct with knowledge of or gross recklessness to improper behavior) while acting as a fiduciary;

    (a)   A fiduciary relationship existed between L. Lowenthal and FGLIC before the debt at issue arose;

    (b)   Defalcation consists of a breach of fiduciary duty which relates to the handling of funds such as positive fraud, fraud in fact, bad faith, moral turpitude, or some other intentional wrong;

    (c)   Requires at least a subjective, criminal level of recklessness.

(2)   Embezzlement; or

(3)   Larceny.

158.   L. Lowenthal signed an Insurance Producer Agreement with FGLIC, prior to Lowenthal's receipt of the fraudulently obtained commissions that are the basis for Lowenthal's debt to FGLIC.

159.   L. Lowenthal owed FGLIC fiduciary duties as FGLIC's agent, including but not limited to duties of care and loyalty, including compliance with the Producer Agreement, the Ethical Code of Conduct, the Market Conduct Guide, and with applicable insurance laws, rules and regulations.

160.   L. Lowenthal also possessed superior knowledge about the fraudulent nature of the life insurance applications policies he was preparing.  FGLIC relied on L. Lowenthal to submit to FGLIC an honest and accurate life insurance application, so FGLIC could fairly evaluate whether to issue a policy to the prospective insured.  Yet L. Lowenthal knew, and FGLIC did not know, that the subject life insurance applications were false and fraudulent and contained L. Lowenthal's material misrepresentations of fact.

161.   L. Lowenthal breached those duties through the fraud described above.

162.   L. Lowenthal's fraud involved the handling of funds: namely, the premium payments used for life insurance applications and the commissions received from FGLIC.

163.    L. Lowenthal's fraud caused FGLIC to pay $4,485,110.70 in commissions to L. Lowenthal.

164.    In taking these actions, L. Lowenthal perpetrated his part in a conspiracy to obtain life insurance policies and commissions from FGLIC under false pretenses.

165.    The conspiracy caused FGLIC to pay $40,321,386.78 in commissions and bonuses to L. Lowenthal and his co-conspirators.

166.    Lowenthal is jointly and severally liable for this amount, along with his co-conspirators.

167.    L. Lowenthal displayed a criminal level of recklessness in his false statements and fraudulent acts in order to obtain commissions from FGLIC and committed numerous violations of applicable insurance laws.  *See*, *e.g.*, N.J.S.A. §§ 2C:21-4.6(a), 17:29A-15, 17:29-AA-14, 17B:30-13.

## COUNT III

### (11 U.S.C. § 523(A)(6))
### (AGAINST L. LOWENTHAL)

168.    FGLIC incorporates by reference herein the allegations contained in the paragraphs above.

169.    A debtor may not discharge a debt arising from willful and malicious injury to another entity or to the property of another entity. 11 U.S.C. § 523(a)(6).

170.    FGLIC must prove the elements of a § 523(a)(6) claim, which are:

(1)    L. Lowenthal caused an injury;

(2)    L. Lowenthal's actions were willful (i.e. deliberate or intentional); and

(3)    L. Lowenthal's actions were malicious (*i.e.* in conscious disregard of one's duties or without just cause or excuse).

27

171.    L. Lowenthal caused approximately $4.5 million in injury to FGLIC through ill-gotten commissions arising out of Lowenthal's sales of FGLIC policies.

172.    In taking these actions, L. Lowenthal perpetrated his part in a conspiracy to obtain life insurance policies and commissions from FGLIC under false pretenses.

173.    The conspiracy caused FGLIC to pay $40,321,386.78 in commissions and bonuses to L. Lowenthal and his co-conspirators.

174.    Lowenthal is jointly and severally liable for this amount, along with his co-conspirators.

175.    As described above, L. Lowenthal acted willfully, deliberately, and intentionally in making the false statements described above to obtain these commissions and bonuses, as part of an overall conspiracy to defraud insurers like FGLIC.

176.    As described above, L. Lowenthal intended for his actions to inflict injury upon FGLIC, or he knew with a substantial degree of certainty that his actions would inflict injury upon FGLIC.

177.    As described above, L. Lowenthal acted maliciously towards FGLIC and acted in conscious disregard of his duties to FGLIC and his duties under applicable insurance laws, rules and regulations.

## COUNT IV

### FRAUD
### (AGAINST ALL DEFENDANTS)

178.    FGLIC incorporates by reference herein the allegations contained in the paragraphs above.

179.    To establish fraud, FGLIC must show:

(1)    Defendants made a representation to FGLIC;

(2)     Defendants knew the representation was false when it was made;

(3)     Defendants made the representation with the intent and purpose to deceive;

(4)     FGLIC actually and justifiably relied on the representation;

(5)     FGLIC sustained a loss as a proximate result of its reliance on the representation.

180.   As set forth above, Defendants, including Lowenthal: (i) knowingly made material misrepresentations to FGLIC; (ii) omitted and concealed material facts from FGLIC; and (iii) prepared and submitted false and fraudulent life insurance applications and other papers, including trust documents, with the intent to induce FGLIC to pay commissions and bonuses to Lowenthal and others, which commissions and bonuses were pocketed, in part, by Lowenthal, and distributed, in part, to Lowenthal's co-conspirators, DOES 1-25.

181.   Defendants fraudulently misrepresented to FGLIC that the insurance applications submitted to FGLIC were legitimate and proper applications for the sale of life insurance policies, when, in fact, they were not.

182.   The applications were false and fraudulent in several respects, including, but not limited to: (a) misrepresenting the identity of the person who would act as trustee of the policy; and (b) misrepresenting that the premiums used to purchase each policy were not borrowed from others, which representations turned out to be false when made.

183.   Defendants made these misrepresentations and material omissions knowing that each was false, and intending that FGLIC would rely on the misrepresentations and material omissions and then pay Lowenthal and others the commissions and bonuses based upon the false and fraudulent applications.

184.   FGLIC's reliance upon the fraudulent misrepresentations and material omissions was reasonable and was expected and foreseeable by Defendants.

185.    Defendants caused FGLIC to pay $40,321,386.78 in commissions and bonuses to Lowenthal and others, which amounts were pocketed, in part, by Lowenthal, and distributed, in part, to Lowenthal's co-conspirators, DOES 1-25.

186.    Defendants are jointly and severally liable for this amount.

## COUNT V

### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

187.    FGLIC incorporates by reference herein the allegations contained in the paragraphs above.

188.    To establish civil conspiracy, FGLIC must show:

(1)    Defendants are two or more people who;

(2)    Made an agreement to act together;

(3)    With the intention to accomplish an unlawful goal with the purpose of harming another;

(4)    That resulted in damages to FGLIC.

189.    As set forth above, as part of the *Lowenthal Scheme*, Defendants conspired with each other to violate the law and harm FGLIC by, *inter alia*, (i) preparing and submitting to FGLIC false and fraudulent insurance applications and other papers, including trust documents; and (ii) unlawfully rebating insurance premiums to repay the co-conspirators, either directly or indirectly.

190.    The result of the conspiracy was that FGLIC was fraudulently induced to pay $40,321,386.78 in commissions and bonuses to Lowenthal and others, which amounts were pocketed, in part, by Lowenthal, and distributed, in part, to Lowenthal's co-conspirators.

WHEREFORE, FGLIC prays for:

1. Entry of a judgment in its favor and against Defendants, jointly and severally, in an amount not less than $40,321,386.78, plus pre- and post-judgment interest, attorney's fees and costs;

2. Entry of an Order and Judgment finding that Debtor Leon Lowenthal's debts to FGLIC in an amount not less than $40,321,386.78, as described herein are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6); and

3. For any further relief the Court deems just and proper.

Dated: October 2, 2020

Respectfully submitted,

Fidelity & Guaranty Life Insurance Co.

By: */s/ Frank Taylor*
Frank Taylor, Esq.
Francisco Vazquez, Esq.
Julie H. Firestone, Esq. (*admitted pro hac vice*)
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Telefax: (212) 318-3400
frank.taylor@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
julie.firestone@nortonrosefulbright.com

*Attorneys for Fidelity & Guaranty Life
Insurance Company*

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Telefax: (212) 318-3400
Frank A. Taylor, Esq.
Francisco Vazquez, Esq.
Julie H. Firestone, Esq. (*admitted pro hac vice*)
frank.taylor@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
julie.firestone@nortonrosefulbright.com
*Attorneys for Fidelity & Guaranty Life*
*Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEON LOWENTHAL, | Case No. 19-24115 (RDD) |
| Debtor | |

**DECLARATION OF JULIE H. FIRESTONE IN SUPPORT OF**
**ADVERSARY COMPLAINT FILED BY CREDITOR FIDELITY & GUARANTY**
**LIFE INSURANCE COMPANY**

I, Julie H. Firestone, declare as follows:

1.      I am an attorney at Norton Rose Fulbright US, LLP and am one of the attorneys

representing Fidelity & Guaranty Life Insurance Company ("FGLIC") in this matter.

2.      Attached hereto as Exhibit A is a demonstrative exhibit that depicts the flow of

funds in the "Lowenthal Scheme," as set forth in FGLIC's Adversary Complaint Determining That

Debts Are Not Dischargeable Pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) AND 523(a)(6),

which is being filed contemporaneously herewith.

3.      Attached hereto as Exhibit B is a demonstrative exhibit in the form of a spreadsheet

of the various persons, entities, and insurance policies at issue in the "Lowenthal Scheme,"

including the dates of premiums paid on the various FGLIC life insurance policies sold by Lowenthal and the dates and amounts of various sham loans provided by the known Funders.

4.       Attached hereto as Exhibit C is a true and correct copy of Debtor Leon Lowenthal's Insurance Producer Agreement with FGLIC.

5.       Attached hereto as Exhibit D is a true and correct copy of a FGLIC's Code of Ethical Conduct.

6.       Attached hereto as Exhibit E is a true and correct copy of a FGLIC's Market Conduct Guide.

7.       Attached hereto as Exhibit F is a true and correct copy of the Complaint filed by Dr. Aharon Gutterman, Batsheva Markowitz, Northeast Anesthesia, P.C. and Aharon Gutterman MD PLLC against Philip Herzog and Ricky Lowenthal.

8.       Attached hereto as Exhibit G is a true and correct copy of the life insurance application for "R.G.," which has been redacted for privacy.

9.       Attached hereto as Exhibit H is a true and correct copy of the R.G. Family Trust, which has been redacted for privacy.

10.      Attached hereto as Exhibit I is a true and correct copy of records of wire payments made to FGLIC as premium payments for the R.G. life insurance policy.

11.      Attached hereto as Exhibit J is a true and correct copy of a FGLIC life insurance application for "E.F.," which has been redacted for privacy.

12.      Attached hereto as Exhibit K is a true and correct copy of the life insurance application for "S.M.," which has been redacted for privacy.

13.      Attached hereto as Exhibit L is a true and correct copy of life insurance application for "P.U.," which has been redacted for privacy.

14.    Attached hereto as Exhibit M is a true and correct copy of life insurance application

for "C.B.," which has been redacted for privacy.

15.    Attached hereto as Exhibit N is a true and correct copy of life insurance application

for "A.B.," which has been redacted for privacy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of October, 2020 in Minneapolis, Minnesota.


/s/ Julie H. Firestone_____

# EXHIBIT A

*United States Bankruptcy Court*
20-06526-rdd   Doc 1   Filed 10/02/20   Entered 10/02/20 21:04:18   Main Document
*Southern District of New York*
Pg 36 of 180
*In re Leon Lowenthal, Debtor*
*Case No. 19-24115*



1) EB was disclosed as the trustee.
2) Two payments were made: 09/14/2016 and 09/29/2016.
3) Payments on two separate occasions.
4) Three payments were made: 09/21/2016, 09/22/2016 and 10/03/2016.

**CONFIDENTIAL**

**EXHIBIT A**

# EXHIBIT B

*United States Bankruptcy Court*
*Southern District of New York*
*In re Leon Lowenthal, Debtor*
*Case No. 19-24115 (RDD)*

Lowenthal Policies Money Flow
*(Sorted by Date of Issuance)*

| Insured | Application Date (Date Signed) | Policy No. | Date of Issuance | Lapse Effective Date | Application Submitted By | Writing Agent | Trust Name; Date Formed | Trustee | Source of Funds | Amount Funded | Date Funded | | Financial Institution Remitting Premium Payment to FGLIC | Premium Paid | Date Premium Paid | FGLIC Commission Paid to Writing Agent (A) | Date FGLIC Commission Paid to Writing Agent | GA/ IMO | FGLIC Commission Paid to GA/ IMO | Date FGLIC Commission Paid to GA/ IMO | FGLIC Bonus Paid to GA/ IMO | Date FGLIC Bonus Paid to GA/ IMO | Entity 1 to Which A Portion of Writing Agent Commission Paid | Amount of Writing Agent Commission Paid to Entity | Date Portion of Writing Agent Commission Paid to Entity | | Entity 2 to Which A Portion of Writing Agent Commission Paid | Amount of Writing Agent Commission Paid to Entity | Date Portion of Writing Agent Commission Paid to Entity | Entity 3 to Which A Portion of Writing Agent Commission Paid | Amount of Writing Agent Commission Paid to Entity | Date Portion of Writing Agent Commission Paid to Entity | Entity 1 to Which A Portion of GA/ IMO Commission & Bonus Paid | Amount of GA/ IMO Commission & Bonus Paid to Entity | Date Portion of GA/ IMO Commission & Bonus Paid to Entity | Entity 2 to Which A Portion of GA/ IMO Commission & Bonus Paid | Amount of GA/ IMO Commission & Bonus Paid to Entity | Date Portion of GA/ IMO Commission & Bonus Paid to Entity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M, S | 12/10/15 | L***30 | 06/02/16 | | Atlantic Insurance Brokerage | Leon Lowenthal | SM Family Trust; December 7, 2015 | SF; Lakewood, NJ 08701 | | | | | TD Bank, NA Glastonbury, CT | $ 788,400.00 | 06/20/16; 08/11/16 | $ 827,820.00 | 06/22/16; 08/16/16 | BIP | $ 157,680.00 | 06/22/16; 06/24/16; 08/16/16 | $ 236,520.00 | | Kindred Enterprises LLC | $ 689,000.00 | 06/27/16; 08/19/16 | | Leon Ricky Lowenthal | $ 133,000.00 | 06/28/16 | | | | HBM Life, Inc | $ 118,260.00 | 06/28/16; 07/12/16; 09/19/16 | PW Insurance Agency Corp | $ 157,680.00 | 07/12/16; 09/19/16 |
| U, P | 03/17/16 | L***20 | 07/13/16 | 10/13/17 | | Leon Lowenthal | PU 2016 Family Trust; February 2, 2016 | MA; Lakewood, NJ 08701 | | | | | TD Bank, NA | $ 597,600.00 | 07/19/16; 08/04/16 | $ 627,480.00 | 07/29/16; 08/09/16 | BIP | $ 119,520.00 | 07/29/16; 08/09/16 | $ 179,280.00 | | Kindred Enterprises LLC | $ 630,500.00 | 08/02/16; 08/12/16 | | | | | | | | HBM Life, Inc | $ 89,640.00 | 08/15/16; 09/19/16 | PW Insurance Agency Corp | $ 119,520.00 | 08/15/16; 09/19/16 |
| B, C | 07/18/16 | L***08 | 08/13/16 | | | Leon Lowenthal | CB 2016 Family Trust; June 15, 2016 | IZ; Fort Lee, NJ 07024; | | | | | TD Bank, NA Glastonbury, CT | $ 355,200.00 | 08/31/16; 09/15/16 | $ 372,960.00 | 09/02/16; 09/20/16 | BIP | $ 71,040.00 | 09/02/16; 09/20/16 | $ 106,560.00 | | Kindred Enterprises LLC | $ 288,000.00 | 09/07/16; 09/22/16 | (E) | | | | | | | HBM Life, Inc | $ 53,280.00 | 10/13/16 | PW Insurance Agency Corp | $ 71,040.00 | 10/13/16 |
| G, R | 07/28/16 | L***65 | 09/01/16 | | Atlantic Insurance Brokerage | Leon Lowenthal | The RG 2016 Family Trust; July 15, 2016 | EB; Piscataway, NJ 08854 | | | | | TD Bank, NA Glastonbury, CT | $ 917,700.00 | 09/14/16; 09/29/16 | $ 963,585.00 | 09/19/16; 10/05/16 | BIP | $ 183,540.00 | 09/19/16; 10/05/16 | $ 275,310.00 | | Kindred Enterprises LLC | $ 1,061,000.00 | 09/21/16; 09/22/16; 10/07/16 | (E) | | | | | | | HBM Life, Inc | $ 137,655.00 | 10/13/16; 11/17/16 | PW Insurance Agency Corp | $ 183,540.00 | 10/13/16; 11/17/16 |
| F, E | 07/22/16 | L***06 | 11/28/16 | | | Leon Lowenthal | The EF Trust 2016; June 1, 2016 | DF; Mahwah, NJ 07495 | Aharon Gutterman | $ 862,000.00 | Approx. late October 2016 or early November 2016 | (POC 8-1, pg 12) | TD Bank, NA | $ 800,550.00 | 01/02/17; 01/09/17 | $ 840,577.50 | 01/13/17 | BIP | $ 160,110.00 | 01/13/17 | $ 240,165.00 | | Prosperity LM Inc | $ 75,000.00 | 01/08/17 | | Business One Consultants, Inc. | $ 72,250.00 | 01/19/17 | CNM Services Inc | $ 700,000.00 | 01/19/17; 01/20/17 | HBM Life, Inc | $ 40,027.51 | 01/24/17 | PW Insurance Agency Corp | $ 107,857.51 | 02/09/17 |
| B, A | 08/23/16 | L***86 | 12/28/16 | | Atlantic Insurance Brokerage; 1265 Cottage Drive; Harrisburg, PA 17112 | Leon Lowenthal | AB 2016 Trust; August 8, 2016 | YB; Teaneck, NJ 07512 | | | | | Wells Fargo SF | $ 812,084.00 | 01/30/17 | $ 852,688.20 | 02/01/17 | BIP | $ 162,416.80 | 02/01/17 | $ 243,625.20 | | Kindred Enterprises LLC | $ 352,150.00 | 02/03/17; 02/06/17 | | CNM Services Inc | $ 500,000.00 | 02/13/17 | | | | HBM Life, Inc | $ 40,604.20 | 02/09/17 | | | |
| | | | | | | | | | Aaron Simon | $ 165,000.00 | | (B) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 50,000.00 | 04/29/14 | (POC 8-1, pg 6) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 108,000.00 | 03/2017 | (POC 8-1, pg 13) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 750,000.00 | 6/2014 | (POC 8-1, pg 7) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 19,000.00 | 06/30/14 | (POC 8-1, pg 8) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 110,000.00 | 06/30/14 | (POC 8-1, pg 9) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 30,000.00 | 06/30/14 | (POC 8-1, pg 9) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 25,000.00 | 07/17/14 | (POC 8-1, pg 10) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 85,000.00 | 05/22/14 | (POC 8-1, pg 11) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 65,000.00 | 09/18/17 | (POC 8-1, pg 14) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 25,000.00 | 11/07/17 | (POC 8-1, pg 15) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 30,000.00 | 12/15/17 | (POC 8-1, pg 16) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Aharon Gutterman | $ 65,000.00 | 12/18/17 | (POC 8-1, pg 16) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 200,000.00 | 09/05/17 | (POC 11-1, pg 2) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 200,000.00 | 09/18/17 | (POC 11-1, pg 3) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 200,000.00 | 12/07/17 | (POC 11-1, pg 4) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 225,000.00 | 01/16/18 | (POC 11-1, pg 5) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 138,000.00 | 02/13/18 | (POC 11-1, pg 7) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 138,000.00 | 01/13/18 | (POC 11-1, pg 8) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 200,000.00 | 04/17/18 | (POC 11-1, pg 9) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 225,000.00 | 03/14/18 | (POC 11-1, pg 11-12) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 225,000.00 | 05/01/18 | (POC 11-1, pg 13-14) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 300,000.00 | 06/04/18 | (POC 11-1, pg 15-16) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 487,000.00 | 06/14/18 | (POC 11-1, pg 17-18) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 100,000.00 | 07/02/18 | (POC 11-1, pg 19-20) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 500,000.00 | 07/03/18 | (POC 11-1, pg 21-22) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 200,000.00 | 07/15/18 | (POC 11-1, pg 23) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 875,000.00 | 08/01/18 | (POC 11-1, pg 24-25) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 487,000.00 | 10/19/18 | (POC 11-1, pg 26) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 360,000.00 | 10/31/18 | (POC 11-1, pg 27) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 430,000.00 | 11/06/18 | (POC 11-1, pg 28) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Alan Rubenstein | $ 500,000.00 | 01/03/19 | (POC 11-1, pg 30) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Avi Lehman | $ 185,000.00 | | (B) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Benjamin Landa | $ 420,000.00 | 10/23/18 | (D) | | | | | | | | | | | Deposit for American Metro Center, in Hamilton, NJ and other real estate ventures located at 309 Maple Avenue, Linden, NJ and 370 Jackson Ave, Scotch Plains, NJ | | | | | | | | | | | | | | | |
| | | | | | | | | | Darren Singer | | | (F) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Eli Rubenstein | $ 405,000.00 | 2017 | (C) | | | | | | | | | | | Aharon Gutterman | $ 405,000.00 | 2017 | | | | | | | | | | | | | |
| | | | | | | | | | Nachum (Michael) Feintuch | $ 2,875,000.00 | 10/09/18 | (POC 9-1) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Nachum (Michael) Feintuch | $ 950,000.00 | 10/09/18 | (POC 9-1) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Rockford Holdings Group LLC, Steve Makowsky and Joe "Yossi" Davidson | $ 345,000.00 | 10/24/18 | (POC 12, pg 3 - 4) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Rockford Holdings Group LLC, Steve Makowsky and Joe "Yossi" Davidson | $ 745,000.00 | 11/15/18 | (POC 12, pg 5-6) | | | | | | | | | | | | | | | | | | | | | | | | | | |

Notes:
This spreadsheet is incomplete, because discovery has not been taken in this case. Once discovery has been completed, this spreadsheet will be updated and completed.
(A) Amount reflected is the gross amount. The amount paid may be net of state taxes withheld, if applicable. FGLIC Commissions paid to Lowenthal were deposited into Bank of America NA account ending x1477.
(B) Creditor listed on Schedule E/F of Lowenthal's bankruptcy schedules (Case No. 19-24115-RRD; Doc No. 1).
(C) Per Exhibit A of Objection to Debtor's Plan and Disclosure Statement Filed by Singer (Case No. 19-24115-RRD; Doc No. 26). Paragraph 84 of Verified Complaint.
(D) Promissory Note between Leon Lowenthal and Menachem Meisner (Borrowers) and Benjamin Landa (Lender) dated October 23, 2018. (Case No. 604694/2019; Doc No. 5)
(E) 9/22/2016 payment to Kindred Enterprises, LLC in the amount of $590,000 appears to be funded from FGLIC commissions received by Lowenthal from Renata Gutterman and Cirla Birnhack policies.
(F) Support attached to POC 10-1, same as support filed with Alan Rubenstein POC 11-1.

**EXHIBIT C**

# Producer/Agency Form


Fidelity & Guaranty Life℠

X Producer
☐ Agency

X Fidelity & Guaranty Life Insurance Company
☐ Fidelity & Guaranty Life Insurance Company of New York

**Instructions**
Step 1: Complete, Sign and Date this Form. If you are a corporate principal, complete a separate form for the corporation. Forward the form(s) to your appointing agency.
Step 2: Appointing General Agencies, please complete the bottom portion of the Form authorizing the hierarchy set up and compensation.
Step 3: Once contracted and you have been given access to SalesLink, you will be asked to sign additional Agreement via an electronic signature.

MGA Name: **Brokerage Insurance Partners, Inc.**       MGA Number: **000316013**
MGA Address: **2330 Wellington Green Dr. #202**
City: **Wellington**                    State: **FL**       Zip Code: **33414**
Phone: **877-561-2422**                   Fax:

---

**Producer/Agency Information**
Producer/Agency Name: _Leon Lowenthal_
Residence Address: _5 Hopal Ln_
City: _Monsey_    State: _NY_  Zip: _10952_
Residence Phone:
Cell Phone _8263 6158_
Business Address: _5 Hopal Ln_
City: _Monsey_    State: _NY_  Zip: _10952_
Business Phone: _875-263-6158_ Fax:
e-mail address:
Date of Birth:
Social Security Number:
Corporation TIN Number:
Gender: ☐ M  ☐ F  ☐ Agency
Resident State License No.:

Attach additional non resident licenses in which you wish to be appointed.

Broker Dealer Name:

   Life Target Premium - Previous 12 Months: $_____
   FG Life Premium - Next 12 Months: $_____

Fixed/Fixed-Indexed Annuity Premium - Previous 12 Months: $_____
   FG Annuity Premium - Next 12 Months: $_____

1. Have you ever filed for bankruptcy? ☐ Yes  ☐ No
2. Have you ever been the subject of any complaint related to the solicitation or sale of any insurance product(s), securities or any financial product or service, in any jurisdiction?
☐ Yes  ☐ No
3. Have you ever been the subject of any investigation or proceeding by any insurance or securities regulator in any jurisdiction?
☐ Yes  ☐ No
4. Have you ever been accused of or charged with any improper conduct related to the solicitation or sale of any insurance product(s), securities or any financial product or service?
☐ Yes  ☐ No

5. Have you ever been *alleged* to have engaged in any fraud?
☐ Yes  ☐ No
6. Have you ever been *found* to have engaged in any fraud?
☐ Yes  ☐ No
7. Have you ever been convicted of any crime?
☐ Yes  ☐ No
8. Have you ever been barred, fined or disciplined by any insurance, securities or other regulator in any jurisdiction?
☐ Yes  ☐ No
9. Have you ever had your license to offer or sell insurance products or securities suspended or revoked in any jurisdiction?
☐ Yes  ☐ No
10. Do you hold a current Certificate of Continuing Education for California and/or Iowa? ☐ Yes (Please attach a copy)  ☐ No
11. Have you taken the AML training course? ☐ Yes  ☐ No
(If not, you are required to complete the LIMRA AML training course and will be entered into the LIMRA database.)

**If the Answer to any question from 1-9 above is yes, please attach an explanation. Additional information such as supporting documents may be required.**

By signing below, I: (i) certify that all of the information provided on this form is true and correct and I acknowledge that my failure to provide truthful and accurate information is a valid basis for the immediate termination of my relationship with Fidelity & Guaranty Life Insurance Company of New York (the "Company" in reference to either or both, as applicable), for cause; (ii) acknowledge that I have received, read, and will comply with the Company's Code of Ethical Conduct and Market Conduct Guide, and that I have received, read, and agree to be bound by the terms of the Company's Producer/Agency Agreement (each as amended from time-to-time). I understand that I can access all of these documents on SalesLink.

Signature of Producer
or Principal of Agency: _Leon Lowenthal_
       Date: _2-2-15_

---

**To be completed by the Appointing Agency**
Name of Agency: **Brokerage Insurance Partners, Inc.**       AGA Code: **000316013**
Approved compensation level/contract type(s): **L5 for Life**
Signature of Authorized Agent: _Brian Whalen_       Date: **02/02/2015**
Only Authorized forms can be faxed directly to Fidelity & Guaranty Life at 410.895.0129.

---

FAIR CREDIT REPORTING ACT DISCLOSURE AND

**EXHIBIT C**

## AUTHORIZATION FOR EMPLOYMENT PURPOSES

Please be advised that a consumer report or investigative consumer report may be obtained from a consumer reporting agency for the purpose of evaluating you for employment, promotion, reassignment, or retention as an employee. This report may contain information bearing on your credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living. Some of this information may be obtained by contacting and interviewing your present and previous employers or references supplied by you.

Please be advised that if interviews are conducted to obtain some of the above-described information, you have the right to request, in writing, within a reasonable time, that we make a complete and accurate disclosure of the nature and scope of the investigation.

You also have the right to request a written summary of your rights to obtain and dispute information in consumer reports and to obtain credit scores.

**By signing this form, I hereby authorize all entities having information about me, including present and former employers, personal references, criminal justice agencies, departments of motor vehicles, schools, licensing agencies, and credit reporting agencies, to release such information to Fidelity & Guaranty Life or any of its affiliates or carriers. I acknowledge and agree that this Release and Authorization shall remain valid and in effect during the term of my employment.**

Agent Name/Principal of Agency Name: _____ *Leon Lorentz* _____

Agent Number/Social Security Number: _____

Signature: _____

Date: _____ 2·2-15 _____

**EXHIBIT D**

# Code of Ethical Conduct for Producers and Employees

INSURER: **FIDELITY & GUARANTY LIFE INSURANCE COMPANY**

**Fidelity & Guaranty Life Insurance Company**
**Fidelity & Guaranty Life Insurance Company of New York**
**Fidelity & Guaranty Business Services, Inc.**
**Fidelity & Guaranty Securities, Inc.**
**Fidelity & Guaranty Assignment, LLC**
*(collectively referred to as the "Company")*

**Effective: May 1, 2008**

As a Company, we are committed to treating our customers fairly and ethically. This Code of Ethical Conduct ("Code") makes that commitment by the Company and its employees. We expect our Producers (the individuals and firms authorized to sell and distribute our Insurance Products) to share this commitment. Therefore, we ask that our producers and employees provide evidence of their agreement to this Code by returning a signed copy to the Company.

## Principles

We commit ourselves, in the sale of our Insurance Products **:**

- To conduct business according to high standards of honesty and fairness and to treat our customers as we would expect to be treated.
- To provide competent and customer-focused sales and service.
- To compete fairly.
- To provide advertising and sales material that is clear, honest, and fair.
- To handle customer complaints and disputes fairly and promptly.
- To maintain a system of supervision and monitoring reasonably designed to demonstrate our commitment to and compliance with these principles.

## Policies

It is our policy, in the sale of our Insurance Products to:

<u>Meet the Needs of our Customers</u>

We will:

- Enter into insurance transactions which assist customers in meeting their insurable needs and objectives.
- Have procedures designed to reasonably assure that recommendations made by Producers to purchase Insurance Products are suitable based upon relevant information obtained from customers.
- Maintain a process to comply with laws and regulations that are related to this Code in the marketing and sale of Insurance Products.
- Proactively – in cooperation with consumers, regulators, other producers and others – seek to improve the life insurance industry's practices for marketing and sales of Insurance Products.
- Adopt and support the concepts in this Code of Ethical Conduct.
- Take corrective action upon identifying any violations of this Code.

# Code of Ethical Conduct for Producers and Employees

INSURER: **FIDELITY & GUARANTY LIFE INSURANCE COMPANY**

## Use Qualified and Trained Producers and Employees

The Company will:

- Have appropriate criteria or guidelines for selecting producers and appropriate employees of good character and business repute who have appropriate qualifications.
- Ensure that producers are licensed, appointed (where necessary), and meet other applicable regulatory requirements required to solicit the Company's Insurance Products.

Further:

- Producers who manage other Producers shall share in this commitment.
- Training will be provided or made available to Producers and appropriate employees, on how to comply with laws and regulations, with Company procedures, and with this Code as well as with respect to the Company's products and their features.
- Information will be provided or made available to Producers and appropriate employees about the Company's applicable Insurance Product(s) and the features and operation of the product(s). The information may be provided or made available through various methods, including: sales, marketing or other descriptive product materials; manuals; training or training materials; software; websites or system-based information; or other appropriate means.

We will:

- We will encourage Producers and appropriate employees to participate in continuing education designed to provide current knowledge regarding products, industry issues and emerging trends.

## Compete Fairly

We will:

- Engage in fair and active competition in the marketing and sales of our Insurance Products.
- Maintain compliance with the applicable state and federal laws fostering fair competition; and
- Refrain from making disparaging remarks about competitors.

Where the sale of an Insurance Product involves a replacement, the Company and, where appropriate, its Producers will:

- Provide consumers with information they need to ascertain whether a replacement is appropriate—including reasons why replacement might not be appropriate; and
- Have procedures to review replacement activity which include a system for tracking, identifying and addressing deviations from the Company's replacement policies and procedures.

# Code of Ethical Conduct for Producers and Employees

INSURER: **FIDELITY & GUARANTY LIFE INSURANCE COMPANY**

## Sell Fairly and Use Clear and Accurate Sales Materials

Further:

- Advertising and sales material that is designed to lead to the sale or solicitation of the Company's Insurance Products will be presented in a manner consistent with the needs of the customer.
- Such advertising and sales material will be based upon the principles of fair dealing and good faith and will have a sound basis in fact.
- Such materials that are presented as part of a sale will be clear and understandable in light of the complexity of the product being sold.
- Such materials are not permitted to be used in the sale of the Company's Insurance Products unless and until they are reviewed and approved by the Company for compliance with this Code and with applicable laws and regulations related to advertising, unfair trade practices, sales illustrations and other similar provisions.

The Company will:

- Maintain procedures designed to control that sales illustrations or other representations of premiums and considerations, costs, values and benefits are accurate, fair, and complete and contain appropriate disclosures. Where appropriate, guaranteed and non-guaranteed elements will be clearly identified, distinguished and explained.

## Appropriately Handle and Monitor Complaints

The Company will:

- Identify, evaluate and handle customer complaints in compliance with applicable laws and regulations.
- Provide an easily accessible way for customer to communicate complaints.
- Will maintain policies and procedures designed to reasonably assure that customer complaint information gathered is analyzed and efforts are made to eliminate their root causes.
- Maintain policies and procedures to reasonably assure that it makes good faith efforts to resolve complaints and disputes.

## Supervision and Monitoring

The Company's management and Producer will:

- Have established and enforced policies and procedures reasonably designed to demonstrate our commitment to and compliance with this Code.

The Company will:

- Have a system of supervision over the sales and marketing activities of its producers and appropriate employees relating to its Insurance Products is designed to reasonably assure compliance with this Code and with applicable laws and regulations. In appropriate distribution systems of independent producers, the Company may agree that a Producer's firm or other independent intermediary will perform supervisory responsibilities as specified in a written agreement with the firm or intermediary.

# Code of Ethical Conduct for Producers and Employees

INSURER: **FIDELITY & GUARANTY LIFE INSURANCE COMPANY**

- Train appropriate employees on this Code, relevant Company compliance policies and procedures, and applicable laws and regulations.
- Monitor the sales and marketing practices of its producers and appropriate employees to ensure compliance with this Code and applicable laws and regulations.

Maintenance of Policy

This Policy will be reviewed on a regular basis by the Chief Compliance Officer of the Company (CCO) and the CCO will be responsible for proposing any necessary amendments to ensure it remains accurate.  Any known exceptions to this Policy should be brought to the attention of the CCO for evaluation and reporting to the General Counsel and other members of senior management as deemed appropriate.

* By affixing one electronic signature to the Code of Ethical Conduct, Insurance Agency/Producer acknowledges that the acceptance/agreement to the terms of the Code of Ethical Conduct does apply to any identification numbers that have been assigned by the Company to the Agency/Producer.

Insurance Agency/Producer may execute this Guide electronically by accessing the Company's producer intranet site and providing acceptable authentication information that will permit the Company to rely upon Insurance Agency's/Producer's electronic 'signature'.

Acknowledged and Agreed to by:

_____        _____

Signature                                                                                      Date

_____

Printed Name

# EXHIBIT E

# MARKET CONDUCT GUIDE

INSURER: FIDELITY & GUARANTY LIFE INSURANCE COMPANY

**Fidelity & Guaranty Life Insurance Company**
**Fidelity & Guaranty Life Insurance Company of New York**
(Collectively referred to herein as the "Company")

## INTRODUCTION

A reputation for fair dealing and integrity is essential to the long-term success of insurers and their Producers who sell products to help meet the needs of their customers. We achieve that goal by striving to comply with both the letter and the spirit of laws and regulations impacting our business. This is a shared commitment between the Company and our Producers. Producers shall, among other things, acknowledge receipt and agree to be bound to the terms of a Producer Agreement with the Company, this Market Conduct Guide, and the Company's Code of Ethical Conduct. Failure of a Producer to meet the standards of this Guide or the Code of Ethical Conduct, or to abide by the terms of the Producer Agreement may, at the Company's sole discretion, result in disciplinary or remedial action, including termination of the Producer's appointment with the Company.

This Market Conduct Guide establishes standards of conduct for Producers appointed by the Company. The goal of this Market Conduct Guide is to provide concise, understandable and usable information and guidance for the Producer. This Guide may not always reflect the complexity and changes of insurance regulation, so this Guide is sometimes only a summary and not definitive guidance. Whenever you have questions about a compliance issue and cannot find the answer in the Guide, please call your designated representative at our Sales Support line at 1-800-445-6758 or the specified contact person for your distribution channel. If you are unsure about whom to call or if you do not receive a clear answer, please call the Law and Compliance Department in the Home Office at 1-888-697-5433.

ADMIN 5516(01-2011)          Fidelity & Guaranty Life Insurance Company Des Moines, IA          Rev 12-2014

**EXHIBIT E**

# TABLE OF CONTENTS

I.      Suitability ............................................................................................................3

II.     Replacements ......................................................................................................6

III.    Applications Taken In A State Other Than State Of Insured's Residence ...........................7

IV.     Producer Licensing, Appointment, Commissions And Education Requirements ..............7

V.      Sales & Marketing Material Compliance Requirements ........................................9

VI.     Sales Illustrations ............................................................................................14

VII.    Unfair Trade Practices .....................................................................................15

VIII.   Written and Oral Disclosures ..........................................................................18

IX.     Special Rules For Fixed Indexed Products .......................................................22

X.      Special Rules For Applicants Over 60 Years Of Age .........................................22

XI.     Fraudulent Insurance Acts ...............................................................................22

XII.    Anti-Money Laundering Program .....................................................................23

XIII.   Customer Monies ............................................................................................25

XIV.    Sales Through Financial Institutions ...............................................................26

XV.     Customer Complaints ......................................................................................26

ADMIN 5516(01-2011)           Fidelity & Guaranty Life Insurance Company Des Moines, IA           Rev 12-2014

## I.    Suitability

The Company expects Producers to treat customers fairly and honestly. Producers are expected to recommend and sell the Company's products based upon customer needs and financial objectives. The professional designations used by the Producers to sell our products must be authentic and representative of an accredited organization and comply with all Company issued guidance.

To identify a customer's needs and objectives for an insurance or annuity product, we require Producers to assess insurance, financial and personal information obtained from the consumer at the time of sale. When a Producer makes a recommendation for one or more of the Company's products, our expectation is that the Producer has made a reasonable effort to gather information necessary to make an appropriate recommendation to the consumer, and that the recommended product be suitable for the consumer based on such information.

The Company has developed a suitability program designed to assist Producers in gathering relevant information from consumers and making recommendations that are suitable in compliance with the National Association of Insurance Commissioner's (NAIC) Suitability in Annuity Transactions model regulation or any successor thereto. Key elements of the suitability program include the following:

**A.    Company Requirements**. The Company requires that all Producer recommendations for the purchase or replacement of annuity products should have a reasonable basis as to their suitability for the consumer, based on the information disclosed by the consumer to the Producer at the time the recommendation is made. The Company also requires its appointed Producers to make every reasonable effort to present each consumer with the information necessary to make well-informed decisions relating to the purchase, exchange, or replacement of any annuity product.

At a minimum, Producers and their clients should be able to answer "yes" to each of the questions below prior to completion of any annuity purchase, exchange, or replacement:

- Does the client understand the key features of the product?

- Does the client understand the purpose of the annuity?

- Does the client have adequate remaining funds in case of an emergency? Is the client comfortable there are no likely, foreseeable significant adverse changes in income or expenses during the annuity surrender period that may affect the client's decision to purchase an annuity?

- If the client is replacing or exchanging another product with this annuity, does the client understand the pros and cons of the exchange, i.e., tax penalties, surrender charges, new surrender periods, loss of existing benefits? Will the consumer benefit from the new annuity's features and enhancements such as any riders selected? Is the complete transaction (including surrender and purchase) suitable?

3

B.    **Suitability Reviews**. The Company has established home office procedures for reviewing the suitability of annuity sales transactions. The process involves a review of information submitted with every application, including a review of the Company's Suitability Acknowledgement Form ("SAF"). The SAF will be reviewed to determine whether the suitability information provided in connection with the transaction:

- Appears to reflect a reasonable basis as to suitability and should be allowed to proceed to issue;

- Appears to lack a reasonable basis as to suitability and should be declined; or

- Requires further review of certain factors and should be held until the Company completes its review.

In situations where additional review is required, the Company will conduct an elevated review of the suitability information, which may include:

- Contacting Producers by telephone with additional questions

- Conducting telephone interviews with applicants; and/or

- Requesting written responses and/or documentation from Producers to support purchase, replacement, or exchange recommendations.

The Company will decline transactions determined via the suitability review process to lack a reasonable basis as to suitability. The Company reserves the right to offer customers the right to free-look an issued annuity at any time and may charge back any commissions paid on that transaction.

C.    **Producer Responsibilities**. Producers must have reasonable grounds for believing that the recommendation of the purchase, replacement or exchange of an annuity is suitable based on the insurance needs and financial objectives disclosed by the consumer. It is the Producer's responsibility to recommend the purchase, exchange, or replacement of an annuity only after carefully evaluating the unique financial circumstances, objectives and needs of the customer and determining an annuity is suitable.

Prior to the recommendation to purchase, exchange or replace an annuity, Producers must also ensure the following:

- The consumer has been reasonably informed of the material features of the annuity,

- The consumer will benefit from purchasing the annuity, and

- The annuity as a whole is suitable for the consumer.

When a recommendation involves a replacement or exchange, Producers are also required to consider the following:

4

- Will the consumer incur surrender charges, negative market value adjustments or other charges like premium bonus vesting adjustments?

- Will the consumer benefit from product enhancements (such as riders)?

- Has the consumer had another annuity exchanged or replaced within the preceding thirty-six (36) months?

D.     **Suitability Acknowledgement Form.**  The Suitability Acknowledgement Form is an essential part of the Company's suitability program and is required with every new annuity application. The SAF is designed to help Producers assess the consumer's financial situation and determine whether an annuity is suitable by asking many of the questions to be considered prior to making an annuity recommendation, including but not limited to:

- What are the consumer's net worth and liquid assets?

- How much of the consumer's liquid assets will remain after the purchase of the annuity? Will the consumer's income after the purchase of the annuity sufficiently cover his or her living expenses?

- What is the consumer's monthly disposable household income?

- What is the source of the funds being used to purchase the annuity?

- What is the consumer's purpose for purchasing the annuity, i.e., what financial goals will this annuity help the consumer achieve?

- Does the long term nature of an annuity product fit the consumer's time horizon? How long does the consumer intend to keep the annuity?

- What is the consumer's investment experience? What other products does the consumer currently own or has owned in the past?

- What is the consumer's federal tax bracket?

- How much risk is the consumer willing and able to sustain in exchange for potentially greater gain?

E.     **Specific Training and Continuing Education.**  Producers are responsible for being knowledgeable of all material features of Company products prior to soliciting sales of such products on behalf of the Company. Producers shall satisfy product-specific training requirements established by the Company and certify they have completed such training prior to solicitation. Producers shall also be responsible for complying with continuing education requirements established by individual states pertaining to the sale of annuity products, suitability, or other related matters. The Company reserves the right to withhold or deny commission to Producers for failure to comply with product-specific training, continuing education requirements, or other Company certifications or requirements.

## II.    Replacements

When replacing a customer's existing life insurance policy or annuity with a new product, the Producer must confirm and document that the replacement is suitable for the consumer. The replacement analysis is frequently governed by specific state requirements, including collecting information about the old product, including surrender charges and other negative adjustments, and using state mandated replacement forms where required. The guiding principle in replacement transactions is that the transaction should not be made unless there is a reasonable basis that it is in the customer's interest. Replacements contrary to the customer's interest and made for the purpose of generating sales commissions for the Producer are inappropriate and unacceptable. **Producers are required to refrain from initiating any replacement sale unless the Producer believes, taking into account all relevant factors such as application of surrender and other charges on the replaced policy, that the customer will benefit from the transaction.**

"Replacement" means any transaction in which a new insurance policy is to be purchased, and the Producer knows or should know that an existing insurance policy has or will be:

- Lapsed, forfeited, surrendered or partially surrendered, or otherwise terminated;

- Converted to reduced paid-up insurance, continued as extended term insurance, or otherwise reduced in value by the use of non-forfeiture benefits or other policy values;

- Amended so as to effect either a reduction in benefits or in the term for which coverage would otherwise remain in force or for which benefits would be paid;

- Reissued with any reduction in cash value; or

- Surrendered, borrowed against, or withdrawn from in order to purchase a new insurance policy or annuity.

Most states also define "replacement" to include internal replacements of policies issued by the same insurer. With the exception of a policy change or exercise of a conversion privilege under the terms of the existing insurance policy, replacement laws and regulations apply to any transfer or exchange from any policy to another.

### Duties of Producers

All Producers must complete with the applicant the application for an insurance policy in its entirety, including the section regarding replacement of existing insurance, which requires both the Producer and applicant to sign, verifying whether a replacement of an existing policy or contract is involved.

With respect to replacements involving the Company's products, the Producer shall:

- Provide the applicant with a "Notice Regarding Replacement," or any other form required by the state, to be signed by both the applicant and the Producer and left with

6

the applicant. Producers are required to send a copy of the completed replacement form to the Home Office along with the application. Forms for each state are available from the Company.

- Record on the application and the Notice of Replacement form a list of all existing insurance policies to be replaced and properly identified by name of insurer, the insured, and contract number.

- Leave with the applicant a copy of any and all sales materials including illustrations, if applicable and/or used at the time the application is taken.

## III.   Applications Taken In A State Other Than State Of Insured's Residence

Applications must be taken and signed in the applicant's state of residence except in those limited circumstances set forth below. The crossing of state lines by a Producer or client for the purpose of selling or purchasing insurance products other than in those limited circumstances set forth below violates Fidelity & Guaranty Life Insurance Company's policy and may contravene state regulation. Producers found to have engaged in this practice may be terminated in accordance with Section 26 of the Producer's Agreement.

The Company recognizes that out-of-state applications may be acceptable in certain limited circumstances. These are limited to the following circumstances:

- A sale to a client who maintains a secondary residential address in the state where the application was signed, and delivery of the policy is taken in the same state where the application was signed;

- A sale to a client who maintains a business or works in a business located in the state where the application was signed, and delivery of the policy is taken in the same state where the application was signed; or

- A sale to a client where the solicitation of the policy occurred in the state where the application was signed, and delivery of the policy is taken in the same state where the application was signed and, further provided, that the Producer making the sale maintains a permanent office in the same state.

A Producer submitting an application taken in a state other than the applicant's state of residence must submit a written explanation (NEXUS Confirmation Form) of the facts regarding reasons for the address discrepancy, to be submitted with the application.

## IV.   Producer Licensing, Appointment, Commissions And Education Requirements

### General Requirements

All 50 states and the District of Columbia have laws requiring licensing of persons engaged in the business of selling insurance. In addition, most states require that even after a business or individual has obtained a producer's license, the Producer may not represent an insurance

company unless the Producer is specifically designated, or "appointed," by the insurance company to sell its products.

These licensing and appointment requirements are prominently stated in the Company's Producer Agreement, which contains a representation that the Producer is properly licensed and authorized to sell the types of contracts covered by the agreement. When there is doubt concerning licensing and appointment requirements, Producers are encouraged to call Sales Support at the Home Office or the specified contact person for the appropriate distribution channel for guidance.

Producers are responsible for obtaining and maintaining licenses in every state, or the District of Columbia, where they are selling insurance for either Fidelity & Guaranty Life or Fidelity & Guaranty Life of NY. This includes completing the continuing education required by the department(s) of insurance in the relevant jurisdictions(s), and notification of any relevant changes in licensing status.

### Resident and Non-Resident Licenses

Producers must be licensed in each state where they do business. To be legally entitled to conduct an insurance business in the Producer's state of residence, the Producer must apply for and obtain a license in that state. In addition, many states require that any non-resident maintain a license in their state of residence, even if the Producer does not engage in any sales activity in their state of residence.

Producers must also observe the licensing requirements of any other jurisdiction in which they do business. It frequently happens that a Producer residing near the border of one or more other jurisdictions sells insurance products in both the Producer's state of residence and the adjoining states. It is generally understood that a Producer will be subject to licensing in all states where he or she solicits or negotiates insurance sales, delivers contracts, collects premiums, or has an office for the conduct of an insurance business. Where there is a doubt concerning the necessity of obtaining a nonresident license, Producers are urged to contact the relevant insurance regulator for that jurisdiction, or call Sales Support or the specific contact person for the appropriate distribution channel.

### Appointment

Producers must also be appointed with the Company to solicit business or take applications for the Company's products. State laws may differ on the precise timing of appointments and the actions that Producers may take before appointments are filed with the state insurance department, so contact Sales Support with any questions.

As a part of the appointment process, the Company performs criminal and civil background checks on all Producers. One of the reasons for performing a criminal background check is to satisfy the Company's obligations under the Federal Violent Crime Control Act ("FVCCA"). The FVCCA makes it a felony for a company engaged in the business of insurance to willfully permit the participation of a person who has previously been convicted of a felony crime involving dishonesty or a breach of trust. Producers should note that the FVCCA contains no "grandfather" provision for persons already working in the business of insurance. The FVCCA

effectively makes it a crime for any insurance company or its subcontractors to continue to do business with an individual after the company or subcontractor learns of a conviction. In addition, the Company reserves the right to terminate or decline a Producer's appointment for criminal history beyond that covered under the FVCCA.

## Commissions and Continuing Education

It is the Company's policy to pay commissions only to Producers who have satisfied applicable licensing and appointment requirements. In addition, most states have adopted continuing education requirements that vary by jurisdiction. In order to maintain state licenses, Producers must stay informed and up-to-date on continuing education requirements in all states where they do business.

## V.    Sales & Marketing Material Compliance Requirements

Communications to those that distribute our products and to the general public must be accurate, informative and creative, and must represent the highest standards of ethics and integrity, balanced and appropriate disclosure and compliance. The Company's Sales & Marketing Material Compliance Policies & Procedures ("Marketing Material Procedures") encompass regulatory requirements and best practices governing sales and marketing material, most notably NAIC Model Advertising Rules adopted by most states..

### Material subject to these requirements

Material subject to these requirements includes any public or producer-use-only material created or used by the Company or any Producer, regardless of the type of media, delivery medium or method of distribution, that is designed to:

1.    create interest among the public or any Producer of insurance products in the Company or its products;

2.    induce the public to purchase, increase, modify, reinstate, borrow on, surrender, replace, or retain a Company policy; or

3.    train or solicit any Producer to induce the public to purchase, increase, modify, reinstate, borrow on, surrender, replace or retain a Company policy.

**Such materials subject to our review include, but are not limited to, these specific kinds of materials, regardless of who prepares them (including materials prepared by or purchased from independent parties):**

1.    Printed and published material, audio/visual material, and descriptive literature used in direct mail, newspapers, magazines, directory ads, telephone yellow page ads, radio and television scripts, web sites and other Internet and Intranet displays or communications, other forms of electronic communications, billboards, and similar displays.

9

2.     Descriptive literature and sales aids of all kinds, including but not limited to circulars, leaflets, booklets, depictions, illustrations, and form letters and lead-generating devices of all kinds.

3.     Material used for the recruitment, training, and education of a Producer and used or designed to be used to directly induce the public or to train Producers to induce the public to purchase, increase, modify, reinstate, borrow on, surrender, or replace a Company policy.

4.     Prepared sales talks, presentations, and related material, including training material.

5.     Solicitation material included with a policy upon policy delivery and material used in the solicitation of renewals and reinstatements unless it is purely factual and administrative and contains no promotional language.

**Such materials not subject to our review include:**

1.     Communications with policyholders that do not urge policyholders to purchase, increase, modify, reinstate, or retain a Company policy. However, if as a secondary purpose the piece mentions benefits or features of a Company policy, the piece must be submitted for review and approval under the Marketing Material Procedures.

2.     Individualized correspondence from an agent to a single prospect or policy owner, although a substantially similar letter being sent to more than one such prospect or policy owner will generally be considered to be a form letter that is subject to review and approval under the Marketing Material Procedures.

Producer-use-only material subject to this requirement is material designed to be used only with and to only be seen by, insurance-licensed Producers and is not to be used for marketing purposes. If such material is likely to be seen by financial professionals without appropriate licensing to distribute Company products (such as Registered Investment Advisor or fee-based financial planners who do not have insurance licenses) or by the public (such as an advertisement in National Underwriter or other trade journal routinely left in customer waiting areas of a Producer's business), it is considered public use material.

**Requirements for Prior Approval**

All Sales and Marketing communications that are subject to the Marketing Material Procedures must be submitted to and approved by the Company PRIOR to use. As stated in the Company's Producer Agreement, failure to obtain the Company's approval of all such material prior to its use may constitute grounds for immediate termination.

The process for obtaining our review of Sales and Marketing communications subject to our review are as follows:

**Submitting Sales and Marketing Communications for Compliance Review and Approval**

- Material must be submitted electronically via email to one of the following email addresses:

  adreview@fglife.com – for Non-Variable Annuity & Life ads

- The following information must be included in the email request for review:

  a.   Product

  b.   Type of material

  c.   Intended use of material

  d.   Distribution area/states where material is to be used

  e.   Estimated number of distribution

- The following types of ads should be submitted for review and approval:

  a.   Printed and published material – consumer brochures, magazine ads, newspaper ads, direct mailers, radio and television scripts, websites, billboards, etc.

  b.   Descriptive literature – circulars, pamphlets, booklets, form letters, etc.

  c.   Material used for recruitment, training and education – Agent manuals, PowerPoint presentations, Product Highlights, Flyers, speeches, etc.

**General Requirements**

- The following disclosures should be included on every ad before being submitted for review and approval:

  o   Product Type – i.e., SPDA, Universal Life, Fixed Index Annuity, etc.

  o   Form Numbers

  o   Full legal name of the Company as well as city and state of domicile

  o   If a Producer piece – For Producer Use Only

Our review of field-submitted material generally takes seven to ten days.

**Sales and Marketing Communications Content Standards**

Following are general guideline standards.

ADMIN 5516(01-2011)          Fidelity & Guaranty Life Insurance Company Des Moines, IA          Rev 12-2014

## A.  Content Standards for ALL Sales & Marketing Material

1.  **MUST**

   a.  If a product is named, must **identify at least once and early the kind of product** being discussed. Not just the marketing name, but "[marketing name] single premium deferred annuity." **Identify the issuing insurer's full and complete name**, and not use marketing names or parent or affiliate company names or the Producer's name in a way that confuses which company is financially responsible for contract obligations.

   b.  **When citing ratings**, the basis for the rating and its ranking relative to all ratings available from the rating agency must be disclosed. (Example: A rating (Excellent) from A.M. Best for financial strength and operating performance. (3rd highest of 16 ratings.)) A.M. Best rating may be used by itself; use of other agency ratings must also include the A.M. Best rating.

   c.  **Cite sources** for quoted material or statistics and the cited materials must not be materially out of date.

   d.  Be based upon principles of **fair dealing and good faith**.

   e.  Be **fair and balanced**. When discussing features and benefits of a product, the limitations must be equally and prominently disclosed. For example, when advertising index crediting strategies for products that do not have a traditional cap rate, the piece must include additional disclosures about other limitations on the upside of the crediting methodology such as participation rates and spreads. Additionally, if the underlying index is a volatility control index, additional disclosure may be required to help facilitate understanding about the potential limited upside of such indices. Finally, when a piece is submitted with hypothetical, non-guaranteed values, the guaranteed values must be displayed in close and equal proximity thereto.

   f.  Provide a **sound basis for evaluating the facts** about the product or strategy discussed,

   g.  Disclose the relationship to the Company of any unrelated person or entity identified in the advertisement, noting any non-affiliation between them and the Company if it is not otherwise clear.

   h.  For Testimonials:

      i.  Disclose if compensation was paid for an endorsement or testimonial.

      ii.  If the testimonial is about product results or benefits or makes specific service statements or claims, state the testimonial may not be representative of another's experience. (A simple claim that "[    ]'s service was friendly, professional and prompt. "needs no disclaimer.)

12

      iii. Cite knowledge and experience of the person quoted sufficient for a consumer to recognize the person as an expert if the testimonial is about an aspect of the product requiring expertise to form a valid opinion.

      iv. "Institutional Sales Material" may not need as much detail about testimonial disclosure. (Consult a Compliance or Law Advertising Reviewer.)

i. Have verifiable support (to be kept at least in the advertising originator's files) of any claims made in the sales and marketing material. (Example: Claims that a product's costs are lower than industry averages.)

j.

k. 'Puffery' must have a basis in verifiable fact. (Contact the Law or Compliance Advertising Review member for information about adjectives that are and are not acceptable 'puffery.')

2. **CANNOT**

a. **Imply a life insurance policy (other than a limited term life policy) or annuity is a short-term, liquid investment.** Presentations regarding liquidity or ease of access to policy values must be balanced by clear language describing the negative impact of early redemptions (including unpaid policy loans). Such disclosure may include loss of policy value, death benefit protection, and tax penalties.

b. **Omit any material fact or qualification** if the omission, in light of the content of the material presented, would cause the communication to be misleading.

c. **Relegate disclosure to a footnote** if doing so inhibits a fair and balanced clear understanding of the content. Some regulators disallow most footnoting of disclosure.

d. **Include any false, exaggerated, unwarranted or misleading statement or claim.** (Consider the context in which the claim is made, and the clarity of the claim.)

e. **Partially compare products** (including features like performance or specific benefits) or services without disclosing that the products likely have other different features, costs and expenses that should be considered in evaluating both products.

f. Claim a product or feature is tax-free or exempt when the tax is merely deferred.

ADMIN 5516(01-2011)          Fidelity & Guaranty Life Insurance Company Des Moines, IA          Rev 12-2014

g.  Use the existence of state guaranty funds/associations to promote the safety of assets invested in insurance products.

h.  Make any statement (i.e., such as the policy will be "self-supporting") or represent in any way that premium payments will not be required unless such representation is accompanied by an adequate explanation as to what benefits would be provided or discontinued at the time when payments will no longer be required, and the conditions under which this would occur.

i.  'Puffery' cannot be promissory or infer certainty about a product's non-guaranteed risks and uncertainties; and cannot compare or infer comparison to other products or companies unless enough information is provided to fairly, completely and accurately evaluate the comparison or at least provide adequate notice of the limited or incomplete comparison being made.

## VI.   Sales Illustrations

### General Rule

With regard to the Company's products, Producers may only use illustration software approved and issued by the Company. Any use or altering of illustration software or an illustration produced with that software without prior approval of the Company is strictly prohibited. If any sales illustration is used to solicit the Company's products, the applicant must receive a copy of the illustration.

### Prohibitions

Producers may not:

- Represent a policy as anything other than life insurance or an annuity, as applicable;

- Make any representation regarding the past performance of the Company's products other than the representations contained in the illustration, or represent that a product's past performance is a reliable indicator of future performance;

- Provide an illustration without clearly indicating that the current interest rate illustrations are based on the Company's current rate schedule, are shown for illustration purposes only, and are not guaranteed;

- Provide an applicant with an incomplete or altered policy illustration;

- Display the current interest rate illustration with such prominence as to render the guaranteed interest rate illustration obscure; or

- Illustrate any of the Company's products not clearly identified by its generic type of life insurance name, and the Company's product name, if different.

## VII.    Unfair Trade Practices

The purpose of this section is to identify certain acts or statements that constitute unfair or deceptive trade or business practices in the sale of the Company's products, in addition to improper advertising as discussed above. The Company will not tolerate unfair trade practices employed by any appointed Producer. When discovered, such acts may be grounds for termination for cause. **Please note that the fact that a specific practice is not mentioned here does not imply the practice is acceptable if it is otherwise inappropriate or unlawful.**

The core philosophy of the Company is that Producers must always deal with policyholders and prospective policyholders in a fair, balanced, and truthful manner. Producers must strive to make full and accurate disclosure so policyholders and prospective policyholders can make informed decisions. Producers should consider each consumer's individual circumstances to ensure reasonable efforts are made to help that consumer make good decisions relative to our products and services.

The following unfair trade practices are prohibited and the Company reserves the right to discipline any Producer found to have engaged in any of these unacceptable practices. This prohibition applies whether the Producer engages in such inappropriate practices in representation of our Company products and services or in the course of any other activities unrelated to our Company products and services.

### Misrepresentation

"Misrepresentation" means any statement which contains false or misleading information, including misleading information because of incompleteness. Specifically, a Producer may not:

- Make or cause to be made any misrepresentation concerning the benefits, advantages, conditions, or terms of an insurance policy;

- Provide false information or fail to provide full disclosure of all requested information on an application for the Company's products;

- Use false or misleading information to induce the lapse, forfeiture, exchange, conversion, or surrender of an insurance policy;

- Obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statement made (in light of the circumstances under which it was made) not misleading; or

- Employ any device, scheme, or artifice to defraud.

Among other things, this means the dissemination of false information and advertising is impermissible. Our Company rules relating to advertising materials are described in detail above. Additionally, Producers must ensure any other oral or other written statements are true and that appropriate disclosures are made to ensure any statements are not misleading by omission of related important information. This includes statements regarding product features,

interest rates, agent compensation, length of sales presentations, company financial ratings, and any other matters pertinent to the sales process.

Examples of specific statements agents should not make without appropriate explanations are the following:

- "No one has lost money on an annuity" or "annuities are 100% safe" (not true for consumers who incur surrender charges or lose cash value resulting from insolvency).

- "Annuities always pay higher interest rates than banks" (such generalizations are not true though it is okay to say specific annuities pay higher interest rates on specific bank products if demonstrably accurate).

- "Annuities are as safe as deposits insured by the FDIC" or "annuities are insured by the government" (this is untrue and in any case references should never be made to FDIC other than to say annuities are not protected by the FDIC).

- "No commission is paid on the sale of an annuity" or "my salary is fixed" or any other statement implying you are paid other than by commission (though it is okay to say there are no fees paid by the consumer if the annuity and any applicable riders in fact have no fees).

- "The sales presentation takes only a few minutes" or "the sales presentation will take less than a half hour" (if the sales presentation typically takes longer).

- "Annuities are safer than other investments" or "annuities pay a higher return than stocks, bonds, or CDs" (such generalizations are impermissible without supportable details relative to specific comparisons of products with full and balanced disclosure).

- "Fidelity & Guaranty Life is one of the safest companies" or "one of the highest rated companies" (though it is okay to explain the Company's rating in accordance with the advertising guidelines above).

- "Annuities protect assets from Medicaid" (generalizations of this kind are untrue and any specific information about the relationship between an annuity and government assistance programs should only be made by qualified attorneys or other professionals).

- "You can always terminate our annuity" (without explaining that there could be surrender charges, tax implications, and other relevant adverse considerations).

- "The interest rate under the annuity will never go below X%" or "the rate of X% is guaranteed" unless factually accurate (whenever discussing annuity interest rates an agent must disclose any minimum guaranteed interest rates, the duration of such guarantees, the discretion of the Company to change future rates or variables affecting future rates as applicable, and any other information necessary to ensure the consumer is not misled about interest rate guarantees or how interest rates are set for the annuity).

16

- "My primary loyalty is to you" or "I am a fiduciary" or similar words or phrases that would tend to mislead the consumer to believe that you put the interests of the client above the interests of the Company or yourself.

The foregoing statements are just examples and by no means exhaustive; other examples are provided below in the section on Disclosures. The goal of each Producer should be to provide fair and balanced information to consumers so they can make informed decisions about Fidelity & Guaranty Life, our products, and you as their insurance agent. You must use good judgment to assess each interaction with your customers and ensure that they are given truthful, accurate, and relevant information befitting their needs and objectives.

## Rebating

"Rebating" means any offer to pay or return premiums or commissions to induce the sale of insurance. For example, an agreement to pay the customer a portion of the commission on a sale would constitute rebating. Unless permitted under state law, Producers may not offer to rebate premiums or commissions or offer any other benefit, except those benefits specified in the policy, to induce the sale of the Company's products.

## Sales Inducements

"Sales inducements" means any gift, prize, goods, wares, merchandise or other item of valuable consideration given as an inducement to enter into any insurance contract, or as an inducement to receive a quote, submit an application or in connection with any other solicitation for the sale of insurance. Sales inducements may also include an agreement of any form or nature promising payment to another for referral or future business. For example, in some states a Producer may not pay a mortgage banker for referral of a new homebuyer who purchases life insurance. Unless permitted by State law, the Company treats "sales inducements" as an unfair trade practice.

## Twisting

"Twisting" describes the practice of using written or oral statements that misrepresent or inaccurately compare the terms, conditions, or benefits contained in a policy for the purpose of inducing or attempting to induce the policyholder to lapse, forfeit, surrender, retain, exchange or convert an insurance policy. For example, falsely describing the features of a competitor's policy to induce the replacement of that policy with either Company's policy – or vice versa -- would constitute "twisting."

## Discrimination

"Discrimination" means refusing to accept applications, refusing to insure, refusing to continue to insure, or limiting the amount, extent or kind of coverage available to an individual, charging a higher rate for the same coverage solely because of the sex, marital status, age, race, religion, national origin or physical or mental impairment of the individual (except where such refusal, limitation, or rate differential is based upon sound actuarial principles or reasonably anticipated loss experience), or refusing to insure solely because another insurer has refused to write a policy or has canceled or has refused to renew an existing policy in which that person was the named insured.

ADMIN 5516(01-2011)          Fidelity & Guaranty Life Insurance Company Des Moines, IA          Rev 12-2014

**Defamation**

"Defamation" means making, publishing, disseminating, circulating or placing before the public, an advertisement, announcement or statement containing any untrue, deceptive or misleading statement with respect to the business of insurance or any insurer in the conduct of its insurance business.

**Tie-in Sales**

"Tie-in sales" or "tying arrangement" means an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. For example, the sale of a life insurance policy cannot be conditioned upon the sale of an annuity contract or purchase of any goods or services.

## VIII.  Written and Oral Disclosures

Rules regarding required disclosure forms in connection with the sale of insurance products and the timing of delivery of such disclosure forms may vary from state-to-state.  Generally, most states require delivery of certain disclosure forms at the time of policy delivery; however, some states require delivery of such disclosure forms upon the applicant's request or upon acceptance of the applicant's initial premium. Many states require a Producer to provide all or some of the following disclosure items:

- Buyers Guide.

- Policy Summary.

- Statement of Policy Cost and Benefit Information.

- Notice to Applicants Age 60 or over.

- State Guaranty Association Notice.

Producers are required to review and understand the disclosure rules of all jurisdictions in which they hold insurance licenses.

Producers are not permitted to modify or omit any disclaimers or notices issued by the Company for use with its products. Such disclaimers or notices are required by the Company and may not be removed under any circumstances.

In addition to disclosure forms required by state law, the Company may develop additional disclosure forms to confirm that the customer understands the product purchased and the features of that product. The Company will supply Producers with these forms.

ADMIN 5516(01-2011)         Fidelity & Guaranty Life Insurance Company Des Moines, IA              Rev 12-2014

**Other Important Disclosures**

In addition to the disclosure from requirements discussed above, the Company requires certain disclosures be made in the sale of our insurance products. These disclosures may be made orally in the course of interacting with consumers or may be made in writing as applicable.

**Disclosure of Status as a Life Insurance Producer**

- A Producer shall inform the prospective purchaser, prior to commencing an insurance sales presentation that he or she is acting as an independent life insurance Producer representing the Company.

- No Producer shall offer to sell any insurance policy in any capacity other than that of a duly licensed insurance Producer.

- No Producer shall use terms such as "financial planner," "investment advisor," "financial consultant," or "financial counselor," in such a way as to imply that the Producer is primarily engaged in an advisory business in which compensation is unrelated to sales, unless that is actually the case. Among other things, this means a Producer may not refer to himself or herself as a "financial planner" unless any offers for financial planning services are unrelated to the commissions received from the sale of insurance products. To the extent a Producer provides services for which he or she is paid fees, compensation must be disclosed. The Producer must obtain the client's written consent in a manner compliant with state insurance laws relating to fee disclosure. If a Producer only provides insurance products, then the foregoing terms such as "financial planner" should be avoided altogether.

- No Producer shall advise about, sell, or offer to sell, estate planning documents or services such as wills, trusts and powers of attorney unless the Producer is authorized to practice law, and unless all conflicts are disclosed and knowingly waived in writing by the consumer in the manner required by law and applicable rules of professional responsibility for the lawyers. Note that this does not prohibit Producers from referring a consumer to an independent attorney with whom the Producer has no financial relationship. This is not intended to prohibit the Producer's recommendation of appropriate insurance products for which authorization to practice law is not required.

**Description of the Product as "Life Insurance" or "Annuity"**

No Producer shall solicit on behalf of the Company the sale of any insurance policy without the use of the words "life insurance" or "annuity" (as applicable) unless such solicitation is accompanied by other language or documents clearly indicating that the product is a life insurance policy or an annuity policy.

When presenting the Company's products, no Producer shall use any of the following terms or phrases to describe the features, conditions or benefits of an insurance policy:

| | | | |
|---|---|---|---|
| 1. | "savings" | 8. | "founder's plan" |
| 2. | "savings plan" | 9. | "profits" |
| 3. | "savings account" | 10. | "profit sharing" |
| 4. | "investment" | 11. | "special benefits" |
| 5. | "investment plan" | 12. | "deposit" |
| 6. | "units" | 13. | "interest plan" |
| 7. | "units of participation" | | |

Use of these terms or phrases or other similar terms or phrases in connection with the Company's products has the capacity or tendency to mislead a purchaser or prospective purchaser to believe that he or she will receive something other than an insurance policy. For example, the term "premium" should always be used instead of "deposit" to describe a contribution to an insurance policy.

**Compensation Disclosures**

Producers may never mislead consumers on how they are compensated for the sale of products. To the extent necessary to avoid creating misimpressions, Producers should disclose to potential customers that they receive compensation tied to the sale of insurance products. For example, if a Producer is holding out as an advisor or sponsoring a seminar, it is best practice to disclose that the Producer is an insurance agent paid commission for the sale of insurance policies and annuities. In addition, Producers must never make statements regarding their compensation that are not true. Producers must not claim they are paid a fixed salary or do not receive a commission from the sale of the Company's products unless that is a true statement.

**Statements Regarding Financial Guarantees and Potential Returns**

Producers must also be careful when discussing any potential financial gains that could result from the purchase of one of the Company's products. Producers must provide clear, balanced, and accurate information when discussing the relative guarantees of the Company's products compared to stocks, bonds, IRAs, certificates of deposits or other kinds of saving instruments or investments.

Specifically with regard to annuities, statements to be <u>avoided</u> include, but are not limited to, the following:

- Annuities are 100% safe;

- No one has lost money on an annuity;

- Annuities always pay higher interest rates than banks;

- Annuities are safer than deposits insured by the FDIC; and

<div align="center">20</div>

- Annuities are insured by the government.

This is by no means an exhaustive list of statements that have the capacity to mislead a purchaser or prospective purchaser. Producers should be careful to avoid making statements similar to the statements identified above. In addition, these general guidelines may also apply to other products offered by the Company. Producers are expected to use their best judgment to avoid misleading purchasers or prospective purchasers by making similar statements when discussing other products offered by the Company.

### Statements Regarding Tax Benefits & Consequences

- A Producer shall not state or imply that an insurance policy's benefits are "tax-free" unless such is the case. Producers shall describe the inside buildup of deferred annuities as "tax-deferred" and not as "tax-free."

- Producers should refrain from providing legal or accounting advice and should encourage customers to seek independent tax or legal advice as appropriate.

- If applicable, Producers must disclose that there may be tax consequences or early withdrawal penalties associated with selling or cashing in any assets to be used to purchase one of the Company's products. Such assets could include stocks, bonds, IRAs, certificates of deposits, or current annuities. Producers must disclose these consequences whether the product being sold or cashed in is offered by the Company or a third-party provider of similar products.

### Interest Rates

- Any discussion of current interest rates shall be accompanied by a statement that such rates are (1) based on the Company's current rate schedules, (2) generally periodically subject to change at the Company's sole discretion, and (3) not guaranteed.

- Any discussion of interest rates that include a bonus interest rate shall clearly identify the amount of the bonus interest rate and shall identify any limitations of the bonus (such as limited duration or that it is a vesting bonus).

### "Free-look" Provisions

A Producer should make applicants aware of the "free look" provision of the Company's products, which may vary from 10 to 60 days dependent upon state requirements (see Special Rules for Applicants Over 60 Years of Age, below).

### Policy Costs

A Producer must disclose all material charges related to an insurance policy issued by the Company and respond to all inquiries concerning the same by providing complete and accurate information.

ADMIN 5516(01-2011)          Fidelity & Guaranty Life Insurance Company Des Moines, IA          Rev 12-2014

## IX.    Special Rules For Fixed Indexed Products

The Company offers a variety of fixed indexed products that provide a guaranteed interest rate and also provide the possibility that interest may accrue based upon a formula linked to an external index such as the S&P 500® or the Russell 2000®. All Producers are subject to the following guidelines for the marketing of fixed indexed products:

- fixed indexed products should not be marketed as a substitute for mutual funds or other equity investments;

- fixed indexed products should be positioned as possible alternatives to traditional annuities;

- marketing of fixed indexed products should not characterize the product as an investment;

- the marketing should make it clear that the product pays a fixed interest rate and does not provide any direct participation in the index used as part of the product's interest crediting formula; and

- the overall focus of the marketing, including any sales presentations, of fixed indexed products should be the long term retirement aspects of the fixed index products, such as minimum guaranteed surrender values and annuity payout options..

## X.    Special Rules For Applicants Over 60 Years Of Age

Several states have adopted regulations that require special procedures for delivery of policies to applicants over 60 years of age. These regulations may include delivery of a Financial Review of the policy, a copy of a Guide to Buying Life Insurance After Age 60 and other notices. State law provides that failure to deliver such documents constitutes an omission, which misrepresents the benefits, advantages, conditions or terms of an insurance policy. In addition, the "free-look" period in some states is extended for applicants over 60 years of age. Every Producer must comply with all rules and regulations pertinent to the sale of life insurance and annuity products to applicants over 60 years of age in each state in which the Producer is licensed.

## XI.    Fraudulent Insurance Acts

State laws broadly define certain acts and practices as fraudulent. Under these laws, Producers may not, either individually or in concert with customers or other persons, engage in fraudulent acts. Fraudulent acts include the following without limitation:

1.    Knowingly fail to return any monies or premiums paid for an insurance policy to the applicant or policy owner, the designee of the insured, or other persons entitled to the monies or premiums if the insurance applied for is not ultimately provided;

2.    Present to an insurer, or cause to be presented to an insurer, documentation or a written or oral statement that is made in support of a claim with knowledge that

the documentation or statement contains false or misleading information concerning a matter material to the claim;

3. Except for prepayment of periodic payments or excess contributions permitted under the terms of the policy, willfully collect excess premium beyond amounts approved or, in cases not subject to approval, beyond charges specified in the policy and fixed by an insurer;

4. Misappropriate or unreasonably withhold funds received or held where the funds represent premiums or returned premiums;

5. Misappropriate benefits under an insurance policy;

6. Act as or hold yourself out to be an insurance producer if the person has not complied with the applicable licensing and appointment laws of their state;

7. Knowingly or willfully make any false or fraudulent statement in or with reference to any application for insurance;

8. Place insurance with an unauthorized insurer not regulated by the state insurance department and/or refuse to obey an order by the state insurance commissioner to produce for examination all policies and other documents evidencing the insurance and the amount of premiums paid or agreed to be paid for the insurance;

9. With intent to deceive, knowingly exhibit a false account, document, or advertisement, relative to the affairs of an insurer;

10. Solicit or take application for, procure, or place for others any insurance for which the Producer has not received a license or certificate of qualification;

11. Knowingly violate the licensing and appointment requirements of the state in which the proposed insurance transaction will take place; or

12. Intentionally fail to report to an insurer the exact amount of consideration charged as premium for an insurance policy, if different from the policy premium, and/or fail to maintain records reflecting that information.

Commission of any fraudulent insurance act subjects the Producer to a range of serious sanctions, including disciplinary action from state insurance departments, criminal prosecution, and civil liability. Such acts are also grounds for immediate termination for cause under the Company's Producer Agreement.

## XII.   Anti-Money Laundering Program

The USA Patriot Act (the "Act") requires financial service firms, including insurance companies, to implement appropriate controls and procedures to detect money laundering activities.

The Company is committed to preventing unscrupulous clients from attempting to fund terrorist or criminal activities or launder the proceeds of illegal activities through the Company ("money laundering activities"). To support our commitment, the Company has adopted an anti-money laundering program that has been reasonably designed to (i) protect the Company against the risks of money laundering activities, and (ii) monitor the Company's service providers and the policies and procedures designed to combat money-laundering activities in their performance of services for the Company.

**Money Laundering Generally**

"Money Laundering" is defined as changing the identity of illegally obtained money so that it appears to have originated from a legitimate source. The Act treats those who assist criminals to launder their ill-gotten gains harshly. As these offenses can also be committed negligently, it is important that all of the Company's employees and Producers, particularly the following, know about money laundering:

- All Producers;

- All employees who have client or account contact (directly or through transactions);

- All employees who keep account/transaction records;

- All employees that exercise supervisory control over such person(s) or area.

The Company will monitor anti-money laundering rules and regulations, and periodically update the Company's anti-money laundering program so that the Company ensures compliance with the Act.

**Applications**

Every product sale must be made using the appropriate Company application form. All responses on the application shall be completed accurately by the Producer and reflect the applicant's responses to those questions as conveyed to the Producer. Any and all information possessed by the Producer relating to the applicant's responses shall be included on the application.

The application shall be reviewed by the Producer before it is signed by the applicant, and then signed by the applicant in the Producer's presence. After the applicant has signed the application, the Producer shall sign as witness to its execution.

Any changes, alterations, amendments or corrections on the application shall be made by the Producer (or applicant) and initialed by the applicant.

**Under no circumstance should a Producer act as a "surrogate" for a non-licensed or non-appointed Producer.** That means that if a Producer appointed by the Company signs the application as the Producer, he or she must have been the Producer who met with the customer or solicited the application. Deliberately circumventing such rules will jeopardize the Producer's appointment with the Company and likely subject the Producer to fines, penalties and possibly the loss of their insurance license.

## XIII.  Customer Monies

### General

As stated in the Company's Producer's Agreement, any initial premium, entire or partial, collected by the Producer shall be immediately forwarded to the Company, in the exact form in which it was paid to the Producer.

Unless specified in writing by the Company, the Producer shall have no authority to collect any premiums or monies from policyholders other than the initial premium.

### Commingling

All monies, negotiable instruments, or securities received by a Producer for or on behalf of the Company shall be held by the Producer as trustee for the Company, and shall not be used by such Producer for any personal or other purposes whatsoever, but shall be immediately forwarded to the Company. Customer monies shall not be commingled with monies in an insurance Producer's personal account or an insurance agency's general account.

### Cash Equivalents

Due to certain anti-money laundering regulations, US financial services companies are required, at a minimum, to give notice to the Department of the Treasury whenever a client pays for a financial product using cash or "cash equivalents" such as money orders or cashier's checks that total $10,000 or more during a calendar year. The Company imposes certain restrictions or assumes certain reporting obligations with respect to cash and cash equivalents as a result of the anti-money laundering requirements. As such, the Company's Policy on accepting cash or cash equivalents for Life Insurance and Fixed Annuity products is available on Saleslink, but some of the highlights are:

Cash and cash equivalents, other than cashier's checks, will not be accepted for Fixed ANNUITY contracts. With respect to LIFE insurance policies, cash and cash equivalents, other than cashier's checks, up to $500 will be accepted.

The Company will accept personal checks (not guaranteed by a bank) with the policyholder's name imprinted on the check along with his or her address and phone numbers. Third party personal checks will not be accepted.

The Company will accept wire transfers.

The Company will accept cashier checks, for ANNUITY and LIFE insurance but a Cash Transaction Report (CTR) will be filed with the U.S. Treasury Department for amounts singularly or cumulatively greater than $10,000 in a 12 month period. With respect to LIFE insurance policies, the Company will file a CTR with respect to money orders that aggregate greater than $10,000 in a 12 month period.

•

## XIV.   Customer Complaints

The Company views all customer complaints very seriously. Consistent with its customer service focus, the Company will strive to resolve all complaints in a fair and timely manner.

### Defined

"Complaint" means any written communication expressing a concern or a grievance. "State Insurance Department Complaint" means a written communication regarding a complaint transmitted by a state insurance department.

### Mandatory Reporting

All customer complaints and all State Insurance Department complaints (collectively, "Complaints"), regardless of their source, shall be reported immediately to the Company and processed as set forth below.

1.   A Producer shall forward any complaint, to the Company's Vice-President – Client Services and Claims.

2.   The Company's,  Vice-President – Client Services Claims will investigate the complaint as appropriate.

3.   A Producer must respond in a timely manner to any request for information from the Company concerning a Complaint, including any request for a written summary of the facts related to a Complaint.

4.   Under no circumstances should a Producer offer cash or any other valuable consideration to settle a Complaint regarding the Company or its products without providing prior written notice to the Company.

* By affixing one electronic signature to the Market Conduct Guide, Insurance Agency/Producer acknowledges that the acceptance/agreement to the terms of the Market Conduct Guide does apply to any identification numbers that have been assigned by the Company to the Agency/Producer.

Insurance Agency/Producer may execute this Guide electronically by accessing the Company's producer intranet site and providing acceptable authentication information that will permit the Company to rely upon Insurance Agency's/Producer's electronic 'signature'.

# EXHIBIT F

FILED: KINGS COUNTY CLERK 01/16/2020 10:44 PM          INDEX NO. 501256/2020
NYSEF DOC. NO. 1 20-cv-01081-AMD-LB   Document 1-1   Filed 02/27/20   Page 4 of 29 PageID #: 8   RECEIVED NYSCEF: 01/16/2020

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

DR. AHARON GUTTERMAN, BATSHEVA
MARKOWITZ, NORTHEAST ANESTHESIA,
P.C., and AHARON GUTTERMAN MD PLLC,

          Plaintiffs,

    -against-

PHILIP HERZOG and RICKY LOWENTHAL,

        Defendants.

Index No.

**VERIFIED COMPLAINT**

Plaintiffs Dr. Aharon Gutterman, Batsheva Markowitz, Northeast Anesthesia P.C., and

Aharon Gutterman MD PLLC (collectively, "Plaintiffs") as and for their Verified Complaint

against Philip Herzog ("Herzog") and Ricky Lowenthal ("Ricky" and together with Herzog, the

"Defendants") hereby allege as follows:

**NATURE OF THE ACTION**

1.    From 2014 to 2018, Herzog, together with certain non-parties, operated an

association-in-fact enterprise (the "Lowenthal-Herzog Enterprise") that engaged in and benefited

from a fraudulent scheme that caused the Plaintiffs to lose approximately $1.8 million.

2.    As part of the fraudulent scheme, nonparty Leon (Yehuda) Lowenthal solicited a

series of loans from the Plaintiffs.

3.    Lowenthal, who concealed the fact that his license as an insurance agent had been

revoked, claimed to need the funds to finance premiums for his clients' life insurance policies.

4.    Lowenthal explained that, within weeks of paying the first premium for each life

insurance policy, Lowenthal would receive a commission of between 108% and 120% of the first

premium payment, which Lowenthal promised to use to promptly repay the Plaintiffs.

**EXHIBIT F**

5.      To further induce Plaintiffs to advance the funds, Lowenthal provided documents
that purported to be valid life insurance policies for his clients.

6.      Dr. Gutterman and Lowenthal were first cousins and close friends who had grown
up together.  Because of their close, familial relationship, Dr. Gutterman trusted Lowenthal.

7.      Upon information and belief, Lowenthal's representations were false.

8.      Upon information and belief, the life insurance documents provided by Lowenthal
had been fabricated by another nonparty who was part of the Lowenthal-Herzog Enterprise,
Hershy Greenfield.

9.      For his part in the Lowenthal-Herzog Enterprise, Herzog, Lowenthal's father-in-
law, supplied signed checks drawn on Herzog's personal bank accounts as collateral and
guarantees for the loans.

10.      Some of Herzog's checks were blank.  Others included specific amounts that
totaled over $1 million.

11.      Plaintiffs gained additional comfort from the involvement of Herzog, who is one
of the proprietors of Herzog Wine Cellars, a successful wine company that owns popular wine
brands Kedem, Manischewitz, Baron Herzog, Jeunesse, and Weinstock.

12.      Upon information and belief, both Herzog and Lowenthal knew the checks could
not serve as adequate collateral because the bank accounts on which Herzog's checks were drawn
lacked sufficient funds to cover the checks.

13.      In reliance on Lowenthal's false representations and fake documents and in
reliance on the false collateral provided by Herzog, the Plaintiffs advanced approximately $3.3
million to the Lowenthal-Herzog Enterprise.

14.      Upon information and belief, the Lowenthal-Herzog Enterprise did not use the

2

funds to finance life insurance premiums as was represented to Plaintiffs.

15.     Upon information and belief, the Lowenthal-Herzog Enterprise used the loans to perpetrate a Ponzi scheme, to purchase real estate, and to pay for personal expenses for Herzog, Lowenthal, and Lowenthal's wife, Ricky.

16.     Of the approximately $3.3 million advanced by the Plaintiffs, the Lowenthal-Herzog Enterprise repaid only $1.5 million over four years.

17.     When it became clear that the loans had been falsely procured and would never be repaid, the Plaintiffs attempted to deposit the collateral checks provided by Herzog.

18.     Those checks were dishonored by the applicable banks.

19.     Plaintiffs bring this action to recover damages arising from the fraudulent scheme perpetrated by the Lowenthal-Herzog Enterprise, Herzog's provision of false checks, and Ricky's unjust enrichment from funds fraudulently obtained from the Plaintiffs.

## JURISDICTION AND VENUE

20.     This Court has personal and subject matter jurisdiction over this action pursuant to CPLR § 301, *et seq*.

21.     Venue is proper in Kings County pursuant to CPLR § 503(a) because Plaintiffs reside in Kings County.

## THE PARTIES

22.     Plaintiff Dr. Aharon Gutterman is an individual residing in Brooklyn, New York.

23.     Plaintiff Batsheva Markowitz is an individual residing in Brooklyn, New York. Batsheva Markowitz and Aharon Gutterman are married and live together with their children.

24.     Plaintiff Northeast Anesthesia P.C. is a domestic professional corporation located in King's County New York.

3

25.     Plaintiff Aharon Gutterman MD PLLC is a domestic professional limited liability company located in King's County New York.

26.     Defendant Ricky Lowenthal is an individual residing in Monsey, New York. Ricky is married to Leon Lowenthal, who has applied for personal bankruptcy.

27.     Defendant Philip Herzog is an individual residing in Monsey, New York. Herzog lives with his daughter, Ricky Lowenthal, and his son-in-law, Leon Lowenthal.

## FACTUAL BACKROUND

### A.      Aharon Gutterman and Leon Lowenthal's Close Relationship

28.     Dr. Gutterman and Leon Lowenthal are first cousins and were, prior to the occurrence of the events described herein, close friends.

29.     Prior to the events described herein, Batsheva Markowitz and Ricky Lowenthal were close friends.

30.     Because of their close relationship, Plaintiffs trusted Leon Lowenthal and the Defendants.

### B.      The Fraudulent Life Insurance Policy Premium Scheme

31.     Lowenthal, Herzog, PW Insurance Agency Corp. Prosperity LM Inc., Hershy Greenfield, and others operated together as an association-in-fact: the Lowenthal-Herzog Enterprise.

32.     Until his license was revoked in 2018, Lowenthal was a licensed insurance broker specializing in life, accident and health insurance policies.

33.     From approximately 2014 to 2018, Lowenthal was associated with various insurance companies, including but not limited to. Zurich American Life Insurance, Fidelity & Guaranty Life Insurance Company, Prudential Insurance Company, Nationwide Life Insurance

4

Case 20-05226-cgm    Doc 1-1    Filed 10/02/20    Entered 10/02/20 21:04:18    Main Document
Pg 2

Company and United of Omaha Life Insurance Company.

34.     In or about April 2014, Lowenthal asked Dr. Gutterman for a loan.

35.     Lowenthal told Gutterman that the loan would be used to help Lowenthal's elderly clients purchase life insurance policies.

36.     Lowenthal provided Dr. Gutterman with documents that Lowenthal claimed to be his clients' life insurance policies.

37.     Lowenthal explained that life insurance companies offered commissions of between 108% and 120% of the first premium payment to incentivize insurance agents to sell such policies.

38.     For example, if a policy carried an initial premium of $100,000, the agent would be entitled to receive a commission of between $108,000 and $120,000 for sourcing the policy.

39.     Lowenthal further explained to Dr. Gutterman that, although Lowenthal himself was not permitted to finance the premiums directly, he could do so with funds from third parties.

40.     Lowenthal represented that the commissions would be paid by the insurance companies promptly after the first premiums were received and that Dr. Gutterman would not have to wait long to be repaid.

41.     Upon information and belief, Lowenthal had no intention of selling insurance policies or using Plaintiffs' funds to finance insurance premiums.

42.     Upon information and belief, the information Lowenthal provided to Dr. Gutterman concerning the life insurance policies, including the documents Lowenthal claimed to be his clients' life insurance policies, was false.

43.     Upon information and belief, the false documents were created by Hershy Greenfield to induce Plaintiffs to lend money to the Lowenthal-Herzog Enterprise.

5

44.     Specifically, upon information and belief, Greenfield fabricated, among other things, false insurance policies, bank deposit slips, commission checks, bank statements, and requests for wire instructions.

45.     Upon information and belief, the Lowenthal-Herzog Enterprise did not use Plaintiffs' funds to finance insurance policies and instead used them to pay for personal expenses, to purchase real estate, and to perpetuate an ongoing Ponzi scheme.

**C.    Plaintiffs Loan the Lowenthal-Herzog
        Enterprise Over $3.3 Million Under False Pretenses**

46.     From on or about 2014 through 2018, Plaintiffs advanced approximately $3.3 million in loans to the Lowenthal-Herzog Enterprise.

47.     Many of Plaintiffs' advances were made by bank transfer to Prosperity LM Inc. ("Prosperity") — an entity operating at Lowenthal's direction as part of the Lowenthal-Herzog Enterprise.

48.     The Lowenthal-Herzog Enterprise used bank accounts held by Prosperity to receive funds from and disburse funds to Plaintiffs in furtherance of the Ponzi scheme.

49.      The Lowenthal-Herzog Enterprise also used Insurance Agency Corp. ("IAC" and, together with "Prosperity," the "Lowenthal Companies"), another entity operating at Lowenthal's direction, to facilitate the Ponzi scheme by using bank IAC's bank accounts to make repayments to Plaintiffs.

50.     Upon information and belief, the Lowenthal-Herzog Enterprise used the Lowenthal Companies to facilitate transactions with other victims in furtherance of the Ponzi scheme.

51.     The majority of transactions between Plaintiffs and the Lowenthal-Herzog Enterprise was done through wire transfers.  Some transactions were done in cash.  A small

6

number of checks were also exchanged.

52.    Many of the loans were memorialized in promissory notes signed by Lowenthal.

### *The Initial $50,000 Loan*

53.    The Lowenthal-Herzog Enterprise began the scheme by seeking small loans from Plaintiffs in an apparent effort to build trust.

54.    In or about April 2014, Lowenthal asked Plaintiffs for an initial loan of $50,000.

55.    As described above, Lowenthal falsely claimed that he needed the loan to finance certain life insurance premiums.

56.    To induce Plaintiffs to make the loan, and in furtherance of the Lowenthal-Herzog Enterprise schemes, Lowenthal provided Dr. Gutterman with a check endorsed by his father-in-law, Defendant Philip Herzog, in the amount of $50,000 as collateral for the loan.

57.    Upon information and belief, Herzog was aware that Lowenthal was providing the $50,000 check to Plaintiffs as collateral for the loan, and Herzog signed the check to increase the Lowenthal-Herzog Enterprise's chances of persuading Plaintiffs to advance the loan.

58.    Plaintiffs were aware that Herzog had a history of guaranteeing ventures involving Lowenthal. For example, in connection with a separate business venture, Lowenthal informed a creditor that his debt of $54,000 and all other debts associated with the business were guaranteed by Herzog.

59.    Herzog's check made Plaintiffs feel more comfortable advancing funds to the Lowenthal-Herzog Enterprise.

60.    Upon information and belief, Herzog knew or should have known that, at the time he provided the check to Plaintiffs through Lowenthal, Herzog's accounts had and would continue to have insufficient funds to cover the amount of the check.

<center>7</center>

### *Herzog Provides a Series of Checks to Induce Plaintiffs to Advance $3.3 Million to the Lowenthal-Herzog Enterprise Over the Next Four Years*

61.     Over the course of the subsequent four years, Plaintiffs advanced approximately

$3.3 million to the Lowenthal-Herzog Enterprise.

62.     Plaintiffs made each advance in reliance on the false representations that the

Lowenthal-Herzog Enterprise was using the funds to finance life insurance premiums and that

each loan was backed by a valid check from Herzog.

63.      From time to time, Plaintiffs received partial repayments from the Lowenthal-

Herzog Enterprise.

64.     The repayments had the intended effect of reassuring Plaintiffs that the

Lowenthal-Herzog Enterprise was solvent and creditworthy and inducing Plaintiffs to advance

more.

65.     In total, Plaintiffs advanced $2,871,000 through bank transfers and $448,000 in

cash.

66.     Upon information and belief, to induce these advances for the benefit of the

Lowenthal-Herzog Enterprise, Herzog signed the following checks and, through Lowenthal,

provided them to Plaintiffs as false collateral:

> a.  In or about May 2014, Herzog provided a signed check in the amount of
>     $50,000 (referenced in paragraph 55 above);
>
> b.  In or about June 2014, Herzog provided a signed check in the amount of
>     $85,000;
>
> c.  In or about November 2016, Herzog provided a signed check in the amount of
>     $850,000
>
> d.  In or about March 2017, Herzog provided a signed check in the amount of
>     $100,000;
>
> e.  In or about January 2018, Herzog provided a signed check with the amount left

8

FILED: KINGS COUNTY CLERK 01/16/2020 10:44 PM
INDEX NO. 501256/2020
NYSCEF DOC. NO. 21
RECEIVED NYSCEF: 01/16/2020
Case 1:21-cv-01082-AMD-RLM Document 1 Entered 10/02/20 21:04:18.2 Main Document 16
Pg 83 of 180

blank.

67.    Upon information and belief, Herzog knew that the bank accounts from which these checks were drawn did not hold enough cash to honor these checks.

68.    Upon information and belief, Herzog knew that the bank accounts from which the blank checks were drawn did not hold enough cash to serve as meaningful collateral for the amount Plaintiffs had advanced.

69.    Upon information and belief, Herzog provided the signed checks with the intention of inducing Plaintiffs to advance funds for the benefit of the Lowenthal-Herzog Enterprise.

### *Lowenthal and Greenfield Present False Documents to Reassure Plaintiffs*

70.    Over the course of the Lowenthal-Herzog Enterprise's scheme, Plaintiffs at times expressed concern about the Lowenthal-Herzog Enterprise's failure to repay Plaintiffs in full.

71.    The Lowenthal-Herzog Enterprise responded by presenting fabricated documents and information to falsely reassure Plaintiffs that their funds were being used to finance life insurance policies.

72.    For example, in 2015, Lowenthal provided Plaintiffs with a document that purported to be Zurich Insurance's wire instructions for the Lowenthal-Herzog Enterprise to pay $281,000 in life insurance premiums.

73.    In or about September 2017, Lowenthal provided life insurance policy documents purportedly issued for three individuals between the ages of 77 and 79.

74.    Two of these policies were purportedly issued by Zurich American Life Insurance Company.  However, according to records from the New York State Department of Insurance, Lowenthal's relationship with Zurich had terminated over three years earlier in May 2014.

9

75.     Lowenthal, on behalf of the Lowenthal-Herzog Enterprise, transferred the phony policies to Dr. Gutterman using electronic mail.

76.     Lowenthal also provided Dr. Gutterman with a copy of a Wells Fargo bank statement that purportedly showed approximately $4.5 million dollars in commission deposits to Lowenthal's Company, "CW Prosperity Advisors Inc."

77.     Lowenthal, on behalf of the Lowenthal-Herzog Enterprise, provided a copy of the false Wells Fargo bank statement to Dr. Gutterman using electronic mail.

78.     Upon information and belief, these false documents, among others, were created and falsified by Hershy Greenfield and provided to Plaintiffs by Lowenthal to induce further loans.

79.     In addition, Hershy Greenfield himself provided Plaintiffs with a false Wells Fargo bank statement dated August 4, 2017 that purportedly showed approximately $770,000 dollars in commission deposits from United of Omaha Life Insurance Company relating to a life insurance policy issued to one of Lowenthal's clients.

80.     Hershy Greenfield, on behalf of the Lowenthal-Herzog Enterprise, provided a copy of the false Wells Fargo bank statement to Dr. Gutterman using electronic mail.

81.     In or about September 2017, Lowenthal opened an account with Bank of America and told Plaintiffs he would use the account to deposit repayments for Plaintiffs.

82.     On or about September 25, 2017, Hershy Greenfield emailed Batsheva Markowitz with the username and password to access this account. However, contrary to his promises, Lowenthal never deposited any funds into this account for the Plaintiffs to withdraw.

83.     Upon information and belief, Lowenthal set up this bank account with no intent to make deposits for sole purpose of inducing Plaintiffs to advance additional loans.

10

### *The Lowenthal-Herzog Enterprise Has Other Victims*

84.    In 2017, Plaintiffs received $405,000 in repayments from an account in the name of Eli Rubenstein.

85.    Upon information and belief, Eli Rubenstein was another victim of the Lowenthal-Herzog Enterprise's Ponzi scheme, who was directed by the Lowenthal-Herzog Enterprise to pay Plaintiffs.

86.    Indeed, on more than one occasion, the Lowenthal-Herzog Enterprise directed the Plaintiffs to make their loans directly to Mr. Rubenstein and another individual, Steven Spector.

87.    Upon information and belief, Mr. Spector was another victim of the Lowenthal-Herzog Enterprise's Ponzi scheme.

88.    Despite multiple demands by Plaintiffs, the Lowenthal-Herzog Enterprise has not made any additional repayments since January 2018.

89.    Of the $3.3 million Plaintiffs were induced to advance to the Lowenthal-Herzog Enterprise, the Lowenthal-Herzog Enterprise has failed to repay $1,787,838.

90.    Upon information and belief, these funds were used to perpetuate the Lowenthal-Herzog Enterprise's Ponzi scheme, invest in real estate, and pay for the personal and family expenses of the individual members of the Lowenthal-Herzog Enterprise.

### D.    Ricky Acknowledges the Ponzi Scheme Perpetrated by the Lowenthal-Herzog Enterprise

91.    On March 13, 2019, Batsheva texted Ricky about the funds the Lowenthal-Herzog Enterprise had failed to repay and the Ponzi scheme Plaintiffs suspected the Lowenthal-Herzog Enterprise was operating.

92.    After initially feigning disbelief, Ricky ultimately confirmed the existence of the Lowenthal-Herzog Enterprise's Ponzi schemes and admitted her knowledge of the scheme.

11

20-06526-rdd   Doc 1   Filed 10/02/20   Entered 10/02/20 04:18   Main Document
Pg 86 of 180
Case 1:21-cv-01082-AMD   Filed   Document 1   Filed 10/02/20   Page 3   PageID #: 10

93.     Ricky wrote, "*I realized you were right & was up all night crying in bed.*"

94.     Ricky admitted the Lowenthal-Herzog Enterprise "*shudve stopped 2 yrs ago*"
[sic].

95.     Ricky also confirmed her father, Herzog's role, promising to "*get my father involved*" in efforts to repay victims.

96.     Seeking an explanation for the fraud and betrayal, Batsheva asked Ricky, "*what did yehuda say happened to all the $?*"

97.     In response, Ricky confirmed her knowledge that the Lowenthal-Herzog Enterprise had been operating a Ponzi scheme by "*borrowing from #1 to pay back #2.*"

98.     Ricky further claimed that the Lowenthal-Herzog Enterprise had hired a professional "*who deals w/ such type of matters, who will help him pay back all the guys & be in charge of this mess.*"

99.     In truth, the purported professional hired by Ricky on behalf of the Lowenthal-Herzog Enterprise was engaged to threaten victims of the Lowenthal-Herzog Enterprise in order to deter them from taking legal action or reporting the illegal conduct to law enforcement.

100.    Specifically, this hired "professional" threatened Dr. Gutterman with physical harm and warned that Dr. Gutterman would lose his medical license if Plaintiffs took legal action.

**ADDITIONAL FACTS PERTAINING TO CLAIMS UNDER RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT**

101.    Lowenthal, Prosperity LM Inc., PW Insurance Agency Corp., Phillip Herzog, Hershy Greenfield, and others formed an association-in-fact enterprise, the Lowenthal-Herzog Enterprise.

102.    Over the course of a four-year period, the Lowenthal-Herzog Enterprise engaged in a scheme to fraudulently induce Plaintiffs to advance millions in loans.

12

103.    Lowenthal, Prosperity LM Inc., PW Insurance Agency Corp., Phillip Herzog, Hershy Greenfield, and others knowingly and intentionally participated in this scheme by obtaining money from Plaintiffs under the false pretense of funding premiums for life insurance policies.

104.    The Lowenthal-Herzog Enterprise fraudulent induced other victims to advance similar loans and then kept the scheme from collapsing by using funds from some victims to partially repay other victims, including the Plaintiffs.

105.    Lowenthal, Prosperity LM Inc., PW Insurance Agency Corp., Phillip Herzog, Hershy Greenfield, and others knowingly and intentionally participated in this Ponzi scheme.

106.    The Lowenthal-Herzog Enterprise used the unlawfully elicited funds to invest in real property in New Jersey, Pennsylvania, Connecticut, and Maryland for its own benefit.

107.    The Lowenthal-Herzog Enterprise also used the funds to pay the personal expenses of its participants.

108.    At least one other victim of the Lowenthal-Herzog Enterprise, Benjamin Landa, filed a lawsuit against Herzog and Lowenthal seeking to recover $420,000 in loans that were never repaid.

109.    As alleged in the action brought by Landa, "*Herzog regularly guaranteed loans for Lowenthal in the past and never expressed any objection to such guarantees.*"

110.    In December 2019, Lowenthal filed for Chapter 11 bankruptcy in the Southern District of New York.

111.    In his bankruptcy petition, Lowenthal listed $3.4 million in "disputed," "unsecured claims" by individuals against him.

112.    Upon information and belief, the individual creditors listed in Lowenthal's

13

Chapter 11 filing are victims of the Lowenthal-Herzog Enterprise.

113.    Upon information and belief, the Lowenthal-Herzog Enterprise defrauded victims of over $6.8 million dollars in total.

## FIRST CLAIM FOR RELIEF
### Violation of RICO, 18 U.S.C. § 1961 et seq.
(Against Philip Herzog)

114.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

115.    The Lowenthal-Herzog Enterprise was engaged in and affected interstate commerce by, among other things, securing loans using false pretenses and using the funds to invest in real estate in other states.

116.    Lowenthal, acting as an agent of the Lowenthal-Herzog Enterprise, falsely represented that the loans would be used to finance life insurance policy premiums.

117.    Upon information and belief, the life insurance policies never existed.

118.    The Lowenthal-Herzog Enterprise instead used the funds to perpetrate a Ponzi scheme, to invest in real property located in New Jersey, Pennsylvania, Connecticut, and Maryland, and to pay the personal and family expenses of its own members.

119.    Plaintiffs' loans were induced by multiple checks endorsed and supplied by Herzog and made out to Plaintiffs totaling $1.085 million dollars.

120.    Plaintiffs' loans were also induced by a blank check signed by Herzog.

121.    Upon information and belief, Herzog knew these checks would not be honored and could not serve as adequate collateral.

122.    Upon information and belief, Herzog intended to use these checks to induce Plaintiffs to advance funds to the Lowenthal-Herzog Enterprise.

14

123.    In the absence of the checks Herzog provided to Plaintiffs as collateral, Plaintiffs would not have advanced funds to the Lowenthal-Herzog Enterprise.

124.    From 2014 through 2018, the Herzog caused injury to Plaintiffs by inducing Plaintiffs to advance $3.3 million to the Lowenthal-Herzog Enterprise based on these false representations.

125.    This amount was advanced through over twenty-six separate transactions from 2014-2018.

126.    The Lowenthal-Herzog Enterprise furthered the schemes by transmitting and causing to be transmitted dozens of emails, text messages, and bank transfers over interstate wires, or wires routed interstate, in violation of 18 U.S.C. § 1343, the federal wire fraud statute

127.    Such interstate wire communications sent on behalf of the Lowenthal-Herzog Enterprise included, without limitation, the following:

   a.   Text messages sent between 2014 and 2018 from Lowenthal and other agents of the Lowenthal-Herzog Enterprise concerning the loans, fake life insurance policies, and other false representations made to induce the loans;

   b.   Emails sent between 2014 and 2018 from Lowenthal and other agents of the Lowenthal-Herzog Enterprise concerning the loans, fake life insurance policies, and other false representations made to induce the loans;

   c.   Bank wires made between 2014 and 2018 transferring the funds loaned by Plaintiffs and transferring partial repayments; and

   d.   Upon information and belief, text messages, emails and bank wires between 2014 and 2018 concerning the investments in real property located without the state in New Jersey, Pennsylvania, Connecticut, and Maryland.

128.    The email and text message communications were non-voice communications made over a network in or affecting interstate commerce.

129.    The Lowenthal-Herzog Enterprise's acts of racketing constituted a pattern by virtue of, among other things, (i) the sheer number of interstate wire communications and

<div align="center">15</div>

fraudulently induced loans obtained by the Lowenthal-Herzog Enterprise; (ii) the occurrence of at

least 26 separate transactions over a four-year period; (iii) the continuous nature of the schemes,

whereby the Lowenthal-Herzog Enterprise induced Plaintiffs and others through fraudulent

pretenses and fabricated documents to make loans, purportedly guaranteed by Herzog, and then

used those funds for the personal benefit of the members of the Lowenthal-Herzog Enterprise;

and (v) the common purpose, result and victims of these acts of racketeering, namely Plaintiffs,

and similarly situated victims, who lost millions of dollars in fraudulently induced loans.

130.    Herzog knowingly and intentionally conducted the affairs of the Lowenthal-

Herzog Enterprise through a pattern of racketeering activity, which injured Plaintiffs, in violation

of 18 U.S.C. § 1962(c).

131.    Herzog, through the Lowenthal-Herzog Enterprise, defrauded Plaintiffs of no less

than $1,787,838.

132.    Plaintiffs are entitled to treble damages in the amount of no less than $5.4 million.

## SECOND CLAIM FOR RELIEF
### Conspiracy to Violate Federal Civil RICO, 18 U.S.C. 5 1962(d)
(Against Philip Herzog)

133.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth

herein.

134.    In violation of 18 U.S.C. § 1962(d), Herzog knowingly, willfully, and unlawfully

conspired with Lowenthal and others to facilitate a scheme which included the operation and

management of a RICO enterprise through a pattern of racketeering activity as described above.

135.    The conspiracy commenced at least as early as 2014 and ended in or around 2018.

136.    The conspiracy's purpose was to extract money from Plaintiffs and other victims

through fraud for the benefit of Herzog, Lowenthal and other members of the Lowenthal-Herzog

16

FILED: KINGS COUNTY CLERK 01/16/2020 10:44 PM
INDEX NO. 501256/2020
NYSCEF DOC. NO. 21
RECEIVED NYSCEF: 01/16/2020
Case 1:20-cv-01082-AMD-RLM Document 1 Filed 02/02/20 Page 91 of 180 Main Document 24
Pg 91 of 180

Enterprise.

137.    Herzog committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy include but are not limited to, providing Plaintiffs with worthless checks purporting to serve as collateral for the loans, to facilitate the Ponzi scheme as described above.

138.    The purpose of the acts Herzog engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of Herzog's actions

139.    The unlawful actions of Herzog, and each of the co-conspirators, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property in an amount to be determined at trial no less than $1,787,838.

140.    Plaintiffs are entitled to treble damages in the amount of no less than $5.4 million.

**THIRD CLAIM FOR RELIEF**
**Violation of New York General Obligations Law § 11-104**
(Against Philip Herzog)

141.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

142.    Phillip Herzog provided four checks to Plaintiffs as collateral for the loans.

143.    Specifically, Herzog provided the following checks:

a.    In May 2014, Herzog provided a signed check drawn on a Chase bank account ending in 7684 made out to Dr. A. Gutterman in the amount of $50,000;

b.    In June 2014, Herzog provided a signed check drawn on a Chase bank account ending in 7684 made out to Dr. A. Gutterman in the amount of $85,000;

c.    In November 2016, Herzog provided a signed check drawn on a Chase bank account ending in 7165 made out to Dr. A. Gutterman in the amount of $850,000;

17

Case 1:21-cv-01082-AMD-LB   Document 1   Filed 02/02/21   Entered 02/02/21 04:18   Main Document
Pg 92 of 180

    d.  In March 2017, Herzog provided a signed check drawn on a Chase bank account ending in 7165 made out to Dr. A. Gutterman in the amount of $100,000.

144.    Herzog also provided a signed blank check drawn on a Chase bank account ending in 7165.

145.    Upon information and belief, when Herzog provided these checks to Plaintiffs, Herzog knew or should have known that his bank accounts had insufficient funds to cover the amounts of the checks.

146.    Upon information and belief, Herzog never deposited sufficient funds into the accounts to cover the checks.

147.    Plaintiffs presented the checks for deposit, including the blank check written out for $70,000, but the checks were dishonored.

148.    Pursuant to General Obligations Law § 11-104, Herzog is liable to Plaintiffs for the "face amount of the check[s]" or $1,155,000.

### FOURTH CLAIM FOR RELIEF
**Fraud for the Provision of Bad Checks**
(Against Philip Herzog)

149.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein

150.    Herzog issued four signed checks to Plaintiffs as collateral for Plaintiffs' loans to the Lowenthal-Herzog Enterprise with a face value totaling $1,085,000.

151.    Herzog also issued a signed blank check to Plaintiffs as collateral for Plaintiffs' loans to the Lowenthal-Herzog Enterprise upon the understanding that the check would be used to cover any outstanding balance on the loans.

152.    The present outstanding balance of the loans made by Plaintiffs is 1,787,838.

18

153.    By tendering the checks to Plaintiffs, Herzog represented that the accounts on which the checks were drawn existed and would have sufficient funds to cover the checks when deposited by Plaintiffs.

154.    These representations were false.

155.    The accounts on which these checks were drawn did not have sufficient funds at the time they were issued or thereafter to cover the check

156.    As a direct and proximate consequence of Herzog's false representations, Plaintiffs have been damaged in an amount of no less than $1,787,838.

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Fraud**
(Against Philip Herzog and Ricky Lowenthal)

157.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

158.    Lowenthal and Greenfield made the following false representations with the intent to deceive Plaintiffs:

a.  In or about April 2014, Lowenthal falsely represented that he and the Lowenthal-Herzog Enterprise intended to use a loan from Plaintiffs to finance premiums for life insurance policies purchased by Lowenthal's clients;

b.  In or about August, 2014, June 2016, October 2016, Lowenthal signed promissory notes in which he falsely represented that the Lowenthal-Herzog Enterprise would repay Plaintiffs by certain dates while knowing the funds would be used to perpetrate a Ponzi scheme and having no intention of repaying the funds by the dates specified;

c.  In or about September 2017, Lowenthal and Greenfield created phony life insurance policies, provided them to Plaintiffs, and falsely represented that the policies were authentic policies taken out by Lowenthal's clients;

d.  In or about September 2017, Lowenthal and Greenfield created a phony bank statement from Wells Fargo, provided it to Plaintiffs, and falsely represented that the statement showed $4.5 million in commission deposits associated with the life insurance policies.

19

159.    Plaintiffs reasonably relied on these false representations and were induced to
advancing approximately $3.3 million in loans to the Lowenthal-Herzog Enterprise.

160.    Herzog had actual knowledge of Lowenthal and Greenfield's fraud.

161.    Herzog substantially assisted the fraud by, among other things, providing multiple
signed checks to serve as collateral for the fraudulently procured loans and facilitating the
engagement of the "professional" to threaten victims.

162.    Ricky had actual knowledge of Lowenthal, Greenfield, and Herzog's fraud.

163.    Ricky substantially assisted the fraud by, among other things, facilitating the
engagement of the "professional" to threaten victims.

164.    As a direct and proximate consequence of Herzog and Ricky's substantial
assistance, Plaintiffs have been damaged in an amount of no less than $1,787,838.

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**
(Against Ricky Lowenthal)

165.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth
herein.

166.    From 2014 to 2018, the Lowenthal-Herzog Enterprise solicited loans from
Plaintiffs under the false pretense that the funds would be used to finance life insurance policies
and that Plaintiffs would be repaid promptly.

167.    Plaintiffs loaned approximately $3.3 million to Lowenthal.

168.    Only approximately $1.5 million was repaid to Plaintiffs and $1,787,838 remains
unpaid.

169.    Ricky has used Plaintiffs' funds for her own purposes, including, by paying her
family's living expenses.

20

170.   It is unjust and inequitable for Ricky to retain Plaintiffs' funds for her own

personal benefit instead of repaying Plaintiffs.

171.   Plaintiffs have been damaged, and Ricky has been unjustly enriched, in an amount

no less than $1,787,838.

<center>**REQUEST FOR RELIEF**</center>

**WHEREFORE**, Plaintiffs request the following relief:

1.   Granting Plaintiff damages, in an amount to be proven at trial as follows:

    a.   On Count 1, a judgment against Philip Herzog in treble damages of not less than $5,363,514;

    b.   On Count 2, a judgment against Philip Herzog in treble damages of not less than $5,363,514;

    c.   On Count 3, a judgment against Philip Herzog in the amount of $1,155,000 for passing bad checks in violation of General Obligations Law § 11-104;

    d.   On Count 4, a judgment against Philip Herzog in the amount of $1,787,838 for fraudulently passing bad checks; and

    e.   On Count 5, a judgment against Ricky Lowenthal in an amount no less than $1,787,838 for the unjust use and benefit of the Plaintiffs' funds;

2.   Awarding punitive damages in an amount to be proven at trial against Defendants

for their intentionally fraudulent and deceitful conduct;

3.   Awarding Plaintiffs all costs and fees incurred in connection with this action,

including reasonable attorneys' fees pursuant to 18 U.S.C. § 1964;

4.   Pre- and post-judgment interest as permitted by law; and

<center>21</center>

5.    Awarding all such other and further relief as the Court deems proper.


Dated:   New York, New York
         January 16, 2020


                         SHER TREMONTE LLP


                         By:  /s/ Justin M. Sher
                              Justin M. Sher
                              Justin J. Gunnell
                         90 Broad Street, 23rd Floor
                         New York, New York 10004
                         T: (212) 202-2600
                         jgunnell@shertremonte.com

                         *Attorneys for Plaintiffs*

22

Case 2:21-cv-01081-AMD-EMD Document 1 Entered 10/02/2021 04:18 Main Document 30

## VERIFICATION

STATE OF NEW YORK       )
                                 ) ss.:

COUNTY OF KINGS        )

         I, DR. AHARON GUTTERMAN being duly sworn, deposes and says:

         I have read the foregoing Verified Compliant and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be upon information and belief and, as to those matters, I believe them to be true.

                                             Dr. Aharon Gutterman

Subscribed and Sworn to before me
this _16th_ day of _January_ , 2020

Notary Public

SHELDON ELEFANT
Notary Public, State of New York
No. 02EL6250150
Qualified in Kings County
Commission Expires Oct. 24, 2013

23

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------X
DR. AHARON GUTTERMAN, ET AL

        Plaintiff(s),              Index No. 501256/2020

     -against-                  AFFIDAVIT OF SERVICE

PHILIP HERZOG, ET AL

        Defendant(s).
-----------------------------------------------X
STATE OF NEW YORK  )
              S.S.:
COUNTY OF ROCKLAND)

        BRENDAN COLLISHAW, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

        That on the 28TH day of JANUARY, 2020, at approximately 6:45PM, deponent served a true copy of the SUMMONS, VERIFIED COMPLAINT, & NOTICE OF ELECTRONIC FILING upon RICKY LOWENTHAL at 5 HOPAL LANE, MONSEY, NY 10952 by personally delivering and leaving the same with PHILIP HERZOG at that address. a person of suitable age and discretion at that address, the actual place of RICKY LOWENTHAL. At the time of service, deponent asked if RICKY LOWENTHAL is in active military service for the United States of America or for the State in any capacity whatever or dependent upon a person in active military service and received a negative reply.

        PHILIP HERZOG is a WHITE MALE, approximately 50 years of age, stands approximately 5 feet 9 inches tall, weighs approximately 170 pounds with BROWN hair and BLUE eyes.

D.L.S., Inc.
400 Rella Blvd.
Ste. 165
Suffern, NY 10901
845-639-7559
www.dlsnational.com



DEMOVSKY LAWYER SERVICE
Premier Nationwide Document Retrieval and Process Service Company
800-443-1058

That on the 29TH day of JANUARY, 2020, deponent served another copy of the foregoing upon RICKY LOWENTHAL by first class mail, by enclosing a true copy thereof in a securely sealed and postpaid wrapper with the words "PERSONAL AND CONFIDENTIAL" written on the same envelope, and not indicating on the outside that it is from an attorney or concerns an action against the person to be served, and depositing the same into an official depository maintained by the Government of the United States, Village of Florida, State of New York, addressed as follows:

RICKY LOWENTHAL
5 HOPAL LANE
MONSEY, NY 10952

BRENDAN COLLISHAW

Sworn to before me this
29TH day of JANUARY, 2020

NOTARY PUBLIC

JONATHAN RIPPS
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RI6109718
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES MAY 17, 2020

D.L.S., Inc.
400 Rella Blvd.
Ste. 165
Suffern, NY 10901
845-639-7559
www.dlsnational.com

2 of 2

DLS DEMOVSKY LAWYER SERVICE
Premier Nationwide Document Retrieval and Process Service Company
800-443-1058

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------X
DR. AHARON GUTTERMAN, ET AL

        Plaintiff(s),                      Index No. 501256/2020

    -against-                         AFFIDAVIT OF SERVICE

PHILIP HERZOG, ET AL

        Defendant(s).
-------------------------------------------------X
STATE OF NEW YORK   )
                 S.S.:
COUNTY OF ROCKLAND)

        BRENDAN COLLISHAW, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

        That on the 28TH day of JANUARY, 2020, at approximately 6:45PM, deponent served a true copy of the SUMMONS, VERIFIED COMPLAINT, & NOTICE OF ELECTRONIC FILING upon PHILIP HERZOG at 5 HOPAL LANE, MONSEY, NY 10952 by personally delivering and leaving the same with PHILIP HERZOG at that address. At the time of service, deponent asked PHILIP HERZOG whether HE is in active military service for the United States of America or for any state in the United States in any capacity whatever or dependent upon a person in active military service and received a negative reply.

        PHILIP HERZOG is a WHITE MALE, approximately 50 years of age, stands approximately 5 feet 9 inches tall, weighs approximately 170 pounds with BROWN hair and BLUE eyes.

                                              
BRENDAN COLLISHAW

Sworn to before me this
29TH day of JANUARY, 2020

JONATHAN RIPPS
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RI6109718
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES MAY 17, 2020

_____
NOTARY PUBLIC

D.L.S., Inc.
400 Rella Blvd.
Ste. 165
Suffern, NY 10901
845-639-7559
www.dlsnational.com

1 of 1

**EXHIBIT G**

## Individual Life Insurance Application

ICC11-1015 (10-11)

**Fidelity & Guaranty Life Insurance Company** Home Office: Des Moines, IA
**Administrative Office: P.O. Box 81497; Lincoln, NE 68501-81497**

### PART I (Page 1 of 8)

*For anyone proposed to be insured: if you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.*

### PRIMARY INSURED

| Name (First, M.I., Last) | | | | | |
|---|---|---|---|---|---|
| R̲ G̲ | | | | | |

| Home Address | | City | State | Zip |
|---|---|---|---|---|
| | | | | |

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|
| | | | | | | |

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|
| | | |

| Type of Identification: | ID Number _____ |
|---|---|

| Currently Employed? ☐Yes ☐No | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

### OTHER INSURED

| Name (First, M.I., Last) | Relationship to Primary Insured |
|---|---|

| Home Address | City | State | Zip |
|---|---|---|---|

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|

| Type of Identification | ID Number _____ |
|---|---|

| Currently Employed? ☐ Yes ☐ No | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

### OWNER(S)

**UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED**

**IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.**
*A secondary addressee may be named to receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) The R̲ G̲ 2016 Family Trust | Relationship to Primary Insured Trust |
|---|---|

| Home Address | City | State | Zip |
|---|---|---|---|

| Social Security or Tax I.D. No. | Date of Birth |
|---|---|

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|

| Type of Identification: | ID Number _____ |
|---|---|

| Currently Employed? ☐ Yes ☐ No | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

**EXHIBIT G**

**Life Insurance Application Part I (Page 2 of 8)**

## SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|
| Home Address | City | State | Zip |

## BENEFICIARY DESIGNATION – Primary Insured

*For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information*

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The R█████████ G█████ | 2016 Family Trust Trust | 100 |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |
| | | |

## BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

## EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity? Amount being replaced $_____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details.* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If 'Yes," please provide details below* | ☒Y | N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☐ *There is no existing coverage.*

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| ████ | ████ | ████ | ████ | | ████ | ☐ | ☐ |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

## STATEMENT OF INTENT

*This section must be completed by the owner and all persons applying for life insurance with this application*

*It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.*

| 1. | Are you financing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else? | ☐Y | ☒N |

**Life Insurance Application Part I** (Page 3 of 8)

## LIFE INSURANCE INFORMATION

| Product Name | Amount of Insurance | Initial Premium | Planned Premium |
|---|---|---|---|
| FG Life Elite | $ 4,750,000.00 | $ 318,012.50 | $ 318,012.50 |

**UNIVERSAL LIFE:** Death Benefit Option:
☒ Option A-Level ☐ Option B-Increasing

Life Insurance Qualification Test: ☒ Guideline Premium ☐ Cash Value Accumulation
*That projected Guideline Premium Test will be used.*

☒ Nontobacco
☐ Tobacco

For Fixed Indexed Products Only: Initial Allocation Percentage *(if not completed, 100% will be allocated to the 100% Par Index Interest Option)*

140% Par Index Interest Option _____%   Fixed Interest Option _____%   Monthly Point to Point _____% *(FGLife Choice & Elite only)*

100% Par Index Interest Option _____%   100% Par Index Interest Option with higher guarantee _____% *(FGLife Choice only)*

Gold Option _____% *(Synergy Global Advantage Gold only)*   Dow Jones Options _____% *(Synergy Global Advantage Gold only)*

Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.)
☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly Bank Draft ☐ Bi-Weekly Bank Draft
☐ Payroll Deduction ☐ Other _____

Payment in Exchange for Conditional Receipt
$

~~No Longer Offered~~

*No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.*

## ADDITIONAL BENEFITS

*Subject to availability. Certain restrictions may apply.*

| PRIMARY INSURED | | OTHER INSURED |
|---|---|---|
| ☐Accelerated Benefit Rider: Critical Illness | | |
| ☐Accelerated Benefit Rider: Terminal Illness | | |
| ☐ Accidental Death Benefit Rider | Amount: $_____ | |
| ☐ Ultimate Income Option Rider | Initial Lump Sum: $_____ <br> Monthly Income of: $_____ for _____ years. <br> Final Lump Sum: $_____ | *Illustration Required.* |
| ☐ Other Insured Rider | Amount: $_____ | |
| ☐ Child Rider | Amount: $_____ | *Supplemental questionnaire required.* |
| ☐ **(UL Only )**Waiver of Monthly Deduction Rider | | |
| ☐ Other: _____ | | |

## PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States? *If "No," please complete W8ben form and the Citizenship Questionnaire.* | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years ?: | | |
| | *If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire.* | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? *If "Yes," please provide details below.* | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? *If "Yes," please provide details below.* | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? *If "Yes," please provide details below.* | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

From: Atlantic Insurance BrcFax: (888) 228-7570     To: F&G NB app fax     Fax: +18889584795     Page 5 of 55 08/01/2016 7:48 PM
20-06526-rdd     Doc 1     Filed 10/02/20     Entered 10/02/20 21:04:18     Main Document     Pg 15 (10-11)
**Life Insurance Application Part I** (Page 4 of 8)     Pg 105 of 180

## PERSONAL HISTORY QUESTIONS (Continued)

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing, or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

## Life Insurance Application PART II

*Provide full name, address, and phone number of primary medical provider.*

❏ *Primary Insured does not have a primary medical provider.*

| Medical Provider Name | Date Last Seen |
|---|---|

*Provide full name, address, and phone number of primary medical provider.*

❏ *Other Insured does not have a primary medical provider.*

| Medical Provider Name | | Date Last Seen |
|---|---|---|
| Medical Provider Address | City, State, Zip | Medical Provider Phone Number |
| Reason and Results of Last Visit | | |

From: Atlantic Insurance BrcFax: (888) 228-7570          To: F&G NB app fax          Fax: +18889584795          Page 6 of 55 08/01/2016 7:48 PM

20-06526-rdd    Doc 1    Filed 10/02/20    Entered 10/02/20 21:04:18    Main Document
**Life Insurance Application PART II (Page 5 of 8)          Pg 106 of 180**

## MEDICAL HISTORY QUESTIONS

| | Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Has the person proposed for insurance ever (a) received care or had treatment for, or (b) been advised by a physician or health care provider to seek treatment for, or (c) consulted with a health care provider regarding: | | |
| 2. | | | |
| 3. | | | |

## MEDICAL HISTORY QUESTIONS (Continued)

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |

## ADDITIONAL INFORMATION

*If additional space is needed for any "Yes," answers please use the space below.*

| Question | Detail | Primary Insured | Other Insured |
|---|---|---|---|
| | | | |

From: Atlantic Insurance BrcFax: (888) 228-7570          To: F&G NB app fax          Fax: +18889584795          Page 8 of 55 08/01/2016 7:48 PM
20-06526-rdd   Doc 1   Filed 10/02/20   Entered 10/02/20 21:04:18   Main Documents (10-11)
**Life Insurance Application Part III** (Page 7 of 8)          Pg 108 of 180

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief: complete; true; and correctly recorded and are subject to the applicable **FRAUD WARNING** notice. **I (We) agree that: a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company. I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, no insurance will take effect unless and until both of the following conditions are satisfied during each proposed Insured's lifetime and while each proposed insured's health is as stated in this application: (1) the life insurance contract is delivered to and accepted by the Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office.** I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports. I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee, medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance. I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ❑

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members. If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit. Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider. There is no premium charged for this rider. I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization. Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

**For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance. I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for. I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.**

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose. This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s); and any other information necessary to sufficiently verify identity(ies). I (we) understand that failure to provide this information could result in the application being rejected. Third party sources may be used to verify the information provided.

**FRAUD NOTICE: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.**

| Signed at (City and State) Piscataway, NJ | Date 7/28/2016 |
|---|---|
| Signature of Prima | |
| Signature(s) of Additional Insured(s) Age 15 or More | |
| Signature of Owner(s)          ured or if Primary Insured is less than Age 18) , trustee | |

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

**To the best of my knowledge, this application**          ☐ **does replace**          ☒ **does not replace**          existing life insurance, mortgage life insurance, **or annuities.**

If so, will this replacement be considered a 1035 exchange?          ☐ Yes          ☐ No

I certify that the indexed disclosure material has been presented to the Applicant. A copy was provided to the Applicant. I have not made statements which differ in any significant manner from this material. I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer | Print Agent/Producer Name | Date |
|---|---|---|
| *[signature]* | Leon Lowenthal | 7/28/2016 |
| Agent /Producer FGLIC Number | Agent/Producer Phone Number | Agent/Producer Fax Number |
| 000316509 | 845-263-6158 | |
| Agent Email Address | | |
| leon@pswllc.com | | |

# Taxpayer Identification Certification

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. The Internal Revenue Service does not require consent to any provision of this document other than the certifications required to avoid backup withholding. Additionally IRS penalties may be imposed by the Internal Revenue Service for failure to furnish the information.

If you have been notified that backup withholding applies review the defined instructions in item 3 of the Certification on Form W-9 once you receive a copy of the instructions. If you would like a copy of the Form W-9 Instructions please contact the Service Center.

_____          7/28/2016
Insured's Signature                Date

_____          _____
Other insured's Signature (if applicable )          Date

_____ trustee          7/28/2016
Owner's Signature  (if not the same as the insured)          Date

ADMIN 5622 (07-2011)

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

# EXHIBIT H



## R   G   2016 FAMILY TRUST

**THIS AGREEMENT OF TRUST** (hereinafter "Agreement" or "Trust Agreement") is dated as of July 15, 2016 and made by and between **R   G   ** (the "Grantor",) and **E   B   **, (the "Trustee.") for the benefit of those persons designated in this Trust Agreement.

**WHEREAS**, the Grantor wishes to establish this Trust for his named beneficiaries, stated in specificity below, to provide sufficient capital to meet the unpredictable demands of Federal Estate Taxation and other costs that may arise at that death of the Grantor;

**WHEREAS**, pursuant to the terms herein, the Grantor wishes to establish irrevocable trust to be known as the "R   G   2016 Family Trust" (the "Trust"); and

**WHEREAS**, for the purpose of establishing the Trust, the Grantor hereby assigns, transfers and delivers to the Trustee the sum of Ten Dollars ($10.00) and such other property (the "Trust Estate"), if any, as described on the attached Schedule "A" to this Trust Agreement.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants herein contained, the Trustee hereby agrees to accept the Trust Estate and agrees to hold and administer the Trust Estate, in trust, for the uses and purposes and subject to the terms and conditions set forth in this Trust Agreement.

### ARTICLE I
### IRREVOCABILITY

This Trust Agreement and each Trust Estate created pursuant to the terms stated herein are expressly declared to be irrevocable.

### ARTICLE II
### ADDITIONAL CONTRIBUTIONS TO TRUST

Property, which is acceptable to the Trustee, may be transferred to the Trust by the Grantor or by others. Such transfers may be accomplished at any time by any instrument, including a last Will, revocable Living Trust or other like document.

### ARTICLE III
### BENEFICIARIES

This Trust shall be for the benefit Grantor's Spouse, I   G    (the Grantor's spouse and income beneficiary"), and the Grantor's children, M   L   , A   G   ,

1

**EXHIBIT H**

M█ G█████, E███ T█████ and S████ G█████ (the "Beneficiaries" or individually a "Beneficiary" or "Children" or individually a "Child")

## ARTICLE IV
## WITHDRAWALS

**Section 1.** When any transfer is made to this trust, the donor of such transfer shall have the right to provide, by written Notification delivered to the Trustee, the extent (if any) to which such transfer shall be subject to withdrawal by one or more beneficiaries under this Trust Agreement, and the manner in which such withdrawal right shall be validly exercised. Any such Notification may, by its terms, be effective as to subsequent transfers to this trust by or on behalf of such donor, unless and until a subsequent amendatory Notification is received by the Trustee from such donor, or until such original Notification is revoked by the donor. If, at the time of any such transfer, the Notification given (or in effect) does not otherwise provide for the manner and time limit for exercising any such withdrawal right, or the amount of the transfer subject to withdrawal, then the following provisions shall apply to each such transfer to this trust.

**Section 2.** Each of the beneficiaries given a withdrawal right with respect to such transfer, as provided in the Notification, shall have the right to withdraw any part or all of his or her proportionate share of such transfer made to this trust. A Beneficiary's proportionate share of a transfer shall mean the amount of the total transfer subject to withdrawal divided by the number of beneficiaries who have a right of withdrawal with respect to the transfer.

**Section 3.** Notwithstanding the provisions of Paragraph A above, during any calendar year, no Beneficiary shall have the right to withdraw (1) any transfer made to this trust as a result of the death of the Grantor or any other person, or (2) any transfer made by a donor to the extent that the transfer is in excess of the amount qualifying for gift tax exclusion with respect to such donor under Internal Revenue Code Section 2503, as from time to time amended, determined as of the date of transfer, after taking into consideration all previous gifts made to such Beneficiary from such donor during the same calendar year. To the extent a Beneficiary's withdrawal right is limited by the provision of item (2) above, the amount of such Beneficiary's proportionate share of the transfer in excess of such limitation shall be added proportionally to the withdrawal rights of the other beneficiaries given a withdrawal right with respect to such transfer.

**Section 4.** It shall be each donor's responsibility to make sure each Beneficiary is reasonably informed as to transfers made by such donor to the trust estate, and the extent to which each Beneficiary has a withdrawal right with respect to such transfers.

**Section 5.** Each Beneficiary shall have the absolute right and power within thirty (30) days of each transfer made to the trust estate to demand immediate distribution to himself or herself of all or any portion of the amount subject to withdrawal by such Beneficiary, by written instrument delivered to the Trustee.

2

**Section 6.** Upon receipt by the Trustee of a proper written instrument of demand, within the specified withdrawal period, the Trustee shall satisfy the withdrawal right by distributing to the Beneficiary exercising such right, in the discretion of the Trustee, (1) the Beneficiary's proportionate share of the actual property transferred to the trust or (2) other assets in the trust estate equal in value to the amount properly demanded.

**Section 7.** To the extent that any withdrawal right has not been exercised by the end of the specified withdrawal period, such right shall thereupon lapse, and the Beneficiary shall forever cease to have any further right of withdrawal with respect to such transfer.

Notwithstanding the foregoing, as to each Beneficiary, no withdrawal right given under this Article shall lapse to the extent that the amount of such withdrawal right, when added to the total value of all powers of appointment or withdrawal held by such Beneficiary which have previously lapsed during the calendar year, will exceed the greater of $5,000 or 5% of the aggregate value of the assets out of which, or the proceeds of which, the exercise of such powers could be satisfied. To the extent any lapse of a withdrawal right under this Article would cause the Beneficiary to exceed the limitations provided above, such power shall not lapse during such calendar year, but shall thereafter lapse on the first to occur of the following: (1) on the first day of January of any subsequent calendar year to the extent such lapse will not violate the limitations provided in this paragraph; provided, however, that if such limitations would otherwise be exceeded, such powers shall lapse in the order in which the transfers were made to which such powers apply, beginning with the earliest such transfer; or (2) at the Beneficiary's death.

**Section 8.** Each Beneficiary shall immediately forfeit all rights of withdrawal upon (1) making an assignment for the benefit of his or her creditors, (2) filing a voluntary petition in bankruptcy, (3) being adjudicated a bankrupt or an insolvent, or (4) consenting to or acquiescing in the appointment of a trustee or receiver of all or any substantial part of his or her assets or properties.

**Section 9.** With respect to any Beneficiary who is under age eighteen (18) or who is under some other legal disability, any action to be taken by such Beneficiary may be taken by such Beneficiary's legal or natural guardian or such Beneficiary's parent (other than the donor of such transfer), on the Beneficiary's behalf.

**Section 10.** Notwithstanding any other provision of this Trust Agreement, no distribution shall be made by the Trustee from any trust estate created in this Trust Agreement at any time or in any manner which would limit or restrict any unexercised right of withdrawal, pursuant to this Article, which has not lapsed.

## ARTICLE V
## ADMINISTRATION AND DISTRIBUTION
## OF TRUST DURING LIFETIME OF GRANTOR

**Payment of Income and Principal during Grantor's Lifetime.** During the Grantor's lifetime, the Trustee may use so much of the income and principal of the Trust Estate as is

3

From: Atlantic Insurance BrcFax: (888) 228-7570    To: F&G NB app fax    Fax: +18889584795    Page 43 of 55 08/01/2016 9:19 PM
20-06526-rdd   Doc 1   Filed 10/02/20   Entered 10/02/20 21:04:18   Main Document
Pg 115 of 180

necessary to pay any premiums due on any life insurance policies which are a part of the Trust Estate. The Trustee may also pay to or apply for the benefit of the Grantor's spouse, Irving Gutterman, such sums from the income as in its sole discretion shall be necessary or advisable from time to time for the medical care, education, support, and maintenance in reasonable comfort. Any income not so paid or applied shall be accumulated and added to principal.

## ARTICLE VI
## DISTRIBUTION OF TRUST AT DEATH OF GRANTOR

**Section 1.** Disposition on Grantor's Death. If the Grantor's spouse, Irving Gutterman, shall survive the Grantor, the Trustee shall continue to hold the Trust Estate and pay any income thereof, in in quarterly distributions, to the Grantor's spouse, ▮ G▮ during her lifetime. Additionally, the Trustee may distribute such necessary sums from the Trust's principal to pay any education expenses of the Grantor's Children, M▮ L▮ A▮ G▮ , M▮ G▮ , E▮ I▮ and S▮ G▮ , as the Trustee deems appropriate.



**Section 2.** If the Grantor's spouse, ▮ G▮ , shall not survive the Grantor, or if the Grantor's spouse ▮ G▮ shall become deceased after the death of the Grantor, the Trustee shall distribute the Trust Estate in equal shares to the Grantor's Children, M▮ L▮ A▮ G▮ , M▮ G▮ , E▮ I▮ and S▮ G▮ *per stirpes*, but only to the extent that such Child has reached the age of Twenty-Five (25) years of age. To the extent that any Child of the Grantor shall be younger than Twenty-Five (25) years of age, the Trustee shall continue to hold that Beneficiary's share in Trust for the benefit of such Beneficiary and may pay such Beneficiary's educational expenses. Upon the Beneficiary attaining the age of Twenty-Five (25) years of age, the Trustee shall distribute such Beneficiary's share outright and free of all trust to said Beneficiary.

**Section 3.** If any Child shall predecease the Grantor, or if any Child shall predecease the Grantor's spouse, Irving Gutterman, before receiving his full share, the share of such deceased Beneficiary shall be distributed to the personal representative of the deceased Beneficiary's estate

## ARTICLE VII
## SUCCESSION OF TRUSTEES

The Grantor hereby appoints E▮ B▮ , as the Trustee of this Trust. In the event that ▮ B▮ fails to appoint a successor trustee or becomes incapacitated or dies, then A▮ F▮ is appointed as the successor trustee. In the event A▮ F▮ fails to appoint a successor trustee or becomes incapacitated or dies, then a majority of the adult Beneficiaries can appoint the successor trustee.



4

## ARTICLE VIII
## SPENDTHRIFT PROTECTION

During the continuance of any trust established hereunder, the Beneficiary shall have no power to assign, neither the income nor the principal of the Trust Estate created hereunder, to transfer or otherwise anticipate, mortgage, alienate, charge or encumber either income or principal, or to give orders in advance upon the Trustees for any payment of income or principal. Additionally, neither the principal nor the income of any Trust Estate created under this Trust Agreement shall be liable for or charged with any debts, contracts, liabilities or torts of the Beneficiary or subject to seizure or other process by any creditor of the Beneficiary.

## ARTICLE IX
## PROCEDURES FOR RESIGNATION OF TRUSTEES,
## AND APPOINTMENT OF SUCCESSOR TRUSTEES

**Section 1.**    Any Trustee shall have the right at any time to resign by mailing written notice to any acting Co-Trustee and if none, then to the beneficiary or beneficiaries of the Trust. A resignation shall take effect five (5) days after the date of such notice. The resigning Trustee shall deliver to each beneficiary or guardian a statement of all receipts and disbursements of the Trust made by it and an inventory of Trust assets then held by it.

**Section 2.**    At any time when a Trustee ceases to act for any reason, the beneficiary or beneficiaries of the Trust, in accordance with the powers granted by this Trust, shall have the full and complete right to nominate a successor Trustee. The Successor Trustee may be an individual or corporate Trustee, providing the nomination of said Trustee does not in any way because the value of the Trust to be deemed included in the estate of the nominating beneficiary.

**Section 3.**    The Successor Trustee shall deliver its receipt for the assets of the Trust to the removed Trustee. Upon that event, the removed Trustee shall be discharged of all its duties and obligations.

**Section 4.**    If, for any reason, a Successor Trustee is needed but is not appointed by the effective date of a Trustee's resignation, the resigning Trustee may select and appoint an interim Successor Trustee, or, at the expense of the Trust, the resigning Trustee may seek the appointment of an interim Successor Trustee by a court of competent jurisdiction. The interim Successor Trustee shall be removed upon final nomination of a permanent Successor Trustee.

**Section 5.**    Whenever a Trustee ceases to act, the Successor Trustee shall have all of the titles, powers, rights, discretions, obligations and immunities of its predecessor Trustee.

## ARTICLE X
## INSURANCE POLICIES

**Section 1.** The ownership of any and all policies of insurance insuring the life of the Grantor applied for and purchased by the Trustee or transferred and assigned to the Trustee shall be irrevocably vested in the Trustee.

**Section 2.** In connection with the transfer of any such policies to the Trustee, the Grantor agrees to execute, in addition to an appropriate assignment of ownership form, any and all other instruments necessary or appropriate to permit the Trustee to exercise all rights, powers, options, privileges or incidents of ownership which the Grantor may have as owner under such policies.

**Section 3.** The Grantor shall not have any right, title, interest or incident of ownership whatsoever in or to any such policies of insurance purchased by or transferred to the Trustee, nor shall the Grantor exercise any right, power, option, election, privilege or incident of ownership under any such policy. The Grantor hereby relinquishes any and all rights, powers, options, elections, privileges and incidents of ownership in any such policies of insurance which are not assignable by the terms of such policies, if any, and will, at the request of the Trustee, execute all other instruments reasonably required to effectuate this relinquishment.

**Section 4.** In addition to the general powers of management and investment of the Trust Estate granted to the Trustee under this Trust Agreement, the Trustee shall be vested with all rights, powers, options, elections, privileges and incidents of ownership in and to all insurance policies which constitute or become a part of the Trust Estate, including, but not limited to, the right to: (1) acquire by gift, bequest, purchase or otherwise, as a part of the Trust Estate, one or more of such insurance policies, which policies shall be owned by the Trustee and payable to the Trustee; (2) exercise any right, power or discretion with respect to the acquisition, retention, disposition or maintenance in force of any policy held in trust, and any incident of ownership with respect to any such policy, including but not limited to the powers stated in the following subsections of this paragraph; (3) receive dividends or distributive shares of surplus on any such policy in cash, or apply the same to the payment of premiums or to the purchase of additional insurance, including term or paid-up insurance, or permit the same to remain on deposit at interest with the respective insurers, and to receive such interest or permit it to accumulate; (4) receive from the respective insurers or from any bank or other lender such advances or loans which may be available on account of any such policy or on the security of any such policy; (5) receive surrender values, proceeds of matured endowments, or other lifetime policy benefits; (6) exercise any and all options, elections, rights and privileges granted in any such policy; (7) sell, assign (absolutely or as collateral), pledge or hypothecate any such policy; (8) convert any such policy into an extended term coverage contract, or into any other form of insurance or annuity; and (9) with respect to payment of premiums on any such policy, subject to any restrictions provided in this Article, pay premiums as they become due from any property held in trust, or prepay, for reasonable periods, as may be deemed advisable, any premiums which may be due, or may reasonably be expected to become due on any such policy.

6

**Section 5.** Upon the death of an insured, the Trustee shall collect any sums due under any and all policies of insurance made subject to the terms of this Trust Agreement and, for that purpose, shall have full power to execute and deliver any receipt or other voucher for the same, to institute any suit or suits at law or equity in order to enforce any such policy, and in case of controversy or litigation over the collection of such proceeds, to adjust, compromise or otherwise settle any controversy or contest concerning any such policy or the collection of proceeds. However, if the Trustee shall enter into or maintain any litigation with respect to any policy, the Trustee shall have the right to be indemnified, or to be reimbursed from the proceeds of such policy or from the Trust Estate, for such expenses as the Trustee may incur. The Trustee may likewise collect and receive any and all property which may be bequeathed and devised to the Trustee by the terms and provisions of the Grantor's last Will or otherwise made subject to the terms of this Trust Agreement and, for that purpose, the Trustee shall have full power to execute and deliver any receipt or other voucher for the same.

**Section 6.** (1) The Trustee may, in the Trustee's sole discretion, pay all or any part of any premium or other charge due on any insurance policies held under this Trust Agreement by applying the income of the Trust Estate to such premium or other charge.

(2) If the Trustee is otherwise unable to pay all or any portion of any such premium or other charge, or elects not to do so, the Trustee may, but shall be under no obligation to: (a) sell at public or private sale a sufficient portion of the property of the Trust Estate or borrow on the collateral of all or any portion of the property of the Trust Estate, to obtain the funds necessary to pay such balance; (b) surrender any such policy or policies of insurance for its or their cash surrender value, or borrow on such policies and make premium payments from the funds so derived; (c) convert any such policy into a paid-up policy in whatever amount may be provided by the terms of such policy, or convert any such policy to a policy of extended term insurance in whatever amount may be provided by the terms of such policy; (d) exercise any other right, option, power, election or privilege under any such policy; or (e) in the Trustee's sole and absolute discretion, terminate the trust as to such policies and transfer and assign the policies to the Beneficiary.

(3) If, at any time, the total amount available to the Trustee is insufficient to pay the premiums or other charges on any policy of insurance held in a Trust Estate by the required due date (including grace periods, if any), the Trustee shall be under no obligation to pay such premiums or charges and shall not be liable to any extent whatsoever in the event such premiums or other charges are not timely paid.

## ARTICLE XI
## TRUSTEE'S POWERS, RIGHTS AND DUTIES

**Section 1.** It is Grantor's intention that the Trustee's powers to conserve, protect, manage and invest property of the Trust shall be the same as Grantor possesses in the management of Grantor's own affairs, notwithstanding the provisions of any judicial decision or statute now in existence or later issued or enacted pertaining to powers which may be properly exercised by

7

fiduciaries. In the event there shall be more than two (2) Trustees acting at any time, then any and all acts of the Trustee shall be effective only upon a majority vote of the Trustees then acting.

**Section 2.**     Without limiting the broad scope of the powers intended herein, Grantor grants the Trustee the following specific powers, which in its' discretion, the Trustee mayor may not exercise.

(a)     To buy or sell real property upon such terms and conditions as the Trustee may deem advisable.

(b)     To collect, hold and retain assets received from Grantor until, in the judgment of the Trustee, disposition of the assets should be made, which assets may be retained even though they include 'an asset in which the Trustee is personally interested; and to receive additions to the assets of the Trust which are acceptable to the Trustee.

(c)     To sell any Trust asset upon such terms and conditions as the Trustee may deem advisable; to acquire an undivided interest in a Trust asset in which the Trustee, in any individual as well as any Trust capacity, holds an undivided interest; to invest and reinvest Trust assets; to deposit Trust funds in a bank or Trust company, including a bank or Trust company operated by the Trustee and including any common Trust fund of any such depository bank or Trust company; to vote a security, in person or by general or limited proxy, including the power to retain in Trust and vote a security issued by a bank or financial institution; to pay calls, assessments, and any other sums chargeable to or accruing against or on account of securities; to sell or exercise stock subscription or conversion rights; or to consent, directly or through a committee or other agent, to the reorganization, consolidation, merger, dissolution, or liquidation of a corporation or other business enterprise.

(d)     To payor contest a claim; to settle a claim by or against the Trust or the Trust assets by compromise, arbitration, or otherwise; and to release, in whole or in part, a claim belonging to This Trust to the extent that the claim is uncollectible in the opinion of the Trustee.

(e)     To change the situs of this Trust to any jurisdiction.

(f)     To employ and pay persons, including attorneys, auditors, investment advisors, to advise or assist the Trustee in the performance of its administrative duties; to act without independent investigation upon their recommendations; and, instead of acting personally, to employ an agent to perform any act of administration, whether or not discretionary.

(g)     To insure the assets of the Trust against damage or lost and the Trustee against liability with respect to third persons.

(h)     To borrow money to be repaid from the Trust assets or otherwise; and to advance money for the protection of the Trust and for expenses, losses, or liabilities sustained in the administration of the Trust or because of the holding or ownership of any Trust assets, for which advances and any interest thereon the Trustee shall have a lien on the Trust assets as against the

8

beneficiary.

(i)     To buy, sell, trade and deal in, stocks, bonds and securities of every nature, including puts, calls, straddles and other options, covered and uncovered, and commodities and contracts for the future delivery of commodities, on margin or otherwise; and to pledge any and all Trust assets for the future delivery of such items.

(j)     To prosecute or defend actions, claims, or proceedings for the protection of Trust assets and of the Trustee in the performance of the Trustee's duties.

(k)     Subject to any express limitation provided with respect to the Trust Estates, or any specific Trust Estate, created under this Trust Agreement, the Trustee may terminate any Trust Estate or merged Trust Estate and distribute the property then constituting such Trust Estate, free from trust, to the Beneficiary of such Trust Estate if, as and when the fair market value of such property is not sufficient, in the opinion of the Trustee, to make it economical, prudent or wise to continue to administer such Trust Estate as a separate Trust Estate.

(l)     In performing enforceable contracts made by the Grantor of the Trust, among other possible choices of action, to affect a fair and reasonable compromise with a debtor or obligor, or to extend, renew, or in any manner modify the terms of an obligation owing to the Trust. If the Trustee, in such capacity, holds a mortgage, pledge, or other lien upon property of another person, in lieu of foreclosure, to accept the conveyance or transfer of encumbered assets from the owner thereof in satisfaction of the indebtedness so secured.

(m)     To pay taxes, assessments, compensation of the Trustee, and other expenses incurred in the collection, care, administration, or protection of the Trust.

(n)     To make distributions, divisions and allocations of property in cash or in kind, or partly in each, and to resolve doubtful questions as to the value of property for such purposes; provided that whenever the provisions of This Agreement direct the division of the Trust estate into Separate Trusts, it shall not be necessary for the Trustee actually or physically to divide the Trust estate into as many parts as there may be Separate Trusts, but an undivided part of the entire Trust estate (or any lesser portion thereof) may be deemed, and shall be duly evidenced by appropriate book entries, to have been allocated to each such Separate Trust.

(o)     To determine the identity of all persons having a vested or non-vested beneficial interest in the Trust, with or without legal proceedings.

(p)     To continue or participate in the operation of any business or other enterprise, whatever its form or organization, with full power to act in a fiduciary capacity as partner or joint venturer, whether or not the Trustee or any person affiliated with, employed by or related to the Trustee may also have an interest (in an individual capacity) in such business operation, enterprise, partnership or joint venture; to enter into, comply with and/or carry out the terms of any binding agreement regarding the disposition or acquisition of any interest in a business entity held in the Trust Estate. For these purposes, the Trustee shall have the power to retain and employ therein the

9

capital of any such business, with power to employ at such salary as the Trustee shall determine any manager of the said business, who may be the Trustee or any person affiliated with, employed by or related to the Trustee; to organize or participate in the organization of a corporation or corporations for the purpose of operating any such business; and generally to act in matters relating to any such business as if the Trustee were beneficially entitled thereto. The Trustee shall be free from all responsibility for losses arising in the prosecution of any such business; all profits and losses therefrom shall be those of the Trust Estate and not of the Trustee.

(q)     To make determinations as to the allocation of receipts and the apportionment of expenditures between income and principal, with the Trustee not being required to follow any provision of law regarding such determinations.

(r)     To purchase policies of life insurance insuring the life of Grantor, or any beneficiary hereunder, providing that the beneficiary to be insured is not acting as a Trustee. In this connection, the following provisions shall apply: the Trustee shall not be obligated to pay any charges, including premiums, with respect to any life insurance policies held as assets of by the Trust. Upon notice at any time during the continuance of the Trust that the premiums due upon such policies are in default, or that premiums to become due will not be paid by Grantor or by any other person, the Trustee may apply any cash values attributable to such policy to the purchase of paid-up insurance or of extended insurance, or the Trustee shall borrow upon such policies to effect the payment of premiums due thereon. If the Grantor or any other insured becomes totally and permanently disabled within the meaning of such insurance policies containing a waiver of premium clause, the Trustee, upon the receipt of such knowledge, shall promptly notify the insurance company which has issued such policies and shall take any and all steps necessary to make such waiver of premium provisions effective. The Trustee shall be under no duty or obligation to invest and/or keep invested any cash of nominal amount that was initially deposited. Notwithstanding the foregoing, however, prior to making payment for any insurance premiums from the income of the Trust, the Trustee shall obtain the written consent of all beneficiaries.

**Section 3.**     In no event shall any distribution from any Trust hereunder be deemed to discharge a support obligation, which obligation may be owed by any Trustee to any Beneficiary.

**Section 4.**     No powers enumerated herein or accorded to the Trustee generally pursuant to law shall be construed to enable Grantor or the Trustee to purchase, exchange, or otherwise deal with or dispose of the principal or income of the Trust for less than full consideration in money or money's worth, or to enable Grantor or the Trustee to borrow the income or principal of the Trust, directly or indirectly, without adequate interest or security. Except as provided by Section 2, no person, other than the Trustee, shall have or exercise the power to vote or direct the voting of any stock or other securities of the Trust, to control the investment of the Trust, either by directing investments or reinvestments or by vetoing proposed investments or reinvestments. Notwithstanding the foregoing, however, the Grantor shall specifically be afforded the opportunity to reacquire or exchange any property in the Trust by substituting other property of an equivalent value. Additionally, the Grantor shall be afforded the opportunity to relinquish this opportunity to reacquire or exchange property by substituting other property of an equivalent value. The relinquishment of the opportunity shall be irrevocable and shall be made only in writing,

10

specifically referring to this opportunity.

## ARTICLE XII
## RIGHTS AND DUTIES OF TRUSTEES BETWEEN
## THEMSELVES AND OBLIGATIONS OF TRUSTEES TO BENEFICIARIES

**Section 1.**     Any Trustee who may be entitled to a discretionary distribution under any provisions of this instrument, which discretionary distributions are not otherwise limited by an ascertainable standard, shall not participate in any determinations relating to such distributions.

**Section 2.**     A Trustee foreclosed from exercising discretion by a majority vote of the remaining Trustees shall not be liable to any person for any damage resulting from nonetheless exercising such discretion.

**Section 3.**     No Trustee shall be permitted to make distribution from the income and/or principal of any Trust under this Agreement which distribution will be deemed to discharge any obligation for support or otherwise, which obligation the Trustee may be required to provide to any beneficiary.

**Section 4.**     At any time when a corporate Trustee may be acting hereunder it shall be permissible for the Trustee, from time to time, to have a commercial lending relationship with any business in which any special securities held hereunder represent an interest even though such a relationship may constitute a technical conflict of interest. The Grantor specifically grants to the Trustee the authority to allow the Trustee to earn interest, take and enforce security interests in collateral owned by that business or otherwise profit from such lending relationship. In no event shall the Trustee be liable for any such technical violation of any conflict of interest or similar rule, unless it proved that the Trustee was clearly motivated by and acting in its' own self-interest, knowing that such action was not in the best interest of the Trust. As long as a lending relationship is entered into without violating the foregoing standard, the Trustee lender shall be entitled to enforce all its' creditor's rights with respect to any such loan, even though such enforcement is not in the best interests of the Trust.

**Section 5.**     The fact that a Trustee (or a firm of which a Trustee is otherwise affiliated) renders legal or other professional services to a trust hereunder shall not be deemed a conflict of interest, and the Trustee may pay fees for such services to such Trustee or firm without prior approval of any court or any beneficiary and whether or not there is a Co-Trustee to approve such payment. An attorney or other Trustee who also renders professional services shall receive full compensation for both services as Trustee and the professional services rendered, except as specifically limited by law, or elsewhere in this agreement.

**Section 6.**     It is understood and acknowledged by the Grantor that, although the original Trustee named hereunder, or any Successor Trustee may be an attorney at law, licensed and admitted to practice in any state or commonwealth of the United States, no attorney/client relationship is intended to be created, or is created, by reason of the execution of this Agreement

11

or the creation or administration of this Trust.

## ARTICLE XIII
## INSURANCE BENEFITS

**Section 1.**     At Grantor's death, the Trustee shall make a diligent effort to collect all death benefits payable to the Trustee, and the Trustee may take any action necessary to enforce payment of such death benefits. However, the Trustee need not take any such action until it has been indemnified to its satisfaction against all expenses and liabilities to which it determines it may be subjected.

**Section 2.**     The Trustee is authorized to settle claims arising out of any instrument governing the payment of death benefits, and its decisions shall be binding upon all persons having a beneficial interest in the Trust estate, whether or not such interest is a vested one.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 1.**     The Trustee shall render a statement of assets in any of the Trusts hereunder and of receipts and disbursements during the period covered at least annually to each of the adult and otherwise legally competent beneficiaries (or to the guardian of any beneficiary) then receiving or entitled to receive income from any of the Trusts hereunder. The Trustee may also, at any time, at its sole option, secure approval of an account of its acts by a court of competent jurisdiction. The books of account of the Trustee at all reasonable times shall be open to inspection by the beneficiaries and such other person(s) as they may designate for that purpose.

**Section 2.**     The Trustee may make payments of money to a minor by making payments to (a) a guardian of the minor, (b) a custodian of property held for the minor's benefit under the Uniform Gifts or Transfers to Minors Act of any state, (c) any suitable person with whom the minor resides, or (d) the minor directly if, in the Trustee's judgment, the minor is of sufficient age and maturity to spend the money properly.

**Section 3.**     If any provision of This Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of This Agreement shall continue in full force and effect and shall in no way be impaired or invalidated.

**Section 4.**     Notwithstanding any foregoing provision to the contrary, at the time of death of the Grantor, should the Trustee hereunder determine that the provisions of any Separate Trust(s) to be administered under the Trust are identical to the provisions of the Separate Trust(s) to be administered according to the provisions of any other Trust(s) established by Grantor during Grantor's lifetime, then, the Trustee may, if the Trustee should so elect, combine the corpus of each Separate Trust into one (1) Separate Trust for each beneficiary in order to provide ease of administration.

12

# ARTICLE XV
## DEFINITIONS

**Section 1.**     When the term "Trust" or "Trust estate" is used without other words of description, it shall mean any or all of the Trusts being administered under this instrument at the time the term is applied.

**Section 2.**     The terms "child" or "children" of Grantor shall mean any child or children born to or legally adopted before or after the date of This Agreement. The terms or "children" with respect to any other person shall mean all born children as well as all legally adopted children, whether or legally adopted by such other person before or after this instrument.

**Section 3.** The term "issue" shall mean and include only children, whether natural born or legally adopted, of the particular benefactor, as the case may be. The term "descendant" or "descendants" shall include all lineal descendants by blood or legal adoption of the named ancestor.

**Section 4.** When the terms "income beneficiary" or "income beneficiaries" are used they shall mean such one or more beneficiaries of a trust to whom income distributions from such trust are required to be made, in the case of mandatory income distributions, or to whom income distributions from such trust are allowed to be made, in the case of other income distributions. Except for distributions which may be made unequally, any distribution of income or principal which is to be made to the income beneficiaries of any trust shall be made to such income beneficiaries in proportion to their respective interests in the income of such trust. For purposes of any notice to be given to, or power exercisable by, the income beneficiaries and for purposes of any distribution to be made pursuant to an early termination of the trust, a beneficiary's interest in the income of such trust shall be determined as though income distributions were required to be made equally among the income beneficiaries.

**Section 5.**     The term "education" shall mean any kind of formal education or training, including undergraduate, postgraduate or professional schooling. The term "education" shall also include technical or trade training, as well as tutoring, classroom supplemental courses and extra-curricular activities including, but not limited to music, art and sports lessons, providing the beneficiary strives therefore in good faith.

**Section 6.**     The term "person" or "persons" shall mean any natural or legal person, or any association of natural or legal persons.

**Section 7.**     The term "Corporate Trustee" shall mean any national banking association, corporation, or other institution, part or all of the business of which involves the regular administration of Trust accounts and counseling in connection with Trust business.

**Section 8.**     As the context of any provision may require, nouns and pronouns of any

13

From: Atlantic Insurance BrcFax: (888) 228-7570     To: F&G NB app fax     Fax: +18889584796     Page 53 of 55 08/01/2016 9:19 PM
20-06526-rdd    Doc 1    Filed 10/02/20    Entered 10/02/20 21:04:18    Main Document
Pg 125 of 180

gender and number shall be construed in any other gender and number.

**Section 9.** The term "future interest" shall have the same meaning and effect given said term in Section 2503(b) of the Code and the Regulations pertaining thereto.

**Section 10.** The term "trust estate" wherever used in this Trust Agreement means all assets, however and whenever acquired (including income and accumulated income), which may be held in a trust at any given time.

**Section 11.**     The term "Trustee", when used without other words of description, shall refer to any Trustee or to all Trustees acting at the time the term is applied.

**Section 12.**     The term "the Code" of "Internal Revenue Code" The term "Internal Revenue Code" as used in this Trust Agreement means the Internal Revenue Code of 1986 or corresponding provisions of any subsequent federal tax laws.

## ARTICLE XVI
## GOVERNING LAW

The validity of This Agreement shall initially be governed under the Laws of the state of New Jersey, as the state of situs of the Trust.

**IN WITNESS WHEREOF,** the parties hereto have signed this Agreement the day and year first above written.

GRANTOR:



R    G

TRUSTEE:

F    B

14

STATE OF New Jersey)

                      ss.:

COUNTY OF Ocean    )

       On the _15_ day of July in the year 2016, before me, the undersigned, a notary public in and for said state, personally appeared R█████ G█████ as Grantor, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity and that by her signature on the instrument, the individual acted, executed the instrument.



Notary Public

P███████ A█
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 05/02/2017

STATE OF New Jersey )

                      ss.:

COUNTY OF Ocean    )

       On the day _15_ of July in the year 2016, before me, the undersigned, a notary public in and for said state, personally appeared E█████ B█████, as Trustee, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual acted, executed the instrument.



Notary Public

P███████ A█
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 05/02/2017

15

## SCHEDULE "A"
## <u>ADDITIONAL PROPERTY</u>

# EXHIBIT I

$795,031.25 PAR Number: 160914004374                          06

Fed Ref: 000231                                              L2230165

Date/Time Received: 09/14/2016 07:40:48 AM

Originator: D4332046229 THE R█████ G█████████ 2016 FAMI MENACHEM MEISNER TRUSTEE 178
ROUTE

59 SUITE 301

Sending Bank:████████TD BANK* TD BANK NA GLASTONBURY CT

Receiving Bank:████████US BANK NEBRASKA

Beneficiary:████████FIDELITY AND GUARANTY LIFE 1700 FARNAM ST OMAHANE

Beneficiary Ref: ATUO-ADRSFJ

Originator To Beneficiary Info: MEMO L2230165

IMAD: 20160914C1B76E1C000231

**EXHIBIT I**

FGLIC_BIP00012326

$122,668.75 PAR NUMBER: 160929036398                    **L2230165**
FED REF: 004325                                          **CO 06**
DATE/TIME RECEIVED: 09/29/2016 02:48:22 PM
ORIGINATOR: D4332046229 THE R█████G█████2016 FAMI MENACHEM MEISNER TRU
STEE 178 ROUTE 59 SUITE 301
SENDING BANK:█████TD BANK* TD BANK NA GLASTONBURY CT
RECEIVING BANK:█████US BANK, NA*
BENEFICIARY:█████FIDELITY AND GUARANTY LIFE 1700 FARMAN ST OMAHAN
E
BENEFICIARY REF: MSJN-AE9Q3N
ORIGINATOR TO BENEFICIARY INFO: POLICY # L2230165
IMAD: 20160929C1B76E1C004325

Batch 181773
B. Piuts
9-30-16

**Dell - Internal Use - Confidential**

# EXHIBIT J

# Individual Life Insurance Application

ICC11-1015 (10-11)

**Fidelity & Guaranty Life Insurance Company** Home Office: Des Moines, IA
**Administrative Office: P.O. Box 81497; Lincoln, NE 68501-81497**

## PART I (Page 1 of 8)

**For anyone proposed to be insured: if you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.**

## PRIMARY INSURED

| Name (First, M.I., Last) | | | | | | |
|---|---|---|---|---|---|---|
| E███████   F████████ | | | | | | |

| Home Address | | | City | State | Zip |
|---|---|---|---|---|---|
| ████████████ | | | ██████ | ██ | ████ |

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|
| █████████ | | | | | | |

| Driver's License Number and Issue State | Other Identification Number (if Driver's License not used): | State/Province and Country of Issue: |
|---|---|---|
| ████████████ | | |

| Type of Identification: | ID Number |
|---|---|
| | |

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☑ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|
| | |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|
| | | ████████████ | |

## OTHER INSURED

| Name (First, M.I., Last) | Relationship to Primary Insured |
|---|---|
| | |

| Home Address | City | State | Zip |
|---|---|---|---|
| | | | |

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|
| | | | | | | |

| Driver's License Number and Issue State | Other Identification Number (if Driver's License not used): | State/Province and Country of Issue: |
|---|---|---|
| | | |

| Type of Identification: | ID Number |
|---|---|
| | |

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☐ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|
| | |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|
| | | | |

## OWNER(S)    UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED

**IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.**
**A secondary addressee may be named to receive notice of possible lapse in coverage.**

| Name (First, M.I., Last) | Relationship to Primary Insured |
|---|---|
| The E██████ E████ Trust 2016 | Trust |

| Home Address | City | State | Zip |
|---|---|---|---|
| ████████████ | ██████ | ██ | ████ |

| Social Security or Tax I.D. No. | Date of Birth |
|---|---|
| ████████ | |

| Driver's License Number and Issue State | Other Identification Number (if Driver's License not used): | State/Province and Country of Issue: |
|---|---|---|
| | | |

| Type of Identification: | ID Number |
|---|---|
| | |

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☐ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|
| | |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|
| | | | |

**EXHIBIT J**

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 2 of 8)

### SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|
| Home Address | City | State | Zip |

### BENEFICIARY DESIGNATION – Primary Insured

*For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information*

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The E███████ F██████ Trust 2016 | Trust | 100% |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |
| | | |

### BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

### EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity? Amount being replaced $_____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details:* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If "Yes," please provide details below* | ☒Y | ☐N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☐ **There is no existing coverage.**

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| ███████████ | | | | | | | |

### STATEMENT OF INTENT    *This section must be completed by the owner and all persons applying for life insurance with this application*

*It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.*

| 1. | Are you financing or refinancing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else? | ☐Y | ☒N |

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 3 of 8)

### LIFE INSURANCE INFORMATION

| Product Name **FG Life Elite** | Amount of Insurance $ 5,000,000.00 | Initial Premium $ 315,550 | Planned Premium $ 315,550 |
|---|---|---|---|

**UNIVERSAL LIFE:** Death Benefit Option:
☒ Option A-Level   ☐ Option B-Increasing

~~Life Insurance Qualification Test~~   ☒ Guideline Premium   ☐ Cash Value Accumulation
*If not indicated, Guideline Premium Test will be used.*

☒ Nontobacco
☐ Tobacco

For Fixed Indexed Products Only: Initial Allocation Percentage *(if not completed, 100% will be allocated to the 100% Par Index Interest Option)*

140% Par Index Interest Option _____%     Fixed Interest Option _____%     Monthly Point to Point _____% *(FGLife Choice & Elite only)*

100% Par Index Interest Option _____%     100% Par Index Interest Option with higher guarantee _____% *(FGLife Choice only)*

Gold Option _____% *(Synergy Global Advantage Gold only)*     Dow Jones Options _____% *(Synergy Global Advantage Gold only)*

Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.)
☒ Annual   ☐ Semi-Annual   ☐ Quarterly   ☐ Monthly Bank Draft   ☐ Bi-Weekly Bank Draft
☐ Payroll Deduction   ☐ Other _____

Payment in Exchange for Conditional Receipt
$

## No Longer Offered

*No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.*

### ADDITIONAL BENEFITS

*Subject to availability. Certain restrictions may apply.*

| PRIMARY INSURED | | OTHER INSURED | |
|---|---|---|---|
| ☐ Accelerated Benefit Rider: Critical Illness | | | |
| ☐ Accelerated Benefit Rider: Terminal Illness | | | |
| ☐ Accidental Death Benefit Rider | Amount: $_____ | | |
| ☐ Ultimate Income Option Rider | Initial Lump Sum: $_____ Monthly Income of: $_____ for _____ years. Final Lump Sum: $_____ | Illustration Required. | |
| ☐ Other Insured Rider | Amount: $_____ | | |
| ☐ Child Rider | Amount: $_____ | Supplemental questionnaire required. | |
| ☐ (UL Only )Waiver of Monthly Deduction Rider | | | |
| ☐ Other: _____ | | | |

### PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States? *If "No," please complete W8ben form and the Citizenship Questionnaire.* | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years ?: | | |
| | *If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire.* | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? *If "Yes," please provide details below.* | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? *If "Yes," please provide details below.* | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? *If "Yes," please provide details below.* | | |

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 4 of 8)

| | PERSONAL HISTORY QUESTIONS *(Continued)* | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing, or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

## Life Insurance Application PART II

*Provide full name, address, and phone number of primary medical provider.*

❏ *Primary Insured does not have a primary medical provider.*

Medical Provider Name | Date Last Seen

*Provide full name, address, and phone number of primary medical provider.*

❏ *Other Insured does not have a primary medical provider.*

| Medical Provider Name | | Date Last Seen |
|---|---|---|
| Medical Provider Address | City, State, Zip | Medical Provider Phone Number |
| Reason and Results of Last Visit | | |

**Life Insurance Application PART II** (Page 5 of 8)

ICC11-1015 (10-11)

## MEDICAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| | Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | | |
| 1. | | | |
| 2. | | | |
| 3. | | | |

ICC11-1015 (10-11)

## Life Insurance Application Part II (Page 6 of 8)

### MEDICAL HISTORY QUESTIONS *(Continued)*

|  |  | Primary Insured | Other Insured |
|---|---|---|---|
| 4. |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| 5. |  |  |  |
| 6. |  |  |  |
| 7. |  |  |  |
| 8. |  |  |  |
|  |  |  |  |
| 9. |  |  |  |

| Medication Name(s) | Condition or Disorder Medication Is Treating | Dosage | Frequency | Prescribing Physician | Beginning Date | Primary Insured | Other Insured |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

### ADDITIONAL INFORMATION

*If additional space is needed for any "Yes," answers please use the space below.*

| Question | Detail | Primary Insured | Other Insured |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  | ❏ | ❏ |

ICC11-1015 (10-11)

**Life Insurance Application Part III** (Page 7 of 8)

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief: complete; true; and correctly recorded and are subject to the applicable **FRAUD WARNING** notice. **I (We) agree that: a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company. I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, no insurance will take effect unless and until both of the following conditions are satisfied during each proposed insured's lifetime and while each proposed insured's health is as stated in this application: (1) the life insurance contract is delivered to and accepted by the Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office.** I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports. I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee, medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance. I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ☐

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members. If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit. Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider. There is no premium charged for this rider. I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization. Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

**For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance. I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for. I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.**

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose. This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s); and any other information necessary to sufficiently verify identity(ies). I (we) understand that failure to provide this information could result in the application being rejected. Third party sources may be used to verify the information provided.

**FRAUD NOTICE: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.**

| Signed at (City and State) Mahwah  N. J | | Date 07/22/2016 |
|---|---|---|
| Signature of Primary Insured Age 15 or More | | |
| Signature(s) of Additional Insured(s) Age 15 or More | | |
| Signature of Owner(s) (If not the Primary ...nsured is less than Age 18) ... , trustee | | |

ICC11-1015 (10-11)

## Life Insurance Application Part III (Page 8 of 8)

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

**To the best of my knowledge, this application**   ❑ **does replace**   ☒ **does not replace**   **existing life insurance, mortgage life insurance, or annuities.**

If so, will this replacement be considered a 1035 exchange?   ❑ Yes   ❑ No

I certify that the indexed disclosure material has been presented to the Applicant. A copy was provided to the Applicant. I have not made statements which differ in any significant manner from this material. I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer | Print Agent/Producer Name | Date |
|---|---|---|
| _Leon Lowenthal_ (signature) | Leon Lowenthal | 07/22/2016 |
| **Agent /Producer FGLIC Number** 000316509 | **Agent/Producer Phone Number** 845-263-6158 | **Agent/Producer Fax Number** |
| **Agent Email Address** leon@pswllc.com | | |

# Taxpayer Identification Certification

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. The Internal Revenue Service does not require consent to any provision of this document other than the certifications required to avoid backup withholding. Additionally IRS penalties may be imposed by the Internal Revenue Service for failure to furnish the information.

If you have been notified that backup withholding applies review the defined instructions in item 3 of the Certification on Form W-9 once you receive a copy of the instructions. If you would like a copy of the Form W-9 Instructions please contact the Service Center.

_____         07/22/2016
Insured's Signature                              Date


_____         _____
Other Insured's Signature (if applicable )       Date


_____, trustee               07/22/2016
Owner's Signature  (if not the same as the insured)   Date

ADMIN 5622 (07-2011)

# EXHIBIT K

From: Atlantic Insurance Br Fax: (888) 229-7570        To: F&G NB app fax        Fax: +18889584795        Page  2  of 32 12/14/2015 11:12 PM

## Individual Life Insurance Application

ICC11-1015 (10-11)

Fidelity & Guaranty Life Insurance Company  Home Office: Des Moines, IA
Administrative Office: P.O. Box 81497; Lincoln, NE 68501-81497

### PART I (Page 1 of 8)

For anyone proposed to be insured:  If you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.

### PRIMARY INSURED

| Name (First, M.I., Last) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Home Address | | | | | City | State | Zip |
| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | | Height (ft., in.) | Weight (lbs.) |
| Driver's License Number and Issue State | | | | Other Identification Number (if Driver's License not used): | | State/Province and Country of Issue: | |
| Type of Identification: | | | ID Number | | | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | | | Occupation and Duties | | No. of Years With Current Employer |
| Earned Annual Income | | | | Email Address | | | |
| Daytime Phone Number | | Evening Phone Number | | Cell Phone Number | | Best Time To Call | |

### OTHER INSURED

| Name (First, M.I., Last) | | | | | Relationship to Primary Insured | | |
|---|---|---|---|---|---|---|---|
| Home Address | | | | | City | State | Zip |
| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | | Height (ft., in.) | Weight (lbs.) |
| Driver's License Number and Issue State | | | | Other Identification Number (if Driver's License not used): | | State/Province and Country of Issue: | |
| Type of Identification | | | ID Number | | | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | | | Occupation and Duties | | No. of Years With Current Employer |
| Earned Annual Income | | | | Email Address | | | |
| Daytime Phone Number | | Evening Phone Number | | Cell Phone Number | | Best Time To Call | |

### OWNER(S)        UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED

IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.
A secondary addressee may be named to receive notice of possible lapse in coverage.

| Name (First, M.I., Last) | | Family Trust | Relationship to Primary Insured  Trust | | |
|---|---|---|---|---|---|
| Home Address | | | City | State | Zip |
| Social Security or Tax I.D. No. | Date of Birth | | | | |
| Driver's License Number and Issue State | | Other Identification Number (if Driver's License not used): | | State/Province and Country of Issue: | |
| Type of Identification: | | ID Number | | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | Occupation and Duties | | No. of Years With Current Employer |
| Earned Annual Income | | Email Address | | | |
| Daytime Phone Number | Evening Phone Number | | Cell Phone Number | Best Time To Call | |

ICC11-1015 (10-11)

Rev. 12-2014

**EXHIBIT K**

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 2 of 8)

### SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|
| Home Address | City | State | Zip |

### BENEFICIARY DESIGNATION – Primary Insured

*For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information*

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The S___ M___ Family Trust | Trust | 100 |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |
| | | |

### BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

### EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity? Amount being replaced $_____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details:* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If "Yes," please provide details below* | ☐Y | ☒N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☐ There is no existing coverage.

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

### STATEMENT OF INTENT    *This section must be completed by the owner and all persons applying for life insurance with this application*

*It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.*

| 1. | Are you financing or refinancing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for your assigning part or all of the policy values to someone else? | ☐Y | ☒N |

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 3 of 8)

## LIFE INSURANCE INFORMATION

| Product Name | Amount of Insurance | Initial Premium | Planned Premium |
|---|---|---|---|
| ELITE IUL | $ 4M | $ | $ |

**UNIVERSAL LIFE:** Death Benefit Option:
☑ Option A-Level    ☐ Option B-Increasing

☑ Nontobacco    ☐ Tobacco

For Fixed Indexed Products Only: Initial Allocation Percentage (if not completed, 100% will be allocated to the 100% Par Index Interest Option)

140% Par Index Interest Option _____%    Fixed Interest Option _____%    Monthly Point to Point _____% (FGLife Choice & Elite only)

100% Par Index Interest Option _____%    100% Par Index Interest Option with higher guarantee _____% (FGLife Choice only)

Gold Option _____% (Synergy Global Advantage Gold only)    Dow Jones Options _____% (Synergy Global Advantage Gold only)

Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.)
☐ Annual   ☐ Semi-Annual   ☐ Quarterly   ☐ Monthly Bank Draft   ☐ Bi-Weekly Bank Draft
☐ Payroll Deduction   ☐ Other _____

Payment in Exchange for Conditional Receipt
$

### No Longer Offered

No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.

## ADDITIONAL BENEFITS

Subject to availability. Certain restrictions may apply.

| PRIMARY INSURED | | OTHER INSURED |
|---|---|---|
| ☐Accelerated Benefit Rider: Critical Illness | | |
| ☐Accelerated Benefit Rider: Terminal Illness | | |
| ☐ Accidental Death Benefit Rider | Amount: $_____ | |
| ☐ Ultimate Income Option Rider | Initial Lump Sum: $_____<br>Monthly Income of: $_____ for _____ years.<br>Final Lump Sum: $_____ | Illustration Required. |
| ☐ Other Insured Rider | Amount: $_____ | |
| ☐ Child Rider | Amount: $_____ | Supplemental questionnaire required. |
| ☐ (UL Only )Waiver of Monthly Deduction Rider | | |
| ☐ Other: _____ | | |

## PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States?<br>If "No," please complete W8ben form and the Citizenship Questionnaire. | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years ?: | | |
| | If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire. | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? If "Yes," please provide details below. | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? If "Yes," please provide details below. | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? If "Yes," please provide details below. | | |

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 4 of 8)

### PERSONAL HISTORY QUESTIONS *(Continued)*

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing, or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

## Life Insurance Application PART II

*Provide full name, address, and phone number of primary medical provider.*

☐ *Primary Insured does not have a primary medical provider.*

| Medical | |
|---|---|
| Medical | |
| Reason | |

*Provide full name, address, and phone number of primary medical provider.*

☐ *Other Insured does not have a primary medical provider.*

| Medical Provider Name | | Date Last Seen |
|---|---|---|
| Medical Provider Address | City, State, Zip | Medical Provider Phone Number |
| Reason and Results of Last Visit | | |

ICC11-1015 (10-11)                                                                 Rev. 12-2014

ICC11-1015 (10-11)

## Life Insurance Application PART II (Page 5 of 8)

### MEDICAL HISTORY QUESTIONS

| Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | Primary Insured | Other Insured |
|---|---|---|
| 1. | | |
| 2 | | |
| 3 | | |

Rev. 12-2014

Life Insurance Application Part II (Page 6 of 8)

ICC11-1015 (10-11)

## MEDICAL HISTORY QUESTIONS (Continued)



### ADDITIONAL INFORMATION

If additional space is needed for any "Yes," answers please use the space below.

ICC11-1015 (10-11)

## Life Insurance Application Part III (Page 7 of 8)

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief, complete, true; and correctly recorded and are subject to the applicable FRAUD WARNING notice. I (We) agree that: a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company. I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, no insurance will take effect unless and until both of the following conditions are satisfied during each proposed insured's lifetime and while each proposed insured's health is as stated in this application: (1) the life insurance contract is delivered to and accepted by the Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office. I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports. I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practitioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee, medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance. I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ☐

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members. If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit. Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider. There is no premium charged for this rider. I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization. Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance. I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for. I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.

CERTIFICATION: I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose. This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s), and any other information necessary to sufficiently verify identity(ies). I (We) understand that failure to provide this information could result in the application being rejected. Third party sources may be used to verify the information provided.

FRAUD NOTICE: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.

| Signed at (City and State) hakewood    N.J | Date    12 | 10 | 15 |
| --- | --- | --- | --- |
| Signature of Primary Insured Age 15 or More | | | |
| Signature [redacted] Insured(s) Age 15 or More | | | |
| Signature [redacted] Insured or if Primary Insured is less than Age 16) | | | |

Rev. 12-2014

ICC11-1015 (10-11)

**Life Insurance Application Part III (Page 8 of 8)**

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

To the best of my knowledge, this application ☑ does replace ☐ does not replace existing life insurance, mortgage life insurance, or annuities.

If so, will this replacement be considered a 1035 exchange? ☐ Yes ☐ No

I certify that the indexed disclosure material has been presented to the Applicant. A copy was provided to the Applicant. I have not made statements which differ in any significant manner from this material. I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer | Print Agent/Producer Name | Date |
|---|---|---|
| | LEON Lowenthal | 12-10-15 |
| Agent./Producer FGLIC Number 000316509 | Agent/Producer Phone Number (845) 263-6158 | Agent/Producer Fax Number (845) 262-1303 |
| Agent Email Address LEON @ PSWLLC . COM | | |

# EXHIBIT L

## Individual Life Insurance Application

ICC11-1015 (10-11)

**Fidelity & Guaranty Life Insurance Company** Home Office: Des Moines, IA
**Administrative Office:** P.O. Box 81497; Lincoln, NE 68501-81497

### PART I (Page 1 of 8)

*For anyone proposed to be insured: if you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.*

### PRIMARY INSURED

| | | | | |
|---|---|---|---|---|
| Name (First, M.I., Last) | | | | |
| Home Address | | | City | State | Zip |
| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
| Driver's License Number and Issue State | | Other Identification Number (If Driver's License not used): | | State/Province and Country of Issue: |
| Type of Identification: | | ID Number | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | Occupation and Duties | No. of Years With Current Employer |
| Earned Annual Income | | Email Address | | |
| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call | |

### OTHER INSURED

| | | | | |
|---|---|---|---|---|
| Name (First, M.I., Last) | | | Relationship to Primary Insured | |
| Home Address | | | City | State | Zip |
| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
| Driver's License Number and Issue State | | Other Identification Number (If Driver's License not used): | | State/Province and Country of Issue: |
| Type of Identification | | ID Number | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | Occupation and Duties | No. of Years With Current Employer |
| Earned Annual Income | | Email Address | | |
| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call | |

### OWNER(S)   *UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED*

*IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.*
*A secondary addressee may be named to receive notice of possible lapse in coverage.*

| | | | | |
|---|---|---|---|---|
| Name (First, M.I., Last) * Trustee - The [ ] 2016 Family Trust | | | Relationship to Primary Insured Trust | |
| Home Address | | | City | State | Zip |
| Social Security or Tax I.D. No. | | Date of Birth | | |
| Driver's License Number and Issue State | | Other Identification Number (If Driver's License not used): | | State/Province and Country of Issue: |
| Type of Identification: | | ID Number | | |
| Currently Employed? ☐ Yes ☐ No | Employer | | Occupation and Duties | No. of Years With Current Employer |
| Earned Annual Income | | Email Address | | |
| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)

Rev. 12-2014

**EXHIBIT L**

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 2 of 8)

### SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|
| Home Address | City | State | Zip |

### BENEFICIARY DESIGNATION – Primary Insured

For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The ███████ ████ 2016 Family Trust | Trust | 100 |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |
| | | |

### BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

### EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity? Amount being replaced $_____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details:* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If "Yes," please provide details below* | ☒Y | ☐N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☐ *There is no existing coverage.*

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

### STATEMENT OF INTENT   *This section must be completed by the owner and all persons applying for life insurance with this application*

*It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.*

| 1. | Are you financing or refinancing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else? | ☐Y | ☒N |

ICC11-1015 (10-11)

**Life Insurance Application Part I** *(Page 3 of 8)*

## LIFE INSURANCE INFORMATION

| Product Name | Amount of Insurance | Initial Premium | Planned Premium |
|---|---|---|---|
| *ILUL* FGLife Elite | $ 8 million | $ 415,280 | $415,280 |

**UNIVERSAL LIFE:** Death Benefit Option:
☒ Option A-Level   ☐ Option B-Increasing

☒ Nontobacco
☐ Tobacco

For Fixed Indexed Products Only: Initial Allocation Percentage *(if not completed, 100% will be allocated to the 100% Par Index Interest Option)*

140% Par Index Interest Option _____%   Fixed Interest Option _____%   Monthly Point to Point _____% *(FGLife Choice & Elite only)*

100% Par Index Interest Option _____%   100% Par Index Interest Option with higher guarantee _____% *(FGLife Choice only)*

Gold Option _____% *(Synergy Global Advantage Gold only)*   Dow Jones Options _____% *(Synergy Global Advantage Gold only)*

Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.)
☒ Annual   ☐ Semi-Annual   ☐ Quarterly   ☐ Monthly Bank Draft   ☐ Bi-Weekly Bank Draft
☐ Payroll Deduction   ☐ Other _____

Payment in Exchange for Conditional Receipt
$

**No Longer Offered**

*No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.*

## ADDITIONAL BENEFITS

Subject to availability. Certain restrictions may apply.

| PRIMARY INSURED | | OTHER INSURED |
|---|---|---|
| ☐ Accelerated Benefit Rider: Critical Illness | | |
| ☐ Accelerated Benefit Rider: Terminal Illness | | |
| ☐ Accidental Death Benefit Rider | Amount: $_____ | |
| ☐ Ultimate Income Option Rider | Initial Lump Sum: $_____<br>Monthly Income of: $_____ for _____ years.<br>Final Lump Sum: $_____ | *Illustration Required.* |
| ☐ Other Insured Rider | Amount: $_____ | |
| ☐ Child Rider | Amount: $_____ | *Supplemental questionnaire required.* |
| ☐ (UL Only )Waiver of Monthly Deduction Rider | | |
| ☐ Other: _____ | | |

## PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States?<br>*If "No," please complete W8ben form and the Citizenship Questionnaire.* | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years ?. | | |
| | *If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire.* | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? *If "Yes," please provide details below.* | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? *If "Yes," please provide details below.* | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? *If "Yes," please provide details below.* | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

Rev. 12-2014

**Life Insurance Application Part I** (Page 4 of 8)

ICC11-1015 (10-11)

## PERSONAL HISTORY QUESTIONS *(Continued)*

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing, or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

### Life Insurance Application PART II

*Provide full name, address, and phone number of primary medical provider.*

❑ *Primary Insured does not have a primary medical provider.*

| Medical Provider Name | | Date Last Seen |
|---|---|---|

*Provide full name, address, and phone number of primary medical provider.*

❑ *Other Insured does not have a primary medical provider.*

| Medical Provider Name | | Date Last Seen |
|---|---|---|
| Medical Provider Address | City, State, Zip | Medical Provider Phone Number |
| Reason and Results of Last Visit | | |

ICC11-1015 (10-11)

**Life Insurance Application PART II** (Page 5 of 8)

## MEDICAL HISTORY QUESTIONS

| | Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)                                                                 Rev. 12-2014

**Life Insurance Application Part II** (Page 6 of 8)

ICC11-1015 (10-11)

## MEDICAL HISTORY QUESTIONS (Continued)

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |



### ADDITIONAL INFORMATION

*If additional space is needed for any "Yes," answers please use the space below.*

| Question | Detail | Primary Insured | Other Insured |
|---|---|---|---|
| | | | |

ICC11-1015 (10-11)

## Life Insurance Application Part III (Page 7 of 8)

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief: complete; true; and correctly recorded and are subject to the applicable **FRAUD WARNING** notice. **I (We) agree that:  a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company.  I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, no insurance will take effect unless and until both of the following conditions are satisfied during each proposed insured's lifetime and while each proposed insured's health is as stated in this application: (1) the life insurance contract is delivered to and accepted by the Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office.**  I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports.  I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee, medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance.  I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ☐

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members.  If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit.  Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider.  There is no premium charged for this rider.  I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization.  Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

**For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance.  I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for.  I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.**

**CERTIFICATION:**  I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose.  This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s); and any other information necessary to sufficiently verify identity(ies).  I (we) understand that failure to provide this information could result in the application being rejected.  Third party sources may be used to verify the information provided.

**FRAUD NOTICE:  Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.**

| Signed at (City and State)   Lakewood   N.J | Date   3-17-15 |
|---|---|
| Signature of Primary Insured Age 15 or More | |
| Signature(s) of Additional Insured(s) Age 15 or more | |
| Signature _____ (if Primary Insured is less than Age 18) | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)

Rev. 12-2014

ICC11-1015 (10-11)

**Life Insurance Application Part III (Page 8 of 8)**

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

**To the best of my knowledge, this application    ☐ does replace   ☑ does not replace   existing life insurance, mortgage life insurance, or annuities.**

If so, will this replacement be considered a 1035 exchange?    ☐ Yes   ☑ No

I certify that the indexed disclosure material has been presented to the Applicant.  A copy was provided to the Applicant.  I have not made statements which differ in any significant manner from this material.  I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer | Print Agent/Producer Name  Leon Lowenthal | Date  3-17-16 |
|---|---|---|
| Agent /Producer FGLIC Number  000316509 | Agent/Producer Phone Number  845 263-6158 | Agent/Producer Fax Number  (845) 262-1303 |
| Agent Email Address  Leon@psullc.com | | |

## Taxpayer Identification Certification

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. The Internal Revenue Service does not require consent to any provision of this document other than the certifications required to avoid backup withholding. Additionally IRS penalties may be imposed by the Internal Revenue Service for failure to furnish the information.

If you have been notified that backup withholding applies review the defined instructions in item 3 of the Certification on Form W-9 once you receive a copy of the instructions. If you would like a copy of the Form W-9 Instructions please contact the Service Center.

3 - 17 - 16

Insured's Signature          Date

Other Insured's Signature (if applicable )          Date

3 - 17 - 16

Date

ADMIN 5622 (07-2011)

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

**EXHIBIT M**

# Individual Life Insurance Application

ICC11-1015 (10-11)

**Fidelity & Guaranty Life Insurance Company** Home Office: Des Moines, IA
**Administrative Office: P.O. Box 81497; Lincoln, NE 68501-81497**

## PART I (Page 1 of 8)

*For anyone proposed to be insured: if you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.*

### PRIMARY INSURED

| Name (First, M.I., Last) | | | | | | | |
|---|---|---|---|---|---|---|---|

| Home Address | | City | State | Zip |
|---|---|---|---|---|

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|

| Type of Identification: | ID Number |
|---|---|

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☑ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

### OTHER INSURED

| Name (First, M.I., Last) | | Relationship to Primary Insured |
|---|---|---|

| Home Address | | City | State | Zip |
|---|---|---|---|---|

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |
|---|---|---|---|---|---|---|

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|

| Type of Identification: | ID Number |
|---|---|

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☐ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

### OWNER(S)     *UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED*

*IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.*
*A secondary addressee may be named to receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | | Relationship to Primary Insured |
|---|---|---|
| The C R 2016 Family Trust | | |

| Home Address | | City | State | Zip |
|---|---|---|---|---|

| Social Security or Tax I.D. No. | Date of Birth |
|---|---|

| Driver's License Number and Issue State | Other Identification Number *(if Driver's License not used):* | State/Province and Country of Issue: |
|---|---|---|

| Type of Identification: | ID Number |
|---|---|

| Currently Employed? | Employer | Occupation and Duties | No. of Years With Current Employer |
|---|---|---|---|
| ☐ Yes ☐ No | | | |

| Earned Annual Income | Email Address |
|---|---|

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |
|---|---|---|---|

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)

Rev. 12-2014

**EXHIBIT M**

## SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|
| Home Address | City | State | Zip |

## BENEFICIARY DESIGNATION – Primary Insured

*For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information*

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The c█████ P█████ 2016 Family Trust) Trust | | 100 |
| | | |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |
| | | |

## BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

## EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity? Amount being replaced $_____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details:* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If "Yes," please provide details below* | ☐Y | ☒N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☐ **There is no existing coverage.**

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

**STATEMENT OF INTENT**      *This section must be completed by the owner and all persons applying for life insurance with this application*

*It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.*

| 1. | Are you financing or refinancing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else? | ☐Y | ☒N |

## LIFE INSURANCE INFORMATION

| Product Name | Amount of Insurance | Initial Premium | Planned Premium |
|---|---|---|---|
| FG Life Elite | $ 5,000,000.00 | $ 269,050 | $ 269,050 |

**UNIVERSAL LIFE:** Death Benefit Option:   □ Life Insurance Qualification Test   ☒ Guideline Premium   □ Cash Value Accumulation

☒ Option A-Level   □ Option B-Increasing   *If not indicated, Guideline Premium Test will be used.*

☒ Nontobacco

□ Tobacco

For Fixed Indexed Products Only: Initial Allocation Percentage *(if not completed, 100% will be allocated to the 100% Par Index Interest Option)*

140% Par Index Interest Option _____%   Fixed Interest Option _____%   Monthly Point to Point _____% *(FGLife Choice & Elite only)*

100% Par Index Interest Option _____%   100% Par Index Interest Option with higher guarantee _____% *(FGLife Choice only)*

Gold Option _____% *(Synergy Global Advantage Gold only)*   Dow Jones Options _____% *(Synergy Global Advantage Gold only)*

| Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.) | Payment in Exchange for Conditional Receipt |
|---|---|
| ☒ Annual   □ Semi-Annual   □ Quarterly   □ Monthly Bank Draft   □ Bi-Weekly Bank Draft | $ |
| □ Payroll Deduction   □ Other _____ | |

## No Longer Offered

*No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.*

## ADDITIONAL BENEFITS

*Subject to availability. Certain restrictions may apply.*

| PRIMARY INSURED | | OTHER INSURED |
|---|---|---|
| □Accelerated Benefit Rider: Critical Illness | | |
| □Accelerated Benefit Rider: Terminal Illness | | |
| □ Accidental Death Benefit Rider | Amount: $_____ | |
| □ Ultimate Income Option Rider | Initial Lump Sum: $ _____<br>Monthly Income of: $ _____ for _____ years.<br>Final Lump Sum: $ _____ | *Illustration Required.* |
| □ Other Insured Rider | Amount: $_____ | |
| □ Child Rider | Amount: $_____ | *Supplemental questionnaire required.* |
| □ (UL Only )Waiver of Monthly Deduction Rider | | |
| □ Other: _____ | | |

## PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States? *If "No," please complete W8ben form and the Citizenship Questionnaire.* | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years ?: | | |
| | *If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire.* | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? *If "Yes," please provide details below.* | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? *If "Yes," please provide details below.* | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? *If "Yes," please provide details below.* | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

**Life Insurance Application Part I** (Page 4 of 8)

| | PERSONAL HISTORY QUESTIONS *(Continued)* | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing, or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

## Life Insurance Application PART II

*Provide full name, address, and phone number of primary medical provider.*

❏ *Primary Insured does not have a primary medical provider.*

Medical Provider Name | Date Last Seen

*Provide full name, address, and phone number of primary medical provider.*

❏                                    ovider.

Medical Provider Name | Date Last Seen

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

## MEDICAL HISTORY QUESTIONS

| Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | Primary Insured | Other Insured |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

## MEDICAL HISTORY QUESTIONS *(Continued)*

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |

## ADDITIONAL INFORMATION

*If additional space is needed for any "Yes," answers please use the space below.*

| Question | Detail | Primary Insured | Other Insured |
|---|---|---|---|
| | | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

Rev. 12-2014

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief: complete; true; and correctly recorded and are subject to the applicable **FRAUD WARNING** notice. I **(We) agree that: a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company. I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, no insurance will take effect unless and until both of the following conditions are satisfied during each proposed insured's lifetime and while each proposed insured's health is as stated in this application: (1) the life insurance contract is delivered to and accepted by the Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office.** I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports. I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee, medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance. I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ☐

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members. If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit. Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider. There is no premium charged for this rider. I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization. Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

**For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance. I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for. I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.**

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose. This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s); and any other information necessary to sufficiently verify identity(ies). I (We) understand that failure to provide this information could result in the application being rejected. Third party sources may be used to verify the information provided.

**FRAUD NOTICE: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.**

| Signed at (City and State)     Fort Lee, NJ | Date   7/18/2016 |
|---|---|
| Signature of Prop~~~ | |
| Signature(s) of Additional Insured(s) Age 15 or More | |
| Signature of Owner (if not th~~~     if Primary Insured is less than Age 18) | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

**To the best of my knowledge, this application**      ☐ does replace   ☒ does not replace      **existing life insurance, mortgage life insurance, or annuities.**

If so, will this replacement be considered a 1035 exchange?   ☐ Yes   ☐ No

I certify that the indexed disclosure material has been presented to the Applicant.  A copy was provided to the Applicant.  I have not made statements which differ in any significant manner from this material.  I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer *(signature)* | Print Agent/Producer Name Leon Lowenthal | Date 7/18/2016 |
|---|---|---|
| Agent /Producer FGLIC Number 000316509 | Agent/Producer Phone Number 845-263-6158 | Agent/Producer Fax Number |
| Agent Email Address leon @ pswllc.com | | |

# Taxpayer Identification Certification

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. The Internal Revenue Service does not require consent to any provision of this document other than the certifications required to avoid backup withholding. Additionally IRS penalties may be imposed by the Internal Revenue Service for failure to furnish the information.

If you have been notified that backup withholding applies review the defined instructions in item 3 of the Certification on Form W-9 once you receive a copy of the instructions. If you would like a copy of the Form W-9 Instructions please contact the Service Center.

_____     7/18/2016
Insured's Signature                                            Date


_____     _____
Other Insured's Signature (if applicable )            Date


_____     7/18/2016
Owner's Signature  (if not the same as the insured)   Date


ADMIN 5622 (07-2011)

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

**EXHIBIT N**

# FACSIMILE TRANSMISSION

**To:** +18888584795

**From:** Atlantic                Insurance

Atlantic Insurance Brokerage

1265 Cottage Drive

Harrisburg

PA                17112

**Phone:**

**Fax Phone:** +18888584795

**Phone:**        13176646261

**Fax Phone:** (888) 228-7570

**Note:**

▆▆▆▆▆ ▆▆▆▆▆▆ /New application

**Date:**        09/23/2016

**Pages:**        56

**EXHIBIT N**

# Individual Life Insurance Application

ICC11-1015 (10-11)

**Fidelity & Guaranty Life Insurance Company** Home Office: Des Moines, IA
**Administrative Office: P.O. Box 81497; Lincoln, NE 68501-81497**

## PART I (Page 1 of 8)

For anyone proposed to be insured: if you have any questions or concerns about any of the contents of this form or the insurance coverage, or wish to discuss the insurance coverage, contact our home office at 800 445-6758.

## PRIMARY INSURED

| Name (First, M.I., Last) | | | | | | | |
|---|---|---|---|---|---|---|---|
| A ███ B ███ | | | | | | | |

| Home Address | | | City ███ | State ███ | Zip ███ |

| Social Security No. ███ | Sex M | Marital Status Married | Date of Birth ███ | Place of Birth ███ | Height (ft, in.) ███ | Weight (lbs.) ███ |

| Driver's License Number and Issue State ███ | Other Identification Number (If Driver's License not used): | State/Province and Country of Issue: |

| Type of Identification: | ID Number |

| Currently Employed? Yes No | Employer | Occupation and Duties ███ | No. of Years With Current Employer |

| Earned Annual Income | Email Address |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number ███ | Best Time To Call |

## OTHER INSURED

| Name (First, M.I., Last) | | Relationship to Primary Insured |

| Home Address | | City | State | Zip |

| Social Security No. | Sex | Marital Status | Date of Birth | Place of Birth | Height (ft., in.) | Weight (lbs.) |

| Driver's License Number and Issue State | Other Identification Number (If Driver's License not used): | State/Province and Country of Issue: |

| Type of Identification | ID Number |

| Currently Employed? ☐ Yes ☐ No | Employer | Occupation and Duties | No. of Years With Current Employer |

| Earned Annual Income | Email Address |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |

## OWNER(S)     UNLESS OTHERWISE INSTRUCTED, THE OWNER WILL BE THE PRIMARY INSURED

**IF THIS APPLICATION IS FOR CORPORATE OWNED LIFE INSURANCE, THE EMPLOYEE HAS NO OWNERSHIP RIGHTS.**
**A secondary addressee may be named to receive notice of possible lapse in coverage.**

| Name (First, M.I., Last) A ███ B ███ 2016 Trust | Relationship to Primary Insured Trust |

| Home Address ███ | City ███ | State ███ | Zip ███ |

| Social Security or Tax I.D. No. ███ | Date of Birth ███ |

| Driver's License Number and Issue State | Other Identification Number (If Driver's License not used): | State/Province and Country of Issue: |

| Type of Identification: | ID Number |

| Currently Employed? ☐ Yes ☐ No | Employer | Occupation and Duties | No. of Years With Current Employer |

| Earned Annual Income | Email Address |

| Daytime Phone Number | Evening Phone Number | Cell Phone Number | Best Time To Call |

ICC11-1015 (10-11)

## Life Insurance Application Part I (Page 2 of 8)

### SECONDARY ADDRESSEE

*To receive notice of possible lapse in coverage.*

| Name (First, M.I., Last) | | Relationship to Primary Insured and/or Owner | | |
|---|---|---|---|---|
| Home Address | | City | State | Zip |

### BENEFICIARY DESIGNATION – Primary Insured

*For each beneficiary, list full name, address, relationship to primary insured and % share. If this application is for corporate owned life insurance, fill in the employer's information*

**Primary Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| The A████ & ████ 2016 Trust | Trust | 100% |

**Contingent Beneficiary(ies)**

| Full Name | Relationship to Primary Insured | % |
|---|---|---|
| | | |

### BENEFICIARY DESIGNATION – Other Insured

*Unless otherwise instructed, the beneficiary for other persons proposed to be insured will be the Owner.*

### EXISTING INSURANCE

| | | Primary Insured | | Other Insured | |
|---|---|---|---|---|---|
| 1. | Will this life insurance, if issued, replace or change any existing life insurance, mortgage life insurance, or annuity?  Amount being replaced $ _____ | ☐Y | ☒N | ☐Y | ☐N |
| 2. | Has any person proposed to be insured had any insurance application declined, postponed, rescinded or been offered rated or modified life insurance, or refused for renewal or reinstatement? *If "Yes," please provide details:* | ☐Y | ☒N | ☐Y | ☐N |
| 3. | Does the proposed owner or any person proposed to be insured have any life insurance or annuity in force or pending, including mortgage life insurance, life insurance sold or assigned to a life settlement, viatical or secondary market provider? *If "Yes," please provide details below* | ☐Y | ☒N | ☐Y | ☐N |

*List existing personal and business life insurance or annuity coverage.*

☒ There is no existing coverage.

| Insurance Company | Type of Policy | Policy/Certificate Number | Life Insurance or Annuity | Accidental Death Benefit Amount | Year Issued | Replacing | 1035 |
|---|---|---|---|---|---|---|---|
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

### STATEMENT OF INTENT     *This section must be completed by the owner and all persons applying for life insurance with this application*

It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits.

| 1. | Are you financing or refinancing a mortgage and/or home equity loan or contemplating the use of any kind of mortgage financing strategy in connection with the purchase of or the payment of premiums on the life insurance policy? (If "Yes," please complete the Premium Financing questionnaire.) | ☐Y | ☒N |
|---|---|---|---|
| 2. | Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else? | ☐Y | ☒N |

## Life Insurance Application Part I (Page 3 of 8)

ICC11-1015 (10-11)

### LIFE INSURANCE INFORMATION

| Product Name | Amount of Insurance | Initial Premium | Planned Premium |
|---|---|---|---|
| FG Life Elite | $ 4,550,000 | $ 384,566 | $ 384,566 |

**UNIVERSAL LIFE:** Death Benefit Option:
☒ Option A-Level    ☐ Option B-Increasing

☒ Nontobacco
☐ Tobacco

For Fixed Indexed Products Only. Initial Allocation Percentage (if not completed, 100% will be allocated to the 100% Par Index Interest Option)

140% Par Index Interest Option _____%    Fixed Interest Option _____%    Monthly Point to Point _____% (FGLife Choice & Elite only)

100% Par Index Interest Option _____%    100% Par Index Interest Option with higher guarantee _____% (FGLife Choice only)

Gold Option _____% (Synergy Global Advantage Gold only)    Dow Jones Options _____% (Synergy Global Advantage Gold only)

Payment Mode: (For bank draft, complete Bank Draft Plan Authorization, and initial payment required.)
☒ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly Bank Draft  ☐ Bi-Weekly Bank Draft
☐ Payroll Deduction  ☐ Other _____

Payment in Exchange for Conditional Receipt
$

**No Longer Offered**

*No coverage will be effective except in accordance with the terms of the conditional receipt and unless the full initial modal premium payment is submitted with the application.*

### ADDITIONAL BENEFITS

*Subject to availability. Certain restrictions may apply.*

| PRIMARY INSURED | OTHER INSURED |
|---|---|

☐ Accelerated Benefit Rider: Critical Illness

☐ Accelerated Benefit Rider: Terminal Illness

☐ Accidental Death Benefit Rider    Amount: $_____

☐ Ultimate Income Option Rider    Initial Lump Sum: $_____    *Illustration Required.*
Monthly Income of: $_____ for _____ years.
Final Lump Sum: $_____

☐ Other Insured Rider    Amount: $_____

☐ Child Rider    Amount: $_____    *Supplemental questionnaire required.*

☐ (UL Only) Waiver of Monthly Deduction Rider

☐ Other: _____

### PERSONAL HISTORY QUESTIONS

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | Is any person proposed to be insured a citizen or permanent resident of the United States? *If "No," please complete W8ben form and the Citizenship Questionnaire.* | | |
| 2. | Has any person proposed to be insured traveled or resided outside the United States or Canada within the past 2 years or plan to travel outside the United States or Canada in the next two years?: | | |
| | *If you answered "Yes," to question 2, please complete the Residence and Travel Questionnaire.* | | |
| 3. | Has anyone proposed to be insured ever been convicted of, pending trial or currently on probation or parole on any felony and/or misdemeanor crime offense? *If "Yes," please provide details below.* | | |
| 4. | Has anyone proposed to be insured ever sought or received treatment, advice, counseling for the use of or is currently using any narcotic, barbiturate, stimulant, amphetamine, hallucinogenic, street, alcohol, or prescription drug? *If "Yes," please provide details below.* | | |
| 5. | In the past 5 years has anyone proposed to be insured been convicted of driving under the influence of alcohol or drugs, reckless driving, a motor vehicle moving violation, or any other type of DWI/DUI, or had a driver's license suspended or revoked? *If "Yes," please provide details below.* | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

Life Insurance Application Part I (Page 4 of 8)

ICC11-1015 (10-11)

## PERSONAL HISTORY QUESTIONS (Continued)

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 6. | Within the past 7 years has anyone proposed to be insured filed for bankruptcy? *If "Yes," please provide details below.* | | |
| 7. | In the past 5 years has anyone proposed to be insured participated in ballooning, bungee jumping, cliff diving, hang gliding, motorized racing, boat racing, parachuting, mountain or rock climbing, skin or scuba diving, rodeo, snowmobiling, competitive skiing; or does anyone proposed to be insured plan to participate in any of these activities or avocations? *If "Yes," please complete the appropriate questionnaire.* | | |
| 8. | In the past 5 years has anyone proposed to be insured flown as a pilot, student pilot, or crew member of an aircraft or plan to? *If "Yes," please complete the Aviation Questionnaire.* | | |

## Life Insurance Application PART II

### Provide full name, address, and phone number of primary medical provider.

❑ Primary insured does not have a primary medical provider.

| Medical Provider Name | Date Last Seen |
|---|---|
| | |

### Provide full name, address, and phone number of primary medical provider.

❑ Other insured does not have a primary medical provider.

| Medical Provider Name | | Date Last Seen |
|---|---|---|
| Medical Provider Address | City, State, Zip | Medical Provider Phone Number |
| Reason and Results of Last Visit | | |

Life Insurance Application PART II (Page 5 of 8)

ICC11-1015 (10-11)

## MEDICAL HISTORY QUESTIONS

| | Please complete part II of the Life Insurance Application unless to be completed by Paramedical Examiner. | Primary Insured | Other Insured |
|---|---|---|---|
| 1. | | | |
| 2. | | | N |
| 3. | | | N |



Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)

Rev. 12-2014

**Life Insurance Application Part II** (Page 6 of 8)                                            ICC11-1015 (10-11)

## MEDICAL HISTORY QUESTIONS *(Continued)*

| | | Primary Insured | Other Insured |
|---|---|---|---|
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |

## ADDITIONAL INFORMATION
*If additional space is needed for any "Yes," answers please use the space below.*

| Question | Detail | Primary Insured | Other Insured |
|---|---|---|---|
| | | | |

Fidelity & Guaranty Life Insurance Company • Des Moines, IA

ICC11-1015 (10-11)                                                                     Rev. 12-2014

ICC11-1015 (10-11)

## Life Insurance Application Part III (Page 7 of 8)

## AUTHORIZATION

I (We) have read the questions and answers on this application. I (We) certify that the statements made in this application are, to the best of my (our) knowledge and belief, complete, true, and correctly recorded and are subject to the applicable **FRAUD WARNING** notice. **I (We) agree that: a copy of this application will form a part of any life insurance contract issued; and that no agent can pass on insurability or modify any life insurance contract issued by the Company.** I (We) also agree that, except as provided in this application's Conditional Receipt, if issued, **no insurance will take effect unless and until both of the following conditions are satisfied during each proposed insured's lifetime and while each proposed insured's health is as stated in this application:** (1) the life insurance contract is delivered to and accepted by the **Owner; and (2) the full initial premium for the mode of payment chosen is paid at our Home Office.** I (We) acknowledge that I (we) have received, read and understand the notices required by the MIB, and the Federal Fair Credit Reporting Act regarding investigative consumer reports. I (We) understand that if requested, I (we) may inspect or obtain a copy of this report.

In order to evaluate my application for life insurance, I (We) authorize any licensed physician, medical practioner, hospital, clinic, the Veterans Administration, laboratory or other medical or medically related facility, the MIB, Inc., insurance companies, a consumer reporting agency, prescription records, Pharmacy Benefit Manager, and my employer to give to Fidelity & Guaranty Life Insurance Company, its reinsurers, or other designee medical and other information which may be pertinent to the evaluation regarding me or any member of my family who is applying for life insurance.

I (We) understand such information may concern my (our): physical history, condition and treatment, including drug or alcohol abuse or mental health information protected by Federal law; general character, habits, reputation, mode of living; financial status, income; occupation; avocations, sports, hobbies and aviation activities.

I (We) also authorize Fidelity & Guaranty Life Insurance Company to obtain an investigative consumer report on me and/or any member of my family who is also applying for life insurance. I (We) understand that I am (we are) entitled to be interviewed by any consumer reporting agency which may be requested to prepare such a report as long as I (we) can reasonably be contacted during normal business hours.
Check here if interview is requested: ☐

I (We) understand that Fidelity & Guaranty Life Insurance Company or our reinsurer(s) may make a brief report thereon to MIB, a not-for-profit membership organization of life insurance companies which operates an information exchange on behalf of its members. If you apply to another MIB Member company for life or health insurance coverage, or a claim for benefits is submitted to such a company, the MIB, upon request, will supply such company with the information in its file.

I (We) understand that if my coverage includes an Accelerated Benefit Rider and I am later diagnosed with a terminal illness, or specified medical condition as defined in the rider, I may receive up to 100% of the life insurance death benefit. Since I would receive my benefits early, the amount payable at my death will be adjusted as defined in the rider. There is no premium charged for this rider. I (We) understand that receipt of benefits may be taxable, and that Fidelity & Guaranty Life Insurance Company recommends consultation with a tax advisor prior to exercising this benefit.

I (We) authorize Fidelity & Guaranty Life Insurance Company and/or its reinsurer(s); or other designee to release information in my (our) file to other insurance companies to which I (we) may apply for life or health insurance coverage or to which a claim may be submitted.

This Authorization will be valid from the date signed for a period of 24 months unless revoked in writing by me (us) and delivered to Fidelity & Guaranty Life Insurance Company. A photographic copy of this Authorization will be as valid as the original; I (we), or any of my (our) representatives are entitled to receive a copy of this Authorization. Failure to sign or revocation of this authorization may impair the ability of a regulated insurance agency to evaluate claims or process applications and may be a basis for denying an application or claim for benefits.

I (We) understand that the information obtained by use of this Authorization will be used to determine eligibility for insurance and/or benefits.

**For any fixed indexed life insurance issued, I (We) understand that I am (we are) purchasing fixed indexed life insurance. I (We) have received a copy of the indexed disclosure material for the fixed indexed life insurance applied for. I (We) understand that while the values of this life insurance may be affected by an external index, the life insurance does not directly participate in any stock, bond, or equity investments and that any values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties.**

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. I (We) understand that federal law requires all financial institutions to obtain identity information in order to verify my (our) identity(ies) and I (we) authorize its use for this purpose. This information includes, but is not limited to, the name(s), residential address(es), date(s) of birth, Social Security or taxpayer identification number(s); and any other information necessary to sufficiently verify identity(ies). I (we) understand that failure to provide this information could result in the application being rejected. Third party sources may be used to verify the information provided.

**FRAUD NOTICE:** Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties.

| Signed at (City and State) | Teaneck, NJ | Date | 08/23/2016 |
|---|---|---|---|

Signature of ████ Insured Age 15 or More

Signature(█████████████████████ /trustee

Signature ██████████ (██████ of Primary Insured or if Primary Insured is less than Age 18)

**Life Insurance Application Part III** (Page 8 of 8)

ICC11-1015 (10-11)

## AGENT CERTIFICATION

1) I have asked the questions contained in this application of the proposed Insured(s) and Owner and duly recorded the answers; 2) to the best of my knowledge there is nothing affecting the insurability of any persons proposed for insurance as stated in this application; 3) if the initial premium was paid with the application, I have remitted it to Fidelity & Guaranty Life Insurance Company and delivered a Conditional Receipt to the Owner; 4) if Disclosure Statements are required, I have given them to the applicant; 5) I have witnessed the signatures on this application; 6) I have verified the identity of the Primary Insured, Other Insured, and Owner, if other than the Primary Insured, through examination of a state or federal government photo identification card provided by the Primary Insured, Other Insured and/or Owner, such as a driver's license or passport.

**To the best of my knowledge, this application**  ❑ does replace  ❑ does not replace  **existing life insurance, mortgage life insurance, or annuities.**

If so, will this replacement be considered a 1035 exchange?  ❑ Yes   ❑ No

I certify that the indexed disclosure material has been presented to the Applicant. A copy was provided to the Applicant. I have not made statements which differ in any significant manner from this material. I have not made any promises or guarantees about the future value of any non-guaranteed elements.

| Signature of Agent/Producer | Print Agent/Producer Name | Date |
|---|---|---|
| | Leon Lowenthal | 8/23/2016 |
| Agent /Producer FGLIC Number | Agent/Producer Phone Number | Agent/Producer Fax Number |
| 000316509 | 845-263-6158 | |
| Agent Email Address | | |
| leon @pswllc.com | | |

## Taxpayer Identification Certification

**CERTIFICATION:** I (We) certify, under penalties of perjury, that I am (we are) the person(s) identified in this application, I am a (we are) U.S. Citizen(s) or resident(s) of the U.S. (includes U.S. resident aliens) and that the taxpayer identification number(s) is (are) correct. The internal Revenue Service does not require consent to any provision of this document other than the certifications required to avoid backup withholding. Additionally IRS penalties may be imposed by the Internal Revenue Service for failure to furnish the information.

If you have been notified that backup withholding applies review the defined instructions in item 3 of the Certification on Form W-9 once you receive a copy of the instructions. If you would like a copy of the Form W-9 Instructions please contact the Service Center.

_____          8/23/2016
Insured's Signature                       Date


_____          _____
Other Insured's Signature (if applicable)   Date

_____          8/23/2016
Owner's Signature  (if not the same as the insured)    Date

ADMIN 5622 (07-2011)

Fidelity & Guaranty Life Insurance Company • Des Moines, IA